# EXHIBIT B

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNI-TOP ASIA INVESTMENT LIMITED,<br>OMC Chambers, RoadTown,<br>Tortola, British Virgin Islands<br><br>      Petitioner,<br><br>      v.<br><br>SINOPEC INTERNATIONAL PETROLEUM<br>EXPLORATION AND PRODUCTION CORPORATION<br>1st Floor, No. 6 Huixin East Street, Chaoyang District<br>Beijing, People's Republic of China<br><br>      Respondent. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br><br>No. _____ |

I, (Ms. Yuan XING), hereby affirm as follows:

1. I am an attorney at Bejing Huanzhong & Partners (北京市环中律师事务所), counsel to petitioner UNI-TOP Asia Investment Limited ("UNI-TOP") in the China International Economic and Trade Arbitration Commission ("CIETAC") arbitration between UNI-TOP and respondent Sinopec International Petroleum Exploration and Production Corporation ("SIPC").

2. Attached hereto as Exhibit A is a true and correct copy of an arbitration award issued by a CIETAC arbitration panel on June 30, 2017.

3. Attached hereto as Exhibit B is a true and correct copy of the Agency Agreement signed

Place: _Beijing, China_

Date: _2020. 6. 28_

_Signature_

[*Page 1 of Chinese Original*]

BETWEEN

SINOPEC INTERNATIONAL PETROLEUM EXPLORATION AND
PRODUCTION CORPORATION

AND

UNI-TOP ASIA INVESTMENT LIMITED

**AGENCY AGREEMENT**

*[Page 2 of Chinese Original]*

This Agency Agreement ("Agreement") is executed by the following parties and comes into force on March 4, 2005:

Sinopec International Petroleum Exploration and Production Corporation ("Company"), established and existing under the law of the People's Republic of China, with its registered address at No. 263, North Fourth Ring Road Central, Haidian District, Beijing, China.

and

UNI-TOP Asia Investment Limited ("Agent"), established and existing under the law of Hong Kong, with its registered address at Room 15, 28/F China Merchants Tower, Shun Tak Centre, 200 Connaught Road Central, Sheung Wan, Hongkong.

Whereas the Agent, based upon its understanding of PetroKazakhstan, states that it, as the agent of the Company, will assist the Company in acquiring PetroKazakhstan or acquiring the relevant shares transferred by PetroKazakhstan, with reasonable efforts and in good commercial spirit.

Therefore, the Agreement demonstrates that, on basis of the mutual commitments and agreements, the terms set forth herein, good and valuable opinions, and the mutual willingness of both parties hereto to accept and fulfill these commitments and agreements, the parties agree as follows:

### Article 1 Interpretation

1.1 <u>Definition</u>

Wherever used in the Agreement, the following words and terms shall have the meanings specified below, except to the extent that they are inconsistent with the purpose of the Agreement or the context:

"**Affiliated Companies**," refer to those subsidiary companies or entities, associated companies or entities, and affiliated companies or entities which directly or indirectly form part of the Agent and/or in which the Agent owns direct or indirect interest, including but not limited to shares of these entities.

*[Page 3 of Chinese Original]*

"**Agent**," refers to UNI-TOP ASIA INVESTMENT LIMITED and its Affiliated Companies.

"**Agreement**", this Agreement, its attachments, and its amendments made from time to time constitute the entire agreement between both contracting parties and supersede all prior agreements, memoranda of understanding, negotiations, and written discussions. No terms, statements, assurances, undertakings, promises or consents, whether direct or indirect, have been made by the Company to the Agent unless otherwise provided in this Agreement.

1.2 Supplements to, amendments of, corrections of, abandonment of, and any other changes to the Agreement shall only be made by both contracting parties in written form.

### Article 2 Purpose and Term of the Agreement

2.1 Purpose of the Agreement

The Company, pursuant to the Agreement, exclusively entrusts the Agent, and the Agent agrees to act as the exclusive agent of the Company to assist the Company in acquiring the shares of PetroKazakhstan directly or indirectly through the Company's affiliated companies according to relevant laws or regulations, and obtaining relevant government approvals (hereinafter referred to as "**Completion of the Transfer**").

2.2 Term of the Agreement

The Agreement shall remain in force for two years from the date it comes into force, or until the Company abandons its intention to complete the transfer, whichever comes first.

### Article 3 Obligations of the Agent

3.1 The Agent agrees that it shall at all times during the term of this Agreement and any possible extension thereof reasonably perform its obligations under the Agreement, and shall keep using efforts and devote sufficient time and attention to contact the management of PetroKazakhstan, to assist Company in acquiring the project.

3.2 Pursuant to the Agreement, the Agent shall assist the Company with the analysis,

3

*[Page 4 of Chinese Original]*

organization, negotiation, and impact of the project.

The Agent shall assist the Company in obtaining information including all information of PetroKazakhstan, prepare any possible detailed evaluation required by the Company, and develop relationships with relevant governments, agencies affiliated to governments, or authorities.

3.3  The Agent agrees:

- to advise the Company on negotiation strategies, in order to complete the equity transaction;
- to assist the Company in negotiating with governments and enterprises managed by governments to complete the transaction, and in negotiating with governmental authorities, enforcement supervision agencies, or regulatory agencies;
- to assist the Company in obtaining any and all documents of concessions, approvals, and all types of documents;
- to use all reasonable means in negotiation to assist the Company in ascertaining a reasonable acquisition price in order to promote the best interests of the Company;
- to provide financial, legal, and technical consulting advice for the Company to complete the acquisition;
- to respond swiftly to all questions raised by the Company;
- to maintain sufficient staff as far as possible in order to fulfill the obligations under the Agreement; and
- to carry out other matters relevant to the agency.

3.4  The Agent cannot represent the Company or accept any responsibility on behalf of the Company.

**Article 4 Obligations of the Company**

4.1  The Company shall conduct economical evaluation under the Agent's assistance and on the basis of relevant information provided by the Agent, and ascertain a reasonable target price for completion of the acquisition.

4.2  Operational Assistance

- The Company shall guarantee to provide the Agent with reasonable relevant assistance and advice;

- The Company shall not retain any other consultant.

4

*[Page 5 of Chinese Original]*

4.3 Payment of Commissions

The Company shall pay commissions to the Agent in accordance with Article 5 of the Agreement.

**Article 5 Commissions, Upfront Fees, and Reports**

5.1 Commissions

Both parties agree that, upon completion of the transaction within the target price range ascertained by the Company, the Company shall pay commission to the Agent in accordance with the following term:

5.1.1 The commission shall be 1% of the part of the completed transaction price $\leq$ USD 1 billion;

0.5% of the part of the complete transaction price between US$ 1 billion $-\leq$ US$ 2 billion;

0.3% of the part of the completed transaction price $\geq$ US$ 2 billion.

5.1.2 If the completed transaction price is below the Company's target price, the Company shall additionally pay the Agent a bonus, equivalent to 2% of the difference between the target price and the completed transaction price.

5.2 Upfront Fees

5.2.1 The Company agrees to pay the Agent an upfront fee of US$ 10,000 per month from the effective date of the Agreement for services provided by the Agent.

5.2.2 The payment stipulated in this Article shall cease when the Company notifies the Agent in writing of its intention to give up the transaction of the project.

5.2.3 Given fact that the Agent has already provided agency services to the Company before the Agreement comes into force, the Company agrees to pay the Agent a total of US$ 20,000 as the upfront fee for January and February 2015.

The Agent shall submit invoices and supporting documents for the fee stipulated in this Article once a month.

The fee stipulated in this Article shall be set off against the commission in full upon completion of the transaction.

*[Page 6 of Chinese Original]*

5.3 <u>Taxes and Costs</u>

Unless previously approved and authorized in writing by the Company, the Agent shall be responsible for all applicable taxes and expenses incurred in connection with the performance of the Agreement.

All payments to the Agent shall be made in US$. If the calculation or the payment of expenditures is not in US$, these expenses shall be converted into US$ using the central exchange rate in the Financial Times on the day when the payment is made.

All payments to the Agent shall be made within 15 days upon the Company's receipt of invoices issued by the Agent.

The various expenses stipulated herein do not include insurance fees, sale or financing fees or commissions.

5.4 <u>Report and Financial Information</u>

Both contracting parties agree to provide each other with all necessary reports, schedules, and financial information according to Article 5.1 of the Agreement, in order to make correct and timely decisions.

**Article 6 Confidentiality**

6.1 <u>Confidential Information</u>

Both parties of the Agreement agree that, whether during or after the term of the Agreement, one party will from time to time receive or become aware of information with respect to the other party or its associated company, which includes but is not limited to any and all of their business, business plans, events, and important matters, as well as any and all of information which is related to both parties but belongs exclusively to the disclosing party or its associated companies ("Confidential Information"). Both parties shall keep secret Confidential Information provided by the other party unless the information is not under confidentiality protection or can be obtained publicly without the receiving party's fault.

6.2 In the circumstances where the party providing Confidential Information so requires in prior written form or the Agreement is

*[Page 7 of Chinese Original]*

terminated due to any reason, the receiving party shall immediately return all Confidential Information and its copies belonging to the disclosing party upon request, and shall not retain any copies of the Confidential Information in part or in whole by any way or in any form.

6.3 The terms and confidentiality obligations in this Article shall remain in effect for 5 years continuously, should the Agreement be changed, updated, terminated, or expire due to any reason.

### Article 7 Post-transaction Undertakings

7.1 The Agent promises that, after completion of the transaction, it shall no longer act as the agent for PetroKazakhstan in transporting crude oil produced by PetroKazakhstan to the Chinese market, and shall not charge any agency fees thereof.

7.2 Both parties agree that the Company shall, on terms agreed separately, entrust the Agent as the sales agent for the portion for the portion [*sic*] of crude oil produced by PetroKazakhstan which is to be sold outside China.

### Article 8 Termination

8.1 According to the following terms, a contracting party of the Agreement shall have the right to suspend [terminate *sic*] the Agreement by submitting to the other party a written suspension [termination *sic*] notice:

1. **No prior notice and no solution**. If the following events take place, a party may suspend [terminate *sic*] the Agreement without submitting a prior written notice and offering an opportunity of solution:

i)   A contracting party intentionally provides grossly mistaken reports to the other contracting party or any third party who has business relationship with them, or intentionally misreports, or materially misreports.

ii)   Either party of the Agreement fails to fulfill its obligations under the Agreement and abide by the procedures stipulated in the terms of the Agreement and other agreements of both parties, and these procedures are necessary for the completion of the equity transaction and related to the purpose of the Agreement.

iii)   Both parties voluntarily give up their business respectively, including actions or remissness showing self-determined intention;

7

*[Page 8 of Chinese Original]*

    intend or agree to terminate business; or show obvious disregard of business operations according to the terms and conditions of the Agreement.

    2.  **Prior notice and solution**. After 30 days of the submission of a written notice specifying any of the following non-performances from a party of the Agreement to the other contracting party, if the remedy for default fails to satisfy the aggrieved party within 30 days:

    i)  A party fails to pay fees or other remuneration upon request of the other party according to the stipulation of this Agreement, or

    ii)  A party fails to perform or abide by compulsory agreements or obligations stipulated in the Agreement, while the other party abides by or performs these agreements and obligations.

8.2 Other Exemptions

    Any act which suspends the contract in accordance with the terms of the Agreement shall not prejudice any other rights (including right of compensation). The aforesaid compensation does not exclude any compensation which can be claimed for by one party according to prescriptions of laws or equity laws in the case where the other party does not fulfill the obligations in the Agreement or disobeys regulations or the stipulations of the Agreement.

8.3 Matters Related to Suspension and Termination

    As to the suspension and termination of the Agreement, if there is no extension of the Agreement, each relevant party agrees on the following terms:

    1.  The Agent shall cease to hold itself out in public as the authorized agent of the Company, and shall avoid any other acts which may imply or indicate that there is a relationship between the Agent and the Company.

    2.  Either party shall return to the other party all Confidential Information provided during this cooperation period.

**Article 9 Relationship**

    The relationship of the parties under this Agreement shall be that of independent contracting parties. The parties of the Agreement shall not be understood as partnership, joint venture, commercial association, or other trust relationship. No

party shall have

*[Page 9 of Chinese Original]*

the right or power to impose any duty on or represent the other party. No party shall regard the other party as being responsible for existing liabilities on the aforesaid basis, unless it is stipulated in advance in writing.

### Article 10 General Provisions

10.1 Successor and Assignee

The Agreement shall bind the Company, the Agent, their respective successors, legal representatives, and assignees.

10.2 Force Majeure

If obligations cannot be fulfilled due to the following reasons, the Company or the Agent shall be exempted from liabilities: (A) the compliance with any laws, regulations, orders, ordinances, necessary conditions, or instructions from any international, federal, provincial, municipal government body or their agents; (B) natural disasters; (C) other party's act or negligence; (D) strike, embargo, or riot; (E) or similar situations. The situations above are deemed force majeure events. One party shall inform the other party in writing of the occurrence of a situation in which a force majeure event takes place. Any delay due to any situation above shall justify late performance or excuse the duty to perform (in part or in whole, subject to concrete situations). If force majeure continues for 6 months (Gregorian calendar) or longer, the Agreement shall terminate automatically, unless both parties agrees otherwise in writing.

10.3 Dispute Resolution

10.3.1 Informal dispute resolution. If a dispute arises between the parties, within 30 days after one party submits the content of the dispute in writing to the other party, both parties shall make an effort to attempt to settle the dispute expeditiously and justly by mutual negotiation. If the dispute remains unresolved within 30 days, any party shall have the right to commence arbitration pursuant to Article 10.3.2.

10.3.2 Arbitration. Any disputes arising out of the agreement shall be submitted to arbitration in Beijing by three arbitrators of the CIETAC according to the relevant rules. The language of the arbitration shall be

*[Page 10 of Chinese Original]*

Chinese. This agreement shall be governed by PRC law. The result of the arbitration shall be the Final resolution of the dispute, and there shall be no litigation. The result of the arbitration shall be made in the form of an arbitral award, which shall be enforceable.

### 10.4 Invalidity

Should any term or part of the Agreement or any term or part arising from the Agreement be ruled to be invalid, then the rest terms or parts will not be invalid automatically without judgments, and will be executed within their own scope. If any applicable law, relevant regulation, or judgement rule requires prior attention or refuses to acknowledge the Agreement's validity of renewal, or raises other matters not mentioned above in the Agreement, or any relevant law, judgment rule, legal rule, standard, enforcement proceedings, or other provision requires a preferential application, then these legal rules or provisions shall apply with priority; as to this, the stipulations of the Agreement shall be invalid and be replaced by the relevant parts.

### 10.5 Miscellaneous

This Agreement is written in Chinese in four counterparts with the same legal force. Each party holds two counterparts.

Sinopec International Petroleum Exploration and Production Corporation

Signature:
Position: General Manager

UNI-TOP Asia Investment Limited

Signature:

Position: Chairman and General Manager

6 - 20016

# 中国石化集团国际石油勘探开发有限公司

# 与

# UNI-TOP ASIA INVESTMENT LIMITED

# 代理协议

1

本代理协议（"协议"）由下列双方于 2005 年 3 月 4 日签署并生效:

中国石化集团国际石油勘探开发有限公司：依据中国法律设立并存续，注册地址为：中国北京市海淀区北四环中路 263 号（以下简称公司）与

UNI-TOP ASIA INVESTMENT LIMITED：依据香港法律设立并存续，注册地址为：香港上環干诺道中 200 号信德中心招商局大厦 28 字楼 15 室（以下简称 "代理人"）

鉴于代理人，根据其对 PetroKhazakstan 公司的了解，声明其作为公司的代理人会通过合理努力并按照良好的商业精神，协助公司收购 PetroKhazakstan 公司或获得由 PetroKhazakstan 公司出让的相关股份（"转让"）。

因此，本协议表明，基于相互的承诺、约定、本协议规定的条件和良好的以及有价值的意见，且双方当事人愿意接受并实现这些承诺和约定，双方当事人达成如下协议：

第1条 解释

1.1 定义

无论在本协议的任何地方出现，下列词语和术语的意思都以下面对其的定义为准，除非其与本协议的主旨或上下文不一致。

"关联公司"，是指那些直接或间接地属于本协议代理人一部分的附属公司或实体、联营公司或实体以及关联公司或实体，并且/或者代理人在这些实体或公司中拥有直接或间接的利益，包括但不限于这些实体的股份。

2

"代理人" 是指 UNI-TOP ASIA INVESTMENT LIMITED 及其所有的关联公司。

"协议"－本协议、附件及不时制作的修订构成缔约双方之间完整的协议并且取代之前所有的协议、谅解备忘录、谈判以及书面讨论。除了本协议约定的以外，公司未对代理人作出任何直接或间接的条件、声明、保证、承诺、允诺或同意。

1.2 本协议的补充、修改、更正、放弃以及其他任何变动都只能由缔约双方以书面形式进行。

第 2 条 协议目的和期限

2.1 协议目的

公司根据本协议，独家委托代理人且代理人同意作为公司的排他的代理人，协助公司根据相关法律或规定直接或通过公司的关联公司间接获得 PetroKhazakstan 公司股份，并协助公司得到相关政府批准（下称"完成转让"）。

2.2 协议期限

自本协议生效之日起在两年内有效，或者公司放弃完成转让的意愿之时，以较早实现的时间为准。

第 3 条 代理义务

3.1 代理人同意，在此期间以及任何可能的展期内，其应始终合理地履行本协议的义务，并不断努力，运用充分的时间和注意力与 PetroKhazakstan 公司管理层联系，以协助公司获得项目。

3.2 根据本协议条款，代理人要在项目的分析、组织、谐商、影响

2

3

方面协助公司。

代理人要协助公司获取信息，包括 PetroKhazakstan 公司的所有资料，并按照公司要求准备任何可能的详细评价；与相关政府、政府附属机构或权力机构发展关系。

3.3 代理人同意：

－在谈判战略上向公司提供建议，以完成权益交易；

－协助公司为完成交易与政府、政府管理的企业协商；与政府权力机构执行监督或管理机构进行协商；

－协助公司获取任何和所有特许、批准和所有类型的文件；

－在协商中采取所有合理手段，协助公司确定收购的合理价位以促成公司的最佳利益；

－为公司完成收购提供财务、法律和技术咨询意见；

－迅速回应公司提出的所有问题；

－尽可能地保持足够的员工以履行本协议中的义务

－其他与代理相关的事务。

3.4 代理人不能代表公司，或以公司名义接受任何义务。

第 4 条 公司义务

4.1 公司根据代理人的协助及代理人提供的相关信息，进行经济评估，确定完成收购合理的心理价位。

4.2 业务协助

－公司须保证向代理人提供有关的合理协助和建议；

－不得另行聘请任何顾问。

3

4

### 4.3 支付酬金

公司应按照本协议第 5 条规定向代理人支付酬金。

### 第 5 条 酬金、前期费用和报告

#### 5.1 酬金

双方同意，在公司确定的心理价位范围内完成交易后，公司应按如下条件向代理支付酬金：

5.1.1 完成交易价格≦10 亿美元部分按 1%计算；

完成交易价格 10—≦20 亿美元部分，超过 10 亿美元部分按 0.5%计算；

完成交易价格≧20 亿美元部分，超过 20 亿美元部分按 0.3%计算。

5.1.2 如完成交易价格低于公司的心理价位时，应另行向代理人支付低于心理价位部分的 2%的奖励。

#### 5.2 前期费用

5.2.1 公司同意自本协议签订生效之时起为代理人所提供的服务每月向代理人支付前期费用壹万美元。

5.2.2 公司书面通知代理人放弃该项目交易之时停止支付本款规定的费用。

5.2.3 鉴于代理人在本协议生效前已为公司提供代理服务，公司同意向代理人补偿 2005 年一月和二月的前期费用，共计贰万美元。

本款所规定费用代理人应每月提交一次发票和支持性文件。

在完成项目交易时本款规定费用全额冲抵酬金。

4

### 5.3 税收与费用

除由公司认可并在之前出具书面授权外，代理须自行承担因本协议代理行为所发生的相应的税款与花费。

所有支付给代理人的费用都使用美元支付，如果在计算或者开支形式不是美元，则将这些费用于支付日那天按照金融时报（Financial Time）的中间汇率换算成成美元。

所有支付给代理人的费用应该在公司收到代理人开出的发票后的15日内支付。

这里所说的各种费用不包括各种与项目有关的保险费，出售或者融资费或者佣金。

### 5.4 报告和财务信息

缔约双方议定，根据本协议 5.1 条向对方提供所有必要的报告以及缔约方所需的进度表和财务信息，以做出正确、及时的决定。

### 第 6 条 保密

### 6.1 保密信息

本协议双方同意，无论本协议是否在履行期间或履行期后，一方会不时收到或知悉与另一方或其联营公司有关的情报，包括但不仅限于任何和所有他们的业务、业务计划、活动和重要事务；以及任何和所有与双方有关的、专属于披露方或其联营公司的信息（"保密信息"）。双方须保守对方提供的保密信息，除非这些信息无保密性约束或在接收方无过错的前提下是可公开获得的。

6.2 根据本协议中的保密信息给予方之前提出的书面要求，或由于

任何原因，协议终止，接受方应根据披露方要求立即归还披露方的一切保密信息及其复印件，而且不能以任何途径和形式保留这些保密信息的任何全部或部分的复印件。

6.3 无论何种原因导致本协议变动、更新或终止、期满，本条款的规定以及保密义务在五年持续有效。

第7条 交易后保证

7.1 代理承诺，在完成交易后，不再作为将 PetroKhazakstan 公司产出原油运往中国市场的代理，并不得收取任何代理费用。

7.2 PetroKhazakstan 公司产出的原油中在中国以外地销售的部分的部分，双方同意根据另行商定的条件，由公司委托代理人作为销售代理商。

第8条 终止

8.1 根据以下条件，本协议中缔约一方在向另一方提交书面中止通知后，有权中止协议：

1. 无事先通知及解决办法。如发生下述事件，一方未事先递交通知也未提供解决机会时，可以中止协议：

i) 缔约方故意向获得本协议的另一缔约方或任何与他们有业务关系的第三方提供重大错误报告，或故意的误报或重大误报；

ii) 本协议中任一方未能履行其在协议中的责任和遵守本协议条款或双方在其它协议中议定的程序，而这些程序对完成权益交易所必需的并与协议目的相关的。

iii) 双方自动放弃各自业务，包括行动或显示出自主意愿的懈

6

7

息；希望或同意终止业务；或依照本协议条款和条件规定对业务操作有明显漠视。

2. 事先通知及解决办法。本协议任一方在向另一缔约方提交书面通知，详细说明下述任一未履行义务的 30 天后，如果在 30 天内，对疏忽责任的补救不能令受害方满意：

　i) 一方未能应另一方要求根据协议规定交付费用或支付其它报酬，或者

　ii)　一方未能履行或遵守本协议强制规定的约定或义务，而这些约定和义务为另一方所遵守或履行。

8.2 其它免责

任何根据本协议条款规定中止合同的行为不能损害其它任何权利（包括赔偿权）。上述赔偿不排除由于一方不履行本协议规定义务或违背规定或不遵守协议规定，另一方按法律条文或依衡平法可以得到的任何赔偿。

8.3 中止或终止的有关事项

关于本协议的中止或终止，如无展期，有关各方同意以下条款：

1.　代理人停止向公众宣称自己是公司授权代理人，并且避免任何其它也许会暗示或指出代理人和公司存在关系的行为；

2.　一方须立即归还另一方所有在此合作过程中所提供的保密信息。

第 9 条 关系

本协议项下双方关系应为独立的订约人。协议双方不能被理解为合伙关系、共同公司、商业联合体或其他的信托关系。任何一方都没有权

7

利或权力给另一方施加义务或代表另一方，任何一方不得视为另一方据此承担现有的责任，除非事先以书面形式规定了此种情况。

第10条 一般规范

10.1 承继者和受让人

本协议将对公司、代理人及其各自的承继人，法定代表人，及受让人有效。

10.2 不可抗力

由如下情况造成的义务无法履行，公司或代理人可免责：（A）由于遵从来自于任何国际，联邦政府，省级政府或市政府或以上机关的代理机构的法律，法规，命令，规章，必要条件或指令；（B）自然灾害；（C）另一方的行为或疏忽；（D）罢工，禁运或暴动；（E）或其他类似于此的事情；上述情况视为不可抗力。一方应以书面形式向另一方陈述不可抗力发生的情况。由任何上述情况引起的延误可以延延履行或免除履行义务（部分或全部，视具体情况而定），如果不可抗力持续6个月（公历）以上，本协议将自动终止，除非双方以书面方式达成了其他约定。

10.3 争端解决

10.3.1 非正式的争端解决。如果双方发生争议，在争端内容以书面方式由一方向另一方提出起30日内，双方应做出努力试图以相互磋商的方式迅速，公正地解决争端。如果30日内仍未解决该争端，任何一方都有权基于10.3.2条款规定的内容提起仲裁程序。

10.3.2 仲裁。由此产生的争端由中国国际贸易经济仲裁委员会的三名仲裁员根据其相关规则在北京予以仲裁。仲裁程序中使用的文字

8

为中文。本协议适用中国法。仲裁的结果应为争议解决的最终结果并不得提起诉讼。裁决的结果以裁决书的形式做出，具有强制效力。

### 10.4 无效

如果本协议的任何条款或部分，或于此产生的任何条款或部分，被判决无效的话，那么其余的条款或部分在未被判决无效的前提下不会自然无效，其在自身范围内继续执行。如果任何可适用的法律或相关法规或判决规则要求事先注意或拒绝承认协议重新开始的效力，或提出其他协议在前面没有提及的事项，或任何相关的法律或判决规则，法律规范，标准，执行程序等规定被要求优先适用，则这些法律规范或规则应该被优先适用，对于这一部分而言，本协议的此部分规则无效应被相关部分代替。

### 10.5 其他

本协议一式四份以中文书就，双方各执两份，具有同等法律效力。

中国石化集团国际石油勘探
开发有限公司

签名: _____

职务: 总经理

UNI-TOP ASIA INVESTMENT LIMITED:

For and on behalf of
UNI-TOP ASIA INVESTMENT LIMITED

签名: _____
Authorized Signature(s)

职务: 董事长 & 总经理

9