# EXHIBIT C

# SPIRIT 北京思必锐翻译有限责任公司

Beijing Spirit Translation Co.,Ltd.

Date: June 29, 2020

To Whom It May Concern:

## COMPETENCY CERTIFICATE FOR LU MIMI

I hereby certify that, it is my belief that, Lu Mimi, translator of Beijing Spirit Translation Co., Ltd. of Room 1703, Tower 7, Jianwai SOHO, No. 39, East 3rd Ring Middle Road, Chaoyang District, Beijing, China, is competent to translate into English the following documents (in Chinese) delivered to you.

1. Arbitral Award [2013] CIETAC BJ AWARD NO. 0907 ([2013] 中国贸仲京裁字第 0907 号裁决书)
2. Civil Ruling (2017) Jing 04 Civil Special No. 39 ((2017)京 04 民特 39 号民事裁定书)

Your faithfully

*Lu Mimi*

He Xue

Managed of Translation Department

Beijing Spirit Translation Co., Ltd.

Case 1:20-cv-01770-DLF   Document 1-4   Filed 06/29/20   Page 3 of 168

# SPIRIT

北京思必锐翻译有限责任公司

Beijing Spirit Translation Co.,Ltd.

Date: June 29, 2020

To Whom It May Concern:

## COMPETENCY CERTIFICATE FOR LU MIMI

I, Lu Mimi, translator of Beijing Spirit Translation Co., Ltd. of Room 1703, Tower 7, Jianwai SOHO, No. 39, East 3rd Ring Middle Road, Chaoyang District, Beijing, China, hereby certify that the English translations of the documents listed below (in Chinese) are, to the best of my knowledge and belief, correct and accurate translations.

1. Arbitral Award [2013] CIETAC BJ AWARD NO. 0907 ([2013] 中国贸仲京裁字第 0907 号裁决书)
2. Civil Ruling (2017) Jing 04 Civil Special No. 39 ((2017)京 04 民特 39 号民事裁定书)

Your faithfully

He Xue

Lu Mimi

# SPIRIT 北京思必锐翻译有限责任公司

## Beijing Spirit Translation Co.,Ltd.

### QUALIFICATION CERTIFICATE FOR LU MIMI



| | |
|---|---|
| 姓名: **鲁弥弥** Full Name | 语种: **英语** Language |
| 性别: **女** Sex | 资格级别: **二级笔译** Qualification Level Translator Level II |
| 出生年月: **1991年01月** Date of Birth | 专业类别: Professional Type |
| | 批准日期: **2015年05月24日** Approval Date |
|  | 签发单位盖章: Issued by |
| | 签发日期: **2016 年 4 月 21 日** Issued on |
| 编号: **14002970** No. | |




# SPIRIT 北京思必锐翻译有限责任公司
## Beijing Spirit Translation Co.,Ltd.

*Below is the translation of the above Qualification Certificate for Lu Mimi:*

Full name: Lu Mimi

Sex: Female

Date of Birth: January 1991

Language: English

Qualification Level:Translator Level II

Professional Type:





(Official Seal of China Foreign Language

Publishing & Distribution Administration)

Implementation and Management Department
for China Accreditation Test for Translators
and interpreters

No.:14002970

Issued by:

Beijing Municipal Human Resources and
Social Security Bureau
Special Seal for Professional Title (1)

Issued on: April 21,2016

*English translation*

裁决书
**Arbitral Award**



*English translation*

# CHINA INTERNATIONAL ECONOMIC AND TRADE ARBITRATION COMMISSION

## ARBITRAL AWARD

| | |
|---|---|
| Applicant: | UNI-TOP Asia Investment Limited ("**UNI-TOP**") |
| Registered Address: | OMC Chambers, Road Town, Tortola, British Virgin Islands |
| Place of Business: | Unit D, 26/F., Morrison Plaza 5-9 Morrison Hill Road Wanchai, Hong Kong |
| Arbitration Representative: | WANG Chun, WANG Beijing |

| | |
|---|---|
| Respondent: | Sinopec International Petroleum Exploration and Production Corporation |
| Registered Address: | No. 263, North Fourth Ring Road Central, Haidian District, Beijing |
| Place of Business: | Building 1, A6 Huixin Dong Street, Chaoyang District, Beijing |
| Arbitration Representative: | LIU Lingyun, GU Jie, YAO Chi, DONG Tieying, LI Amin |

Beijing

30 December 2013

[*Page 1 of Chinese Original*]

# ARBITRAL AWARD

[2013] CIETAC BJ AWARD NO. 0907

On the basis of the Agency Agreement signed on March 4, 2005 between the Claimant UNI-TOP Asia Investment Limited (hereinafter "Claimant") and the Respondent Sinopec International Petroleum Exploration and Production Corporation (hereinafter "Respondent") and the Request for Arbitration submitted by the Claimant to the China International Economic and Trade Arbitration Commission (hereinafter "CIETAC") on August 30, 2012, CIETAC accepted this arbitration under the abovementioned agreement.   The case number is X20120680.

This arbitration procedure is governed by CIETAC Arbitration Rules that became effective on May 1, 2012 (hereinafter "Arbitration Rules").

On 24 September 2012, the CIETAC secretariat delivered the Notice of Arbitration, the Arbitration Rules, and the Panel of Arbitrators by EMS to both parties. At the same, the Request of Arbitration and the attached evidence submitted by the Claimant were also delivered to the Respondent.

On 13 November 2012, the Respondent submitted its Statement of Defense and supporting evidence.

The Claimant appointed Mr. AN Hongqi as the arbitrator.   The Respondent appointed Mr. TAO Jingzhou as the arbitrator.   Because both parties had not jointly appointed or jointly authorised CIETAC to appoint the presiding arbitrator, in accordance with the provisions of the Arbitration Rules, the Chairman of CIETAC

*English translation*

[*Page 2 of Chinese Original*]

appointed Mr. XIA Jun as the presiding arbitrator in this case.   After the three arbitrators had signed the Declarations of Independencew, the tribunal was constituted on December 4, 2012 to hear this case.   On the same day, the CIETAC secretariat sent the Notice of Formation of the Arbitral Tribunal to both parties.

The Arbitral Tribunal consulted the CIETAC secretariat and decided to schedule a hearing on February 6, 2013 to hear this case.   On December 24, 2012, the CIETAC secretariat sent the Notice of Oral Hearing to both parties.

On February 6, 2013, the hearing was held as scheduled in Beijing.   Both parties sent their arbitration representatives to attend the hearing.    At the hearing, the Claimant submitted an Application to Amend its Claims with supporting evidence, the parties made their submissions, presented the original of evidence, conducted cross-examination and debate, and answered the questions raised by the Arbitral Tribunal.

After the hearing, the Claimant made a supplementary payment for the requisite deposit for arbitration fees in relation to its Application to Amend its Claims. The Claimant's Amended Request for Arbitration was accepted.

On March 7, 2013, the Claimant submitted supplementary evidence.

The Arbitral Tribunal consulted the CIETAC secretariat and decided to hear the parties' opinions on April 3, 2013 on issues including conciliation in this case. On March 20, 2013, CIETAC secretariat sent the relevant notice to both parties.

On March 25, 2013, the Respondent submitted an Application to Postpone Conciliation.

On March 29, 2013, the Claimant submitted the Opinion in Relation to the Disagreement to Postpone Conciliation for Case X20120680.

After considering the factual circumstances in this case, the Arbitral Tribunal decided to postpone the hearing on issues including conciliation to April 8, 2013. On March 29, 2013, the CIETAC secretariat sent both parties the

2

[*Page 3 of* Chinese *Original*]

notice on postponement.

On April 8, 2013, both parties sent arbitration representatives to present the hearing.   Because both parties were willing to conciliate, the Arbitral Tribunal conducted conciliation for the disputed matters.   Based on the situation in the conciliation, and after consulting both parties, the Arbitral Tribunal decided to suspend the arbitration for 40 working days to allow further conciliation to resolve issues related to the dispute through negotiations.

After the expiration of the suspension, both parties wrote to the Arbitral Tribunal in relation to the latest developments regarding the conciliation.   The Claimant stated that it had not received any response from the Respondent in relation to the settlement; the Respondent stated that the gap in parties' positions was huge, and there was no basis and no prospect for any settlement.

Taking into account the above circumstances, the Arbitral Tribunal decided to conduct a second hearing on August 8, 2013.   CIETAC secretariat sent the Notice of Oral Hearing to both parties on June 24, 2013.

On August 8, 2013, the Arbitral Tribunal held the hearing as scheduled at CIETAC.   Both parties sent arbitration representatives to attend the hearing.   At the hearing, the parties made their submissions, presented the original of evidence, conducted cross-examination and debate, and answered the questions raised by the Arbitral Tribunal.

After the hearing, the parties submitted supplementary opinions within time limitation.

All the materials of the case were served on both parties in accordance with the Arbitration Rules.

The CIETAC secretary general extended the time limit for the award on the application of the Arbitral Tribunal to December 30, 2013.

This case is now closed, on the basis of the documents on the record and the facts and evidence presented, according to the relevant regulations in Arbitration Rules, and in accordance with the agreement,

3

[*Page 4 of Chinese Original*]

the Arbitral Tribunal renders this Award after deliberation and discussion.

The analysis of the facts, the Arbitral Tribunal's reasoning and decision are as follows:

## I.   Factual Background

As found after the hearing, the Claimant and the Respondent signed the Agency Agreement between Sinopec International Petroleum Exploration and Production Corporation and UNI-TOP ASIA INVESTMENT LIMITED (hereinafter "Agency Agreement") on March 4, 2005.   The parties agreed that the Respondent would appoint the Claimant as the exclusive agent to assist in the acquisition of shares in PetroKazakhstan either directly or indirectly through the Respondent's affiliates, and in obtaining the relevant government approvals to complete the transfer.   Upon completion of the transfer of shares, in addition to the payment on initial expenses, the principal would pay the agent the commission in the agreed proportion and afford it the anticipated interests.

The facts and reasons submitted by the Claimant and the Respondent on the dispute in this case are as follows:

The Claimant states in the Request that the Claimant's affiliate, Hong Kong Universal Petroleum Development Company Limited (hereinafter "Universal Petroleum"), had been cooperating in crude oil trading with Kazakhstan PETROKAZAKHSTAN Inc. (hereinafter "PKZ" or "PK Inc.") since 2002.   In 2004, the Claimant immediately informed China Petrochemical Corporation (hereinafter "SINOPEC") after the Claimant learnt through Universal Petroleum that PKZ Inc.'s shareholders was going sell the company's assets.   SINOPEC immediately directed its subsidiary, the Respondent, to represent SINOPEC in relation to the acquisition. At the same time, it authorized the Claimant to communicate, coordinate and negotiate with the PKZ Inc.'s shareholders on behalf of the Respondent.   On March 4, 2005, the Claimant (UNI-TOP Company) and the Respondent signed Agency Agreement in relation to the acquisition.   During the 10-month acquisition process, the Claimant had assisted all parties in

4

[*Page 5 of Chinese Original*]

communicating, relaying documents, and also done a large amount of high-level public relations, lobbying and negotiation preparatory work.   It assisted SINOPEC on all the necessary preparatory works for and prior to the completing the acquisition.

Through the work of the Claimant, the Respondent conducted multiple rounds of negotiations with the shareholders of PKZ Inc.   In the meantime, as China National Petroleum Corporation ("CNPC") expressly indicated their interests in acquiring the shares in PKZ Inc., and to maintain national interest and avoid internal competition, on June 27, 2005, CNPC and SINOPEC agreed to jointly acquire the shares in PKZ Company under coordination of the relevant government department on the basis of the preparatory work that had been done by SINOPEC. At the same time, it was confirmed that after completing the acquisition, CNPC would hold 60%, and SINOPEC would hold 40%.   On August 15, 2005, CNPC, representing both companies, successfully bid and completed the acquisition of the shares in PKZ Inc.. The investment in PKZ Inc.'s assets not only protected the national energy security, it also added a high-quality overseas source of oil supply and generated a stable and enormous profit.

Yet, since the completion of the acquisition of the shares in PKZ Inc., the Claimant repeatedly demanded payment from the Respondent of the stipulated commission under the Agency Agreement.   Although the Respondent recognized all of the Claimant's work and repeatedly promised to pay the Claimant the commission corresponding to all of the shares in PKZ Inc. acquired in CNPC's name, the Respondent had continuously refused to pay based on the asserted reason that SINOPEC was still negotiating with CNPC and had not actually conducted the transfer of the shares in PKZ Inc..   In fact, CNPC and SINOPEC conducted multiple discussions on the transfer of the shares in PKZ Inc. after the completion of the acquisition. On May 17, 2007 the two companies signed a Meeting Minutes of Special Session, which confirmed that CNPC promised to transfer the shares as originally agreed to SINOPEC.   If the shares in PKZ Inc. could not be transferred, CNPC promised to transfer the shares in some other overseas

[*Page 6 of Chinese Original*]

project.   SINOPEC also authorized the Respondent to be responsible for the substantive issues related to the transfer.   Accordingly, it can be confirmed that the relevant rights of the shares in PKZ Inc.'s shares are already held by the Respondent, the objective of the Agency Agreement is already achieved.

The Claimant submits, the Respondent's successful acquisition of PKZ Inc.'s assets is due to the Claimant's provision of the information on the opportunity.   The Claimant had conducted a large amount of work during the acquisition and had performed all obligations under the Agency Agreement, which were decisive in the ultimate successful acquisition in the PKZ Inc. project.   It is without doubt that the Respondent had, for all practical purposes, acquired the shares in PKZ Inc. and corresponding rights.   The Respondent should not rely on its own delay in claiming for such confirmed rights against CNPC, or its own failure in conducting the procedure of the share transfer, to refuse to perform the obligations under the Agency Agreement *vis-à-vis* the Claimant.

The Claimant states: prior to the signing of the Agency Agreement, the Claimant's affiliate Universal Petroleum had maintained cooperation on trade in crude oil with PKZ Inc. many years.   Crude oil produced by PKZ Inc. was sold to China by Universal Petroleum.   In 2005, after CNPC acquired the shares in PKZ Inc., PKZ Inc. unilaterally terminated Universal Petroleum's dealership and had not granted the Claimant or Universal Petroleum the dealership rights of the crude oil produced by PKZ Inc. outside of China.   The Claimant submits that because of the Respondent, the Claimant had completely lost the rights it enjoyed as a sales agent of PKZ Inc. and the expected realizable economic benefits, causing the Claimant and Universal Petroleum to lose a source of business and suffer enormous economic losses.

For these reasons, the Claimant filed a Request for Arbitration claiming:

1.  The Respondent to pay the Claimant US$ 17,049,000 as agent commission;
2.  The Respondent to pay the Claimant

[*Page 7 of Chinese Original*]

US$14,586,366.67 as interest for delayed payment (based on an annual interest of 14%, currently calculated from 23 August 2006 to 31 Aug 2012, with the final amount subject to the date of the recognition of the arbitral award) and anticipated loss of profits;

3.  The Respondent to pay the Applicant RMB27,907,508.10 as exchange rate losses;

4.  The Respondent to pay the Applicant all its legal expenses associated with this case;

5.  The Respondent to bear the cost of this arbitration.

The Applicant raised the following reasons in support of the calculation of its quantum of compensation:

1.  Regarding the agent remuneration: Clause 5.1 of the Agency Agreement states that both parties agree that when the deal is completed within the company's target price, the company will pay the agent remuneration in accordance with the following: for the portion of the deal completion price that is ≤ US$1 Billion USD, a payment of 1%; for the portion of the deal completion price between US$1 Billion to US$2 Billion, a payment of 0.5%; for the portion of the deal completion price that is ≥ 2 Billion USD, a payment of 0.3%. According to CNPC's China A shares Initial Public Offering MoU dated 26 September 2007, the CNPC subsidiaries had acquired 67% of the PKZ's shares by cash in the amount of RMB21.367 Billion on 23 August 2006. According to the exchange rate published by the People's Bank of China on the same date, it is equivalent of US$2.683 Billion. The Applicant believes that this should be the "deal completion price" mentioned in the Agency Agreement, and accordingly the payable agent remuneration should be USD17,049,000.

2.  Regarding the loss in interest caused by overdue payment: according to Art. 107 of the Chinese Contract Law, if a party fails to perform its obligation under a contract, or its performance fails to satisfy the terms of the contract,

[*Page 8 of Chinese Original*]

it shall bear the obligations for breach of contract such as the obligation to continue to perform its obligations, the obligation to take remedial measures, or the obligation to compensate for losses. In August 2005, the Respondent and third-party CNPC jointly acquired the 100% shareholding that was agreed as the acquisition target in the Agency Agreement.  In July 2006, the Kazakhstani national oil company acquired 33% of the shareholding from CNPC.  The Applicant believed that it had performed its obligation under the Agency Agreement.  After the acquisition was completed on 15 August 2005, the Respondent practically enjoyed the benefits of a shareholding in the acquisition target. The Applicant hereby requests its interest losses, calculated from 23 August 2006 until 31 August 2012 for the moment, in total 2200 days. Based on a 14% annual interest rate, the Applicant's interest losses amount to US$ 14,586,366.67.

3. Regarding the loss in exchange rate: according to the exchange rate published by the Bank of China on 23 August 2006, 1 USD was 7.9672 RMB. On 30 July 2012, 1 USD was 6.3303 RMB. Accordingly, the exchange loss is 27,907,508.10.

4. Regarding the legal fees: Article 50(2) of the CIETAC Arbitration Rules states: the arbitral tribunal has the power to decide in the arbitral award, having regard to the circumstances of the case, that the losing party shall compensate the winning party for the expenses reasonably incurred by it in pursuing the case. The Applicant's legal fees should be regarded as reasonably incurred expenses. According to the legal representation contract signed between the Applicant and Beijing Shanggong Law Firm, the applicant retained Shangdong Law Firm to represent the Applicant in the arbitration. The legal fees payable to Beijing Shangdong Law Firm is 6% of the amount recovered from the Respondent.

The Applicant had submitted a Request to Amend its Request for Arbitration, with the following requested changes:

1. The Respondent to pay the Applicant US$ 21,540,000 as agent remuneration;

[*Page 9 of Chinese Original*]

2.  The Respondent to pay the Applicant USD 16,934,628.33 interest losses (temporarily calculated until 31 Aug 2012, to be finally calculated as of a date determined in the arbitral award);

3.  The Respondent to pay the Applicant USD 2,776,000 as loss of expected profits;

4.  The Respondent to pay the Applicant all its legal expenses associated with this case;

5.  The Respondent continue to perform the Agency Agreement, and the Applicant to enjoy the rights to market PKZ's crude oil products outside of China;

6.  The Respondent to bear the cost of this arbitration.

   The Applicant has also amended the standards applicable to its calculations, in particular:

1.  According to SINOPEC's internal reports, CNPC acquired PKZ's 100% shares based on a transaction price of USD 4.18 Billion. The Applicant therefore believes that USD 4.18 Billion should be the "deal completion price", accordingly the agent remuneration should be USD 21,540,000.

2.  The Respondent should pay the interest loss, calculated from 15 August 2005 to the actual date of payment. The annual interest rate is 11%, temporarily calculated to 31 August 2012, totalling 2573 days, amount to an interest loss of USD 16,934,628.33.

3.  The Applicant's affiliate, Universal Petroleum, originally sold PKZ's crude oil products to China at a profit of USD 0.45 per barrel (1 ton = 7.7 barrels), which amounts to a profit of USD 3.47 per ton. Until 2005, Universal Petroleum had

[*Page 10 of Chinese Original*]

monthly crude oil sales of 100,000 tons. Based on a fixed profit of USD 0.45 per barrel, Universal Petroleum's monthly profits amounted to at least USD 347,000. To strictly comply with the Agency Agreement, Universal Petroleum had ended its dealership 8 month earlier, in September 2005, and thus it lost a total of USD 2,776,000.

4.  According to the legal representation contract signed between the Applicant and Beijing Shanggong Law Firm, the applicant retained Shangdong Law Firm to represent the Applicant in the arbitration. The legal fees payable to Beijing Shangdong Law Firm is 8% of the amount recovered from the Respondent.

5.  In relation to the continued performance of the Agency Agreement with respect to the Applicant's right to market PK Inc.'s crude oil products outside of China.   Clause 7.2 of the Agency Agreement stipulated that, for such dealership rights outside of China, the parties agrees that the agent would be granted such rights based on separately negotiated terms. After CNPC's acquisition of PKZ, the dealership was not given to the Applicant as agreed. The Applicant requests the Respondent to perform the obligation under the Agency Agreement and to grant the Applicant dealership rights outside of Chinas.

The Respondent replied noting that, while the Applicant claimed in its Request of Arbitration that it had performed all of its obligations under the the Agency Agreement, and played a decisive role in the successful acquisition of PKZ, the Respondent (SIPC) should pay the Applicant the agency commission and compensate its losses.   In response, the Respondent believes that the Applicants submission are inconsistent with the Agency Agreement and the facts, and the Request for Arbitration has no legal basis and should be dismissed.

[*Page 11 of Chinese Original*]

The Applicant required that the Respondent pay the agency commission, interest losses for delayed payment, compensation for expected profits, foreign exchange losses, lawyers' fees and arbitration fees, totalling 6 different requests.   Among these, the interest losses raised by the Applicant are based on PK Inc.'s unilateral early termination of its crude oil dealership contract with Universal Petroleum.   Clearly, this has nothing to do with this case, and does not fall within the scope of the matters to be determined here.   As for the remaining five requests, the fundamental arbitration request is for payment of the agency commission, and the other requests arise out of this request.   Therefore, the Respondent only needs to rebut the request for payment of agency commissions.

The Respondent believes that the Applicant's request for payment of agency commissions should be dismissed:

First, according to the Agency Agreement's requirements on payment of agency commissions, the Respondent only has the obligation to pay after the Respondent has acquired shares in PK Inc;

Second, the term of the Agency Agreement has already ended, and the contractual obligations are terminated.   There is no contractual basis for the Applicant's requests;

Third, the Applicant's requests fall outside the statute of limitations and should be dismissed;

Fourth, the Applicant's standing is flawed and does not meet the requirements for initiating arbitration.

The Respondent provides the following reasons for the submissions listed above:

(First) The Agency Agreement stipulates that the condition for payment is that the Respondent acquires PKZ's shares.

The Respondent has yet to receive any shares of PK Inc. to date, so the condition for payment is not fulfilled. The Applicant's request has no factual or legal basis:

1) In the Agency Agreement signed by the Applicant and the Respondent, Clause 5.1 provides that the agency agreement's condition for payment is "upon completion of the transaction within the target price range ascertained by the Company, the Company shall pay commission to the Agent."   The completion

[*Page 12 of Chinese Original*]

of the transaction refers to the Respondent acquiring shares in PK Inc., and the purpose provisions and agent obligation provisions in the Agency Agreement clearly provide as such.

Clause 2.1 of the Agency Agreement provides, "to assist the Company in acquiring the shares of PetroKazakhstan directly or indirectly through the Company's affiliated companies according to relevant laws or regulations, and obtaining relevant government approvals (hereinafter referred to as "Completion of the Transfer").   Clause 3 of the Agency Agreement provides that the Applicant's obligation is as follows: "The Agent agrees that it shall at all times during the term of this Agreement and any possible extension thereof reasonably perform its obligations under the Agreement, and shall keep using efforts and devote sufficient time and attention to contact the management of PetroKazakhstan, to assist Company in acquiring the project."   Clearly, the Agency Agreement provides that the condition for payment of agency commission is the Respondent acquiring shares in PK Inc..

According to international M&A practice in the oil and gas sector, the share acquisition process involves signing (due diligence, evaluation & appraisal, negotiation & bids, signing share and purchase agreements), fulfilment of closing conditions (including but not limited to getting any waivers of pre-emptive rights and government approvals), and completion (transfer of title and corresponding consideration). Clearly, the Respondent had not entered into any agreement with the original shareholders of PK Inc., and had not acquired any shares in PK Inc. either. According to Article 405 of the Chinese Contract Law, the Respondent had yet acquired any PKZ's shares, so it is under no obligation to pay any agency commission to the Applicant.

2)  The Applicant's submission that it did a large amount of work and played a decisive role in the acquisition, and that the Respondent practically already has the shares in PK Inc. and has obtained an equivalent benefit, but has been indolent in claiming or has waived its rights in not actually obtaining the shares, is not supported by any evidence, and is internally contradictory.   It is completely not in accordance with the facts and cannot support the requests.

The Respondent notes that, according to the Agency Agreement, as long as the Respondent

[*Page 13 of Chinese Original*]

has not received shares in PK Inc., the Applicant has no entitlement to request the agency commission, regardless of who much work the Applicant has done, and what part the Applicant has played, and regardless of whether the Respondent has been indolent in claiming or has waived its rights, or because of whatever reasons there may be for the failure to acquire shares in PK.   All of these cannot be seen as the Respondent already acquiring the shares and thereby being required to pay the agency commissions to the Applicant.

3) The Respondent also provides the following rebuttal to the Applicant's submissions on the facts:

(1) The Applicant's assertions that it did a large amount of work and played a decisive role are not consistent with the facts. In actual fact, the PK project did not achieve a successful acquisition, and the Applicant's company did not play a so-called "decisive role." The Respondent has already paid all the expenses in relation to the Applicant's work that were due under the Agency Agreement.

Firstly, during the time the Respondent participated in the acquisition of PK Inc. shares, the Applicant's work was mainly hotel reservations, arrangement of meetings and relaying documents. The Applicant's claim that it "did a lot of high-level public relations work and negotiation preparatory work on behalf of the Respondent over an acquisition process that lasted over 10 months" lacks support in evidence.

Secondly, the Applicant's assertions of a so-called "decisive role" are not consistent with the facts. The the reason why the Respondent entered into the Agency Agreement with the Applicant was that it hoped to acquire all PKZ's shares through the Applicant's coordination and exclusive negotiation status. Yet, the Applicant not only failed to get the Respondent exclusivity status, but also failed to deliver any negotiation results as an agent. When the PK project shifted from negotiations to a public bidding process, the CNPC side won the PK Inc. shares through a competitive bid.   Thus, the purpose of the Agency Agreement was not realized.   Thereafter, CNPC and SINOPEC were in discussions about transferring part of the PK Inc. shares, but to this date that has not been successful.   The Applicant did not contribute anything on this.

13

[*Page 14 of Chinese Original*]

Finally, Clause 5 of the Agency Agreement stipulated that the agent remuneration included: (1) initial expenses (US$10,000 per month); (2) those expenses incurred and duly authorized in writing by the Respondent; (3) the agency commission after completion of the deal. The work done by the Applicant belongs to categories 1 and 2, with fees totalling US$159,898, which was paid by the Respondent in accordance with the Agency Agreement. The Applicant has no right to claim the agency commission which should be paid out by the Respondent only after the deal is successfully completed.

(2) The Applicant's claim that, through government intervention and coordination, CNPC and SINOPEC decided to jointly acquire PKZ, and after the acquisition 60% would go to CNPC and 40% would go to Sinopec Group, with CNPC representing both companies in succeeding in the competitive bid, is without factual basis and cannot support its arbitration request.

Firstly, the Applicant's assertions of "jointly acquiring" and "representing … in the competitive bid" are without evidentiary support.

Secondly, according to the Confidentiality and Inaction Agreement signed between the Respondent and PK Inc., the Respondent shall not by any means act in concert with any other entities. In fact, the Respondent and CNPC bidded separately in the competitive bidding process on 30 June 2006, and the claimed "jointly acquiring" and "representing … in the competitive bid" refers to a relationship that did not exist.

Finally, according to the Agency Agreement, the Respondent is not required to pay the Applicant any agency commission if the Respondent did not acquire PK Inc.'s shares.   Regardless of whether it was a joint acquisition or representative bid, it is not possible to conclude that the Respondent has already acquired PKZ's shares.

(3) The Meeting Memorandum submitted by the Applicant did not confirm the legal consequences to do with share ownership.   The submission hat it proves that the Respondent practically has the PK shares is not consistent with the facts.   In actual fact,

[*Page 15 of Chinese Original*]

after the May 2007 Meeting Memorandum, and until March and June 2008, the Applicant and the Respondent had amended and extended the Agency Agreement, specifically providing that the Applicant was to solve the issues to do with the state's pre-emption rights and governmental approvals. Therefore, the Applicant itself confirmed that the Respondent had not acquired any PKZ shares or any of the corresponding rights.

4) The Applicant's assertion that "the Respondent had been indolent in claiming or waived its claim for its entitlements and rights against CNPC, or for its own for its own reasons was unable to complete the transfer of shares from CNPC to the Respondent" is contrary to the facts and cannot be used to support its request.

First of all, on the one hand, the Applicant claims that the Respondent had already in effect acquired PK Inc.'s shares; on the other hand, it claims that the Respondent had for its own reason refused to or given up claim its entitlement and rights against CNPC, and consequently for its own reasons was unable to complete the transfer of shares from CNPC to the Respondent. This is internally contradictory.

Second, after CNPC won the bidding process, SINOPEC held many negotiations regarding the transfer of shares.   The negotiation did not yield any results regarding rights in PK Inc. shares, and SINOPEC was not indolent in claiming, and had not waived, its entitlement against CNPC.
Moreover, the Agency Agreement and law does not restrict the Respondent's commercial autonomy, and the Applicant has no right to request the Respondent to engage in business deals regardless of cost.

Lastly, regardless of whether SINOPEC had been indolent in claiming or had waived its entitlement against CNPC, or whether for its own reasons it was unable to complete the transfer of shares, according to the Agency Agreement, as long as the Respondent did not acquire PKZ's shares, the Respondent would not be required to pay any agency commission.

(Second) The Agency Agreement's term has expired and the contractual rights and obligations have been terminated. The Applicant's claim has no basis in contract.

[*Page 16 of Chinese Original*]

Clause 2.2 of the Agency Agreement stipulated that the validity of the agreement is 2 years, and through various amendments, the validity was extended to 31 December 2008.  Now, the contractual term has expired and the condition for payment is not accomplished, and therefore the Agency Agreement has already terminated. Therefore, the Applicant's claim has no contractual basis.

(Third) The Applicant's Request for Arbitration falls outside the statute of limitations and should be dismissed.

As mentioned above, the Agency Agreement was valid until 31 December 2008. But CIETAC only received the Applicant's Request for Arbitration on 24 September 2012, which raises the basic issue of whether the condition for payment of agency commissions is satisfied. The Request for Arbitration falls outside the limitation period. The Applicant claimed that it had repeatedly demanded the Respondent to pay the agency commission, yet the Applicant was not able to provide any evidence to support its claim. According to Article 135 of the General Principles of Civil Law of the People's Republic of China, the Request for Arbitration should be dismissed.

(Fourth) The Applicant's standing is flawed.

The Agency Agreement stipulated that the Agent UNI-TOP is a company registered in Hong Kong. But in the arbitration application, UNI-TOP is a company registered in the British Virgin Island. The Applicant may not be the same entity as the agent in the Agency Agreement, and if proved to be true, the Applicant did not have standing to apply for arbitration.

For the above reasons, the Respondent believes that the Applicant had already received the relevant fees due, but yet it still makes a baseless claim for huge agency commissions in spite of the non-fulfilment of the agreed condition. The Applicant's Request for Arbitration does not have any factual and legal support. Therefore the Arbitral Tribunal should dismiss the Request for Arbitration entirely.

After 2 hearings, the Applicant and the Respondent submitted their closing statements.

16

[*Page 17 of Chinese Original*]

The Applicant states in the closing statement as follows: PKZ Inc. in this case was originally named Hurricane Marketing Limited Project. The Applicant was appointed by the Respondent to be the agent to coordinate with the seller on behalf of the Chinese side. The Applicant had devoted a lot of time, human resources, and money to conduct essential public relations and Agent work. The Applicant assisted the Chinese side to complete the substantive aspects of its acquisition work, such that the Chinese side was able, under the coordination of the relevant Chinese government departments and in accordance with the method so determined, achieve the country's strategic development plan.   The Applicant had performed its obligations as agent in relation to the oversea acquisition, and the Respondent had completed the PKZ acquisition through a joint acquisition with CNPC. The Respondent should therefore pay the Applicant its agency fees, together with the actual loss and loss of expected profits caused by the Respondent's breach.

(First) The project in contention was successfully completed thanks to the Applicant's introduction. Prior to the signing of Agency Agreement, the Applicant had already conducted a large amount of essential public relations and agent work.

Ms. Liu Fang ("Ms. Liu"), CEO of Universal Petroleum, an affiliate of the Applicant, had a very good cooperation relationship with the Kazakhstan government and key persons in the Kazakhstani industry. Starting from 2002, Universal Petroleum had an crude oil trading relationship with PKZ Inc. (Hurricane), opening the first railway oil transportation line for crude oil between China and Kazakhstan, and maintained a stable cooperative relationship.

Because of this relationship with PKZ Inc., in September 2004, the CEO of PKZ Inc., Bernard F. Isautier mentioned to Ms. Liu the possibility of selling part of the PKZ Inc. shares

[*Page 18 of Chinese Original*]

and asked Ms. Liu to help to find potential buyers. Since Universal Petroleum and SINOPEC also had a long-term relationship of cooperation, Ms. Liu gave this information to SINOPEC at once. The management at Sinopec Group regarded the opportunity highly, and immediately ordered its subsidiary the Respondent to begin the acquisition process. Mr. Zhou Baixiu was the general manager of the Respondent. (Because the whole acquisition was under the supervision of SINOPEC, including SINOPEC's role in negotiating with CNPC after the acquisition, the Respondent and SINOPEC should be treated as the same "SINOPEC side".)

In November 2004, the Respondent gave Ms. Liu an authorization document together with a draft Acquisition MoU prepared for PKZ Inc.. Thanks to Ms. Liu's efforts, SINOPEC side obtained the negotiation opportunity and exclusive negotiation status. The Respondent signed with PKZ a Confidentiality and Inaction Agreement, officially kicking off the initial work of the proposed acquisition. The Respondent and the Applicant entered into the Agency Agreement in March 2005 after the Respondent had already started the due diligence work and talked directly to the PKZ Inc. CEO Mr. Bernard F. Isautier.

It must be emphasized that PKZ Inc.'s oil fields were only 1500 kilometers from the Xin Jiang Province of China, and the oil fields had very good and stable oil reserves with high quality products potential.  Therefore, the acquisition was very beneficial to the national energy security of China, and was of strategic value in opening an energy route to the West and obtaining a high-quality overseas oil supply source.  Prior to SINOPEC kicking off the acquisition project, it had filed the project with relevant department of the Chinese government and approvals were granted. That is to say, the project in contention was not merely a commercial action, but also reflected strategic planning by the Chinese government and the national interest (and was an act of the state). In light of the above, in the hope of achieving maximum interest for the Chinese side,

[*Page 19 of Chinese Original*]

the Applicant was actively trying to facilitate the deal with PKZ Inc.

(Second) The Applicant had performed its obligations under the Agency Agreement

Clause 3 of the Agency Agreement stipulate the "agent obligations" will include:

i.  "3.1. The Agent agrees that it shall at all times during the term of this Agreement and any possible extension thereof reasonably perform its obligations under the Agreement, and shall keep using efforts and devote sufficient time and attention to contact the management of PetroKazakhstan, to assist Company in acquiring the project."

ii.  "3.2. Pursuant to the Agreement, the Agent shall assist the Company with the analysis, organization, negotiation, and impact of the project., negotiation, and influence. The Agent shall assist the Company in obtaining information including all information of PetroKazakhstan, prepare any possible detailed evaluation required by the Company, and develop relationships with relevant governments, agencies affiliated to governments, or authorities."

iii.  "3.3. The Agent agrees: to advise the Company on negotiation strategies, in order to complete the equity transaction; to assist the Company in negotiating with governments and enterprises managed by governments to complete the transaction, and in negotiating with governmental authorities, enforcement supervision agencies, or regulatory agencies; to assist the Company in obtaining any and all documents of concessions, approvals, and all types of documents; to use all reasonable means in negotiation to assist the Company in ascertaining a reasonable acquisition price in order to promote the best interests of the Company; to provide financial, legal, and technical consulting advice for the Company to complete the acquisition; to respond swiftly to all questions raised by the Company; to maintain sufficient staff as far as possible in order to fulfill the obligations under the Agreement; and to carry out other matters relevant to the agency."

The Applicant had conducted its work actively and fully in compliance with the above terms from the beginning to the end.   This included the following:

1, The Applicant was responsible for communications and negotiations with PKZ Inc. on behalf of the Respondent.

If the Respondent's claim that the Applicant was merely responsible for hotel bookings and meeting arrangements was true, the Applicant would not need to maintain deep channels of communication with PKZ Inc. side

[*Page 20 of Chinese Original*]

and would not need to travel multiple times to Kazakhstan (PKZ Inc's place of business) and the UK (where PKZ Inc.'s shareholders and managers are based). Yet, the fact was that, except for two meetings, PKZ and Bernard F. Isautier had maintained a regular communication with the Respondent through Ms. Liu, including daily emails and telephone communications. Because PKZ is a listed company on four jurisdictions, including the US, in order to maintain confidentiality during the acquisition period, many things had to be discussed in person. From November 2004 to April 2009, Ms. Liu traveled to Kazakhstan 22 times. From November 2004 to August 2005, she traveled to the UK 8 times to negotiate with the PKZ's shareholders and Bernard F. Isautier face-to-face, and to follow up on the negotiations between the Respondent and PKZ Inc.   Although, at the hearing, the Respondent only recognized part of the facts, this is enough to prove Ms. Liu had contributed thorough and material agency work to the entire acquisition process.

2, The Applicant was responsible for receiving PKZ Inc. documents and information necessary for the review and approval of the acquisition and to deliver the same to the Respondent.

The Applicant was responsible for relaying relevant messages, documents, and materials between PKZ and the Respondent. Because of large quantity of information and it being confidential information, the Applicant did not keep any paper documents. What can be seen is that: on 25 Feburary 2005, Ms. Liu had delivered to the Respondent those list of documents necessary to conduct due diligence, including geological data, environmental protection data, HSE data, relevant legal matters, economic data, financial, accounting, and taxation data etc.   Pursuant to the request of the Respondent, on 25 April 2005, Ms. Liu also delivered legal documents and information relating to PKZ's litigation.

3, The Applicant had gained SINOPEC side exclusive negotiation status and the opportunity to acquire all of the shares,

[*Page 21 of Chinese Original*]

and participated in acquisition preparation, discussion, and negotiation process.   The Applicant had played a key role in the successful acquisition of the project.

After learning that PKZ Inc. was interested to sell part of the shares, SINOPEC side raised that it hoped to acquire all PKZ Inc. shares and submitted to PKZ Inc. an MoU regarding exclusive negotiations. Ms. Liu relayed the MoU to Mr. Bernard F. Isautier, and PKZ Inc. also requested the Respondent to sign a Confidentiality and Inaction Agreement. Later, after persuasion by Ms. Liu, PKZ Inc. agreed to the terms proposed by SINOPEC and agreed to give SINOPEC exclusive negotiation status. The relevant PKZ Inc. documents were relayed to the general manager of the Respondent, Mr. Zhou Baixiu. During the negotiation period, PKZ Inc. had never disclosed any information about the plan to sell shares, had never bidded publicly for the shares, and had never conducted any negotiations with any third-party except the Respondent.   PKZ Inc. strictly complied its duty under the Confidentiality Agreement (subsequently, the Respondent actively gave up the exclusivity status by writing to PKZ).

A representative of the Respondent claims that the Respondent had received in May an invitation to bid, and the Respondent used that to claim that the Applicant had not gained the Respondent exclusivity status. But the fact was that PKZ never recognized it had ever commissioned other company to send an invitation to bid to SINOPEC. Also, on 17 June 2005, the vice general manager of the Respondent, Mr. Zhou Yuqi, led a delegation to London to meet PKZ Inc. and made an opening offer in person, and PKZ counter-offered as well. This illustrated that, at that time, the bidding process had not started yet. It had always been PKZ Inc.'s intention to meet the Chairman of SINOPEC, Mr. Chen Donghai, in an effort to complete the deal at a price acceptable to both sides. However, due to SINOPEC's own reasons, the general manager of the Respondent did not meet with PKZ Inc. again. On the contrary, after the intervention of the relevant government department on 27 June, the Respondent did not continue Respondent took the opinion of the relevant department of the government and did not make any more offers, instead changing course to pursuing a joint acquisition with CNPC. Therefore, during the initial stage of the acquisition, the agent had duly and fully performed all of its agency obligations, whereas the Respondent had altered its acquisition plan unilaterally and cannot claim that the Applicant had not played a key role in the deal.

*English translation*

[*Page 22 of Chinese Original*]

Regarding the Applicant and Mr. Liu's work and results on the PKZ acquisition project, SINOPEC and its officers that participated in the project, in particular general manager Mr. Zhou Baixiu and vice general manager Mr. Zhou Yuqi, all had positive comments. Prior to the critical period Ms. Liu was working at that time in Kazakhstan. GM Mr. Zhou Baixiu sent a SMS to Ms. Liu on 12 June 2005 that: "I hope you can go to London and contact Yuqi directly, and to assist him when necessary. Thank you for everything you have done." Vice general manager Mr. Zhou Yuqi sent a SMS to Ms. Liu on 13 June 2005 that: "the negotiation starts with discussion, then about price, it is expected to quote price to PKZ tomorrow or the day after tomorrow. It is believed that your participation will further push the cooperation between the two sides".

Additionally, the mention of the "target price" of acquisition in the Respondent's defense requires explanation. In June 2005, Vice GM Mr. Zhou Yuqi and the legal manger Mr. Zhang Lianhua led a team to London to negotiate price. On that day, PKZ's share price was US$30.44, and there were total of 76 million shares. The Respondent quoted US$2.8 billion (equivalent of US$36.84 per share). PKZ Inc. responded preliminarily that to add US$10 to the share price of US$30.44, with a premium of 25%, amounting to a total purchase price of US$3.8 billion. Based on the her prior experience working on the project for some time, Ms. Liu confirmed that PKZ Inc.'s quotation price had obvious room for negotiation, and informed Mr. Zhou Yuqi to negotiate further regarding the price. But he said this time he was authorized to quote only US$2.8 billion, and that he had to go back to negotiate. The main reason for Mr. Zhou's decision was that he thought that, even by a bidding process, no other company had an advantage like SINOPEC and that they could put pressure on PKZ Inc. in a bidding process and negotiate a lower price.   On the one hand, at that time, only SINOPEC had conducted due diligence on PKZ, and other companies would not be able to blindly make a high bid in such a short period of time; on the other hand, PKZ Inc. offered to sell 100% of the shares but would only accept a one-time cash payment, which was difficult for foreign companies.

[*Page 23 of Chinese Original*]

Besides, SINOPEC had already filed the project with the relevant department of the government in accordance with the applicable regulations, and other domestic companies would not take part in the bidding.

Yet, unexpectedly, CNPC took part in the project, and the final acquisition price was US$4.18 billion. That is to say, even with the US$3.8 billion that PKZ Inc. was demanding, the Respondent had the opportunity to complete the deal within its target prize, but did not seize the opportunity.

In the 7 months from November 2004 to June 2005, the Applicant had assisted the Respondent to comprehensively complete the preparatory work for the acquisition, which laid a solid foundation for the successful acquisition for US$4.18 Billion by the Chinese side.

The Applicant wishes to draw the attention of the Arbitral Tribunal to the fact that the price of the transaction was more than US$4 Billion and that the parties to this transactions were all multi-national listed companies. This not only had an impact to the industry, but also significantly influenced the affected states and international relations. Therefore, in such a significant transaction, duties of confidentiality and disclosure must be complied with, and normally discussions would be conducted face-to-face.   During the process, sensitive and key information, for example price, could not be discussed or confirmed in writing or by email. The Respondent refused to recognize the effort and result of the Applicant's hard work by asserting that there was not enough evidence in writing, which is completely contrary to the objective facts and a breach of fundamental principles of fairness, honesty, and good faith.

(Three) The contractual purpose of foreign acquisition as agreed in the Agency Agreement was achieved.

1, Sinopec Group had agreed to bid together with CNPC, and to share the PKZ shares according to an agreed proportion.

After SINOPEC's first offer in London, CNPC made clear its intention to acquire PKZ Inc. shares.   In SINOPEC side's

[*Page 24 of Chinese Original*]

internal report, the following is recorded: "In the spirit of protecting the national interest and to avoid internal competition, on 27 June 2005, at a meeting coordinated by the leaders of government departments, SINOPEC reported on its earlier work in relation to the acquisition of PK, and the meeting clarified that CNPC and Sinopec Group would jointly acquire the PK project.  On 28 June 2005, the relevant government departments organized a negotiation between the two companies regarding the joint acquisition, and decided that, after the completion of acquisition, CNPC will get 60% of PKZ's shares, and Sinopec Group will get 40% of PKZ's shares.  Thereafter, the two companies worked closely on the joint acquisition.  In order to protect the national interest, and to ensure that a Chinese company would win the bid, both companies agreed that, on the second round of bidding on 15 August, CNPC would make the bid on behalf of both companies, and after winning the bid CNPC would transfer the shares to SINOPEC." This point was recognized by the Respondent in the hearing. The Respondent stated that it was the weaker party of the two, because at that time CNPC was constructing the Sino-Kazakhstan oil pipeline. This was the reason the relevant governmental department requested the two companies to make a joint bid, and in order to protect the national interest SINOPEC side had no choice but to agree.

This illustrated that it was only a matter of external appearances that Sinopec Group and CNPC bid separately. In reality, both large companies violated confidentiality and bid in concert, in order to achieve the acquisition by the Chinese side as agreed earlier.  Therefore, the goal of the Agency Agreement was altered unilaterally by SINOPEC side and changed to that of making a joint acquisition, the Respondent still promised to pay the Applicant its fees as an agent.

2, CNPC had acquired PKZ shares on behalf of Sinopec Group and completed all of the completion procedures.

According to "CNPC's China A shares Initial Public Offering Prospectus" and Sinopec Group's internal report "Brief on PKZ Project", CNPC had acquired 100% of PKZ Inc. shares in August 2005 for US$4.18 billion. On July 2006, the Kazakhstani national oil company acquired 33% of PKZ Inc. shares from CNPC.

[*Page 25 of Chinese Original*]

In August 2006, CNPC injected the remaining 67% of its PKZ shares into its listed subsidiary, PetroChina Company Limited ("PetroChina"), and those assets were included in the consolidated financial statements of PetroChina.

That is to say, the Chinese side in actual fact completed the whole share acquisition process, including the signing of the contract and completion. The disclosure of the assets by PetroChina was the best proof. At the same time, since CNPC acquired PKZ Inc., PKZ Inc continued to generate huge profits and generate stable and large revenues. PetroChina's prospectus discloses that, in 3 years, profits totaled RMB 18.27 Billion. It could be said that the original goal of acquisition by the Chinese side had been achieved.

3, The Chinese side's successful completion of the acquisition was due to the work completed by the Applicant at the initial stage, and built on the Applicant's fulfilment of its obligations under the Agency Agreement.

From November 2004, the Respondent started the preparation work for the acquisition of PKZ Inc., with the help of the Applicant, and completed the process of due diligence. According to a SINOPEC internal report: "According to the coordination opinion given by the relevant department of the government, on 21 July 2005, SINOPEC briefed CNPC regarding the result of the of the initial due diligence, which laid the foundation for CNPC's due diligence". Thereafter, CNPC represented both parties in the bid on 15 August.

For such a large-scale international acquisition, SINOPEC took 7 months to finish the due diligence and other initial preparation work. CNPC represented SINOPEC side in the bidding process, and this was entirely the result of both parties' cooperation on the foundation of SINOPEC's initial work. Thus, the successful bidding not only realized the Chinese side's interest, but also achieved the goal SINOPEC had agreed in the Agency Agreement.

[*Page 26 of Chinese Original*]

What needs to be explained is that, the Respondent claimed that in April 2005 the negotiation was suspended, and it received in May a letter of invitation to tender from PKZ Inc., which then changed the acquisition process to a public bidding process. When the Applicant's Exhibit 12 was discussed at the hearing, the Respondent recognized that Ms. Liu participated in the negotiations at the time. On 31 May 2005, Bernard Isautier sent a letter replying Ms. Liu, stating that he did not know the persons sending the letter, namely Akshay Prasad, Nigel Robinson, or the circumstances to do with Goldman Sachs International.   Bernard Isautier confirmed that they did not represent PKZ.   Under these circumstances, Mr. Zhou Yuqi led a team to London to make an offer for the first time on 12 June 2005. During the preparation for a second offer by the Respondent, because of the participation of CNPC, the relevant government departments organized a coordination meeting on 27 June, and consequently altered the acquisition method. Therefore, it cannot be said that the Respondent's negotiations were unable to continue with PKZ Inc. and then the process changed to a public bidding process.

4, SINOPEC side's rights under the PKZ project are sufficient and definite.

SINOPEC and CNPC had confirmed many times both before and after the acquisition the distribution of shares and rights, and consensus was reached. This was not only confirmed by both sides, it also received approval from the key Chinese governmental departments, with many important coordination meetings held:

(1) As previously mentioned, on 27 June 2005, a meeting was held by the relevant department of the government to discuss joint bidding by the two companies. This meeting confirmed the proportion of shareholding after the acquisition would be 60% for CNPC and 40% Sinopec Group.

(2) After successful acquisition in August 2005, on 21 March 2006, the relevant government department held a meeting specifically to coordinate the transfer of PKZ Inc. shares from CNPC to SINOPEC. During that meeting, the relevant government department, CNPC

[*Page 27 of Chinese Original*]

and SINOPEC reached consensus including that "in the event that there are no legal obstacles, CNPC agrees to transfer the shares to SINOPEC", and that "if legal obstacles cannot be avoided, the parties will uphold the national interest and CNPC agrees to transfer shares in other overseas project to SINOPEC".

(3) On 10 May 2006, both parties confirmed arrangements in relation to the transfer of PKZ Inc. shares.   Both parties confirmed their working group members; confirmed the assets would be valued as at 31 December 2006; and targeted the transfer of shares by the end of the year.   This meeting's meeting memorandum was signed by the assistant to general manager of the CNPC, Mr. Wang Songjin, and the original general manager (the then assistant to the general manager) of the Respondent, Mr. Zhou Baixiu.

Due to the fact that the Applicant had not participated the share transfer process, it is not clear to the Applicant what had caused the failure to transfer the shares. However, it can be confirmed that, until now and without any written contract, SINOPEC still believes that CNPC has obligations to transfer the PKZ Inc. shares or other equivalent interests. SINOPEC claimed that it had not given up the claim, which proved that CNPC was in effect bidding on behalf of SINOPEC and the agreed proportion of shares or equivalent interest were obligated to be transferred to SINOPEC. Therefore, SINOPEC side's rights pursuant to the PKZ share acquisition are valid and definite, and the various meetings coordinated by the relevant government departments and meeting memoranda were valid and effective. Unless SINOPEC unilaterally gave up or was deliberately indolent in exercising its rights, SINOPEC had sufficient rights and interests in relation to the PKZ share acquisition, and SINOPEC had sufficient reason to exercise its right of claim.

(4)    Prior to this arbitration, SINOPEC and the Respondent recognized the relevance and connection between the Applicant's work and the Chinese side's acquisition of the PKZ Inc. shares, and promised to pay the Applicant the agency commission.

1, After the completion of the PKZ acquisition, the Respondent had entered into supplementary agreements with the Applicant 3 times.

[*Page 28 of Chinese Original*]

In August 2005, after the CNPC had completed the deal on behalf of SINOPEC Group, the Applicant had demanded payment of the agency commission from the Respondent many times. The Respondent refused and hoped to postpone the payment date using the excuse that the parties had not finalized the transfer of shares. The Applicant and Ms. Liu took into account the friendly cooperative relations and possible future long-term cooperation, and in the hopes of reducing the pressure on SINOPEC as much as possible, agreed to sign extension agreements on 2 March 2007, 14 March 2008, and 13 June 2008. And during the third extension, the task of coordination with the Kazakhstan Government was added.

It can be seen from the three extension agreements that, the Respondent did not change the goal of the Agency Agreement, the calculation method of the agency commission, and the form of payment, etc., and did not question the work already completed by the Applicant. Also, the Respondent did not mention the termination of the Agency Agreement or giving up its claim on the PKZ Inc. shares.   The three extension agreements confirmed the fact that the Applicant had completed its overseas agent work, and reflected SINOPEC side's wish to pay the agency commission under the Agency Agreement.

2, SINOPEC and the Respondent had confirmed many times to the Applicant that they will pay the agency commission as agreed in the Agency Agreement, and the Applicant's Request for Arbitration is not filed outside the limitation period. After signing the extension agreements and prior to this arbitration, the Applicant had demanded payment from the Respondent many times, including through letters, and Ms. Liu reminded the Respondent's leadership many times that it should comply with the Agency Agreement, even suggesting that, if the Respondent is not able to comply with the Agency Agreement, it should disclose to SINOPEC the circumstances to do with the Applicant's agency role and transfer the rights and obligations under the Agency Agreement to SINOPEC.   Ms. Liu also requested that SINOPEC side fulfil its obligations in the Agency Agreement to designate the Applicant as the dealer for its products outside China.   Each time, SINOPEC would

[*Page 29 of Chinese Original*]

confirm with Ms. Liu that the Applicant had performed an important role and that it would pay the agency commission in accordance with purchase price paid for the 100% shareholding in PKZ Inc., but also expressed the desire that the amount could be paid only after SINOPEC had acquired the shares.

The abovementioned can be proved by the GM of the Respondent Mr. Zhou Baixiu that Ms. Liu had requested many times for the Respondent to perform its obligations during the period 2008 to 2011, and Ms. Liu and the Respondent had discussed the postponement of payment many times. Mr. Zhou said, "I remember there were 2 times in 2009, 1 time in 2010. What I had told her was the same. First, we did not have the shares; Second, we did not give up our claim; In 2009, there was one time she mentioned that to enter into another extension agreement, I told her to discuss the matter with general manager Mr. Zhou Yuqi. In 2011, UNI-TOP had sent letter to the Group company and requested to further extend the Agency Agreement. The same letter was sent to me as well. I forwarded the message to Comrade Yaocang."   The Respondent had confirmed that they had received the letter from Ms. Liu in 2011, and the leader of the Respondent made instructions in response. The Respondent's representative stated in court that they would not give up the Respondent's claim against CNPC but that, even if the shares were transferred to the Respondent successfully, the Respondent would not pay the agency remuneration because the matter had already passed.   In summary, the above demonstrates that this case is not outside the relevant limitation period, and the Applicant's lawful rights should be effectively protected.

(Fifth) Due to the breach of Agency Agreement by SINOPEC and the Respondent, the Applicant had suffered large losses and cannot continue to operate normally.

1, SINOPEC had seriously breached the principle of fairness, honesty and good faith, by being indolent in claiming or waiving its right to claim against CNPC, which resulted in the Applicant's inability to claim against the Respondent owing to the format of the transaction.   In order to show off its work, SINOPEC side did not disclose to CNPC the participation of the Applicant and the significant role that it had performed. The Respondent did not provide to CNPC details of the trade remedy terms promised to the Applicant. In order to protect the Chinese interest,

[*Page 30 of Chinese Original*]

SINOPEC side breached business ethics and conducted the acquisition jointly with CNPC, unilaterally altering the agreed performance under the Agency Agreement. The worse part is that the Respondent did not give any regard to the lawful right of the Applicant, refuses to or give up claim the rights that ought to be enjoyed by the Respondent under the Agency Agreement. This action should be strongly condemned and the Respondent should bear all the responsibility so caused.

It should be emphasized that it is not known whether the Respondent has claimed its rights against CNPC or not, or the reason why the Respondent did not claim its rights against CNPC. But it is clear that SINOPEC gave no regard to its own increasing loss. Due to the continuing production and operation of PKZ Inc., with profit capabilities increasing each year, the later SINOPEC decides to claim its lawful rights, the higher the transaction costs and the difficulty of evaluationg and calculating the value and profit of holding PKZ Inc. shares. Of course, as two giant state-owned enterprises in China, no matter whether SINOPEC or CNPC holds the shares, there would be not loss to the national interest in the big picture.   However, this would result in irreversible loss for the Applicant.

On 23 August 2006, CNPC transferred the PKZ shares to the Pervinage Holding B.V., a subsidiary of PetroCina. PKZ shares ultimately became the assets of a listed company in the end. Under these circumstances, not only the Respondent was irresponsible to the Applicant, but it was also irresponsible to the shareholders of both Sinopec Group and CNPC.

2, The Respondent should compensate the Applicant for the actual losses caused the Respondent's breach.

According to Article 107 of the Chinese Contract Law, if a party fails to perform its obligation under a contract, or its performance fails to satisfy the terms of the contract, it shall bear the obligations for breach of contract, including the obligation to continue to perform its obligations,

[*Page 31 of Chinese Original*]

the obligation to take remedial measures, or the obligation to compensate for losses. In the current case, the Applicant's actual lossses caused by the Respondent's unilateral breaches include, but not limited to:

1) The Applicant was unable to receive the agency commission. According to the internal report of SINOPEC, the acquisition price of PKZ Inc. based on CNPC's winning bid was US$4.18 billion. The Applicant submits that US$4.18 billion should be the "transaction completion price" under Clause 5.1 of the Agency Agreement. The corresponding agent remuneration should be US$21,540,000 (1,000,000,000×1% + 1,000,000,000×1% + 2,180,000,000×0.3%).

2) The Applicant's interest losses from its failure to receive the agency remuneration.   The Respondent should pay the interest losses from 15 August 2005 till the actual payment date.   Based on an annual interest rate of 11%, calculated for the time being until 31 August 2012, totalling 2573 days, the interest losses amount to US$16,934,628.33 (21,540,000×11%⁄360×2,573).

3) The loss of crude oil trading business, which the Applicant originally had with PKZ, caused by the Applicant's strict compliance with the obligation under the Agency Agreement. As previously explained, at the time the Applicant undertook the agent work, the crude oil trading contract between Universal Petroleum and PKZ Inc. was still valid.

Clause 7.1 of the Agency Agreement provides, "The Agent promises that, after completion of the transaction, it shall no longer act as the agent for PetroKazakhstan in transporting crude oil produced by PetroKazakhstan to the Chinese market, and shall not charge any agency fees thereof." In order to cooperate with the Respondent's acquisition activity, Universal Petroleum ended the crude oil trading cooperation with PKZ prematurely. In 2002, PKZ's crude oil sales via Universal Petroleum to China's Sinopec Lianhe Petroleum Company, amounted to to 20,000 tons per month. The profit at that time was US$0.45/barrel (1 ton = 7.7 barrels), or US$3.47/ton. The monthly profit was at least US$69,400. By 2005, PKZ Inc.'s crude oil sales to Sinopec Lianhe Petroleum Company

*English translation*

[*Page 32 of Chinese Original*]

had increased to 100,000 tons per month. According to calculation using the fixed profit of US$0.45/barrel agreed with Sinopec Lianhe Petroleum Company, the monthly profit was at least US$347,000.

According to the trade contract signed between Universal Petroleum and PKZ Inc., it was valid until 30 April 2006. Universal Petroleum had ended the contract 8 month ahead of time, in September 2005. Therefore, Universal Petroleum had at least lost 8 months' sales profit totaling US$2,776,000. Universal Petroleum now specifically authorizes the Applicant to claim for the loss caused by the early termination of the oil trade contract with PKZ.

Besides, Clause 1 of the Agency Agreement states that "Agent" is the Applicant and its affiliates. Therefore, Universal Petroleum, being an affiliate of the Applicant, should be taken into account when calculating loss during the arbitration.

4)  The legal fees paid by the Applicant and arising from this dispute. Taking into account that the Applicant is facing disrupted business operations and could not make payment of legal fees, the Applicant had entered into a pure risk legal engagement contract. The legal fees are calculated based on the amount awarded by the Arbitral Tribunal, *i.e.*, 8% of the actual amount recovered by the Applicant from the Respondent.

3, The Respondent should afford relevant dealership rights to the Applicant in accordance with the contract, or to compensate the Applicant for the lost of expected profits caused by the Respondent's breach.

Clause 7.2 of the Agency Agreement provides, "Both parties agree that the Company shall, on terms agreed separately, entrust the Agent as the sales agent for the portion for the portion [*sic*] of crude oil produced by PetroKazakhstan which is to be sold outside China". On 14 March 2008, parties confirmed this upon signing the second extension agreement. However, due to the fact that Sinopec Group had not disclosed to CNPC the significant role that the Applicant had performed in this project or the promise that it had made to the Applicant, after acquiring PKZ Inc.,

[*Page 33 of Chinese Original*]

CNPC did not award the dealership right to the Applicant after completion of the transaction. Due to the significant breaches by SINOPEC, it should comply with the Agency Agreement and award the dealership rights to the Applicant. If this cannot be performed for the Respondent's own reasons, the Respondent should compensate for the loss of expected profits.

As recorded in the "Brief on PKZ Project", the annual oil production of PKZ Inc. starting from 2005 was 10,000,000 tons; according to the Dzungarian Gate Branch of the China Certification & Inspection (Group) Co. Ltd (Xinjiang), from 2006 to September 2012, PKZ Inc. had transported to China a total of 14,749,025.758 tons of crude oil. In other words, crude oil sales outside China amounted to 45,250,974.242 tons, and these should have been distributed by the Applicant.   If calculated based on a profit margin of at least US$3.47 per ton, the Applicant's expected profits have been more than US$157,020,880.619.

In fact, SINOPEC Group and the Respondent had recognized the relevance between the Applicant's work and the Chinese side's acquisition of the PKZ project. The original general manager of the Respondent Mr. Zhou Baoxiu had confirmed this in writing, stating that the Applicant's demand for payment is sufficient on both facts and reason. Yet, the Respondent denied this by saying, "as long as the Respondent does not acquire shares in PK Inc., the Applicant is not entitled to agency remuneration, regardless of how much work the Applicant had done, or how large a role the Applicant had played, and regardless of whether the Respondent itself was indolent in claiming or had waived its claims against CNPC, or whether for its own reasons SINOPEC was unable to acquire the PK shares."   As can be seen, the Respondent gave no regard to the Agency Agreement by using the national interest as an excuse, and completely disregarded basic principles of honesty and good faith, denying objective facts. The Respondent uses this as an excuse for the huge losses that it had caused to the company, the company's shareholders, and state-owned assets.

[*Page 34 of Chinese Original*]

In response to the Applicant's claim, the Respondent stated the following:

When the Applicant brought up the arbitration, it had six claims against the Respondent. They were claims for agency commission, interest losses for overdue payments, anticipatory profit loss, foreign exchange losses, legal fees, and arbitration costs. On 6 Feb 2013, the Applicant changed its claims. Now, the claims are for agency commission, overdue interest loss, anticipatory profit loss, legal fees, arbitration costs, and also to award the Applicant the dealership rights of PKZ Inc.'s products outside of China.

The Respondent takes the view that the main arbitration claims are: (1) agency commissions; (2) the loss of expected profits relating to dealership rights for PKZ Inc.'s products outside of China.   The remaining arbitration claims are derived from these two claims.

While defending against these claims, the Respondent takes the view that Applicant cannot prove that it is in fact the agent described in the Agency Agreement, and the Applicant cannot prove that the limitation period has been discontinued. Hence, the Respondent proposes to dismiss all the above claims.

Therefore, the Respondent believes that the main disputes of the case are: the issue of the Applicant's standing; whether the Respondent should pay the agency commission; whether the Respondent should compensate the Applicant by paying anticipatory profit loss and award the aforementioned dealership right; and whether the arbitration brought exceeded the limitation period.

The first issue of standing

(First) The Applicant cannot prove that it is the agent UNI-TOP described in the Agency Agreement.

In the Agency Agreement, UNI-TOP was described as a Hong Kong company. But in the Request for Arbitration, the Applicant stated that UNI-TOP was a company registered in the British Virgin Islands.

[*Page 35 of Chinese Original*]

The evidence submitted by the Applicant does not form a chain of evidence and cannot prove that the Applicant was the same entity as the agent in the Agency Agreement.   Therefore, the Applicant has no right to demand agency commissions under the Agency Agreement.

1, The written evidence submitted to the Arbitral Tribunal cannot prove that the Applicant was the agent. In order to prove it is the same entity as the agent in the Agency Agreement, the Applicant submitted to the Arbitral Tribunal a "Testimonial of the Company Registry of the Hong Kong Special Administrative Region", the "Statement of Hong Kong Han Qi sheng Accounting Firm", and the Applicant's BVI Registration Certificate. Yet, the Respondent takes the view that these pieces of evidence cannot prove that the Applicant was the same entity as the agent with the following reasons:

1) The BVI Registration Certificate can only prove that the Applicant is a company registered in the British Virgin Islands. But it cannot be used to prove that the Applicant is the same entity as the agent in the Agency Agreement.

2) The "Testimonial of the Company Registry of the Hong Kong Special Administrative Region" can prove that there is no company called "UNI-TOP ASIA INVESTMENT LIMITED" existed in Hong Kong. But, this cannot prove that, except in BVI, "UNI-TOP ASIA INVESTMENT LIMITED" does not exist in other countries or regions.

3) The intention of submitting the "Statement of Hong Kong Han Qi Sheng Accounting Firm" was to make a connection between the Applicant and the agent using office address. According to the understanding of the firm, when the Applicant was newly formed, the Applicant's office address in Hong Kong was the same as stated in the Agency Agreement. Yet, this statement was purely subjective and did not have any objective evidence to support it. According to the "Statement", Han Qi Sheng Accounting Firm learned about the Applicant's address because it had provided address communication services to the Applicant. If so, the communication address of the Applicant and the Han Qi Sheng Accounting Firm

*English translation*

[*Page 36 of Chinese Original*]

should be the same. From many BVI government registration receipts of Han Qi Sheng Accounting Firm on the Applicant's behalf, it was shown that, from 2004, the Applicant and the Han Qi Sheng Accounting Firm did have the same address.   From these receipts, the Respondent found out that, on those receipts, there were no "Unit 15, 28/F, China Merchants Towers, Shun Tak Centre, 200 Connaught Road Central, Sheung Wan" (the address that the Applicant claimed during the signing). Therefore, Han Qi Sheng Accounting Firm's statement that, when the Applicant was newly formed, the Applicant's office address in Hong Kong was the same as stated in the Agency Agreement, was rebutted by its own submission.

2, The Applicant claimed during the hearing that the Respondent had paid the Applicant expenses on four occasions, and from this behavior, the Applicant was in fact the agent under the Agency Agreement. Yet, according to the "Payment Advice" and receipts, they did not show UNI-TOP's address and registering jurisdiction. Therefore they cannot be used to prove that the recipient UNI-TOP was the same entity as the Applicant of this case.

3, The Applicant claimed that the Applicant and UNI-TOP under the Agency Agreement had the same Chairman and legal representative, Ms. Liu Fang, which demonstrated that the Applicant was the same entity as the agent under the Agency Agreement. Yet, first, the Applicant did not submit any objective evidence (like company registration documents) in relation to the job title of Ms. Liu in the Applicant or the agent company. Second, even if Ms. Liu was the legal representative of both the Applicant and the agent, the Respondent cannot evaluate whether the Applicant was the same entity as the agent, because one natural person can become the chairman and legal representative of many companies. The record of short messages (12 Jun 2005 to 17 Jun 2005) between the Applicant and the Respondent, together with "Certification Letter", the visa record of Ms. Liu, and the copy of passport showed that Ms. Liu had at least two identities at the same time: the first is Liu Jun, with Chinese National

[*Page 37 of Chinese Original*]

ID No. 110101196405062088; the second is Liu Fang, with Hong Kong Special Administrative Region Passport No. HA9052174. Ms. Liu claimed herself to be the legal representative and actual controller of the Applicant. And her doubtful identity further reinforced that the Applicant's standing in this case is flawed.

Lastly, the Applicant claimed that the stamp in the Agency Agreement was the same as the Applicant's stamp, therefore the two parties were the same company. Yet, the Respondent believed that, just by looking at the stamps, one cannot judge whether the parties are the same company. First, there was no expert appraisal of the stamps; second, there is no such stamp registration system in the common law countries, therefore it cannot be relied on to judge the issue in contention here.

In view of the doubtful standing of the Applicant, the Arbitral Tribunal should not allow any of the Applicant's requests.

For convenience's sake, it is assumed below that the Applicant has appropriate standing, and when mentioning UNI-TOP, the Respondent does not distinguish between the Applicant and the agent.

(Second) Universal Petroleum should not be confused with the Applicant

The Applicant had submitted many contracts signed by Universal Petroleum and hoped to use them as evidence of the claim. The Respondent takes the view that the Applicant should not be confused with Universal Petroleum.

First, the Applicant did not have sufficient evidence to prove that Universal Petroleum is an affiliate    1. The Applicant did not supply objective evidence (like the company registration documents); 2. The Applicant relied on Ms. Liu's "Explanatory Statement", which she signed under the title of the authorized representative of both the Applicant and Universal Petroleum. It attempted to prove that Ms. Liu was the chairman and actual controller of the Applicant and Universal Petroleum, and to further prove that the two companies are connected companies. Yet, the Applicant did not provide any evidence as to the actual job title of Ms. Liu in the Applicant and Universal Petroleum (like company registration documents). At the same time, the Applicant did not provide any documents to prove that Ms. Liu

[*Page 38 of Chinese Original*]

was the authorized representative of the Applicant and Universal Petroleum (like a Board Meeting Resolution). Therefore, the "Explanatory Statement" is at most a document used by Ms. Liu to speak under the names of the Applicant and Universal Petroleum. It does not contain any proof.

Second, even if Universal Petroleum is an affiliate of the Applicant, it is still not a party to the Agency Agreement. 1. There was no mention of Universal Petroleum in the Agency Agreement; 2. Universal Petroleum had not signed the Agency Agreement; 3. Universal Petroleum had not expressly conveyed that they had accepted the Agency Agreement; 4. The Respondent had never intended to form an agreement with Universal Petroleum.

Lastly, even if Universal Petroleum had rights under the Agency Agreement, the Applicant could not claim the relevant rights because Universal Petroleum had not submitted the Request for Arbitration.

<u>Second, the issue of whether the Respondent should pay the agency commission</u>

(First) The Agency Agreement provides that the condition for payment was that the Respondent acquires PKZ Inc. shares. Because the Respondent had not yet acquired any PKZ Inc. shares, the condition for payment has not been realized. Therefore, the Applicant's arbitration claim had no factual and legal basis.

1.  The nature and effect of the Agency Agreement

Regardless of the label or the content, the Agency Agreement, as the parties agreed during the hearing on 8 Aug 2013, is in the nature of a contract of attorney or agent. It does not contravene any legislation and binds both parties legally.

The nature of the contract means that: 1. Article 405 of the Chinese Contract Law provides that, 'when an agent has satisfied the entrusted affairs, a principal shall pay agency commission to the agent. …   If the parties have stipulated otherwise, such stipulations shall govern."   Therefore, Clause 5.1 of the Agency Agreement, in providing for the payment of agency commission upon the

[*Page 39 of Chinese Original*]

completion of the transaction at the target price, was effective. 2. Article 399 of the Chinese Contract Law provides that that, "an agent shall handle entrusted affairs in accordance with instructions of a principal."   Article 63 of the General Principles of the Civil Law of the People's Republic of China provides that, 'the principal shall bear the civil liability for the agent's acts of agency'. Therefore, the Respondent as the principal should have commercial autonomy.

2. The condition for payment under the Agency Agreement was that the Respondent acquires PKZ Inc. shares.

First, in order to acquire all PKZ Inc. shares, the Respondent and the Applicant entered into the Agency Agreement. Clause 5.1 of the Agency Agreement stated that when the condition for payment is when the company completes the transaction within its target price.   Clause 2.1 of the Agency Agreement stipulated that the purpose of the contract is "to assist the Company in acquiring the shares of PetroKazakhstan directly or indirectly through the Company's affiliated companies according to relevant laws or regulations, and obtaining relevant government approvals (hereinafter referred to as "Completion of the Transfer"). Clause 3 of the Agency Agreement provides, "The Agent agrees that it shall at all times during the term of this Agreement and any possible extension thereof reasonably perform its obligations under the Agreement, and shall keep using efforts and devote sufficient time and attention to contact the management of PetroKazakhstan, to assist Company in acquiring the project". Therefore, it can be seen that the condition for payment was is that the Respondent acquires PKZ shares.

Second, the "General Manager Zhou's Letter" submitted by the Applicant mentioned that, "after CNPC had acquired the PKZ project, Ms. Liu Fang had met us and requested us to pay under the Agency Agreement. The legal and contract department's view was that, only after CNPC had transferred the shares to us and the government approval was granted, could the agent remuneration be paid. I agreed with this opinion and had explained this to Ms. Liu Fang together with Lianhua. And Ms. Liu accepted this in the end". "The Agency Agreement is about to expire and Ms. Liu requested us to pay or to transfer the Agency Agreement to CNPC. We researched and believe that, 1. we cannot pay, the reason is the same as previously said……

[*Page 40 of Chinese Original*]

after negotiation the other party had accepted this"; "There is another extension in 2008, the circumstances were the same".   The above quote demonstrated that, regardless of whether it was within the validity period of the Agency Agreement, or after the expiry of the Agency Agreement, the Applicant had recognized that the condition for payment was that the Respondent acquires PKZ shares.   The Applicant's second point in the "General Manager Zhou's Letter" also confirmed that "after the CNPC side obtains the PK project rights, MS. Liu Fang requests SIPC to pay in accordance with the Agency Agreement, SIPC stated that payment would be after CNPC transfers rights in the project."

Lastly, during the 6 Feb 2013 hearing, the Applicant had admitted clearly that the payment method was "payment on success".

3.   The Respondent had not acquired any shares up to now; the condition for payment was not realized.

The Applicant had not completed the whole acquisition process in accordance with the M&A practices.   The Respondent had not signed any contract with PKZ shareholders, and had not acquired any PKZ shares. According to Article 405 of the Chinese Contract Law, the Respondent does not need to pay any agency commission.

(Second) The Applicant's claim that it had conducted a large amount of work and played a key role in the transaction, while the Respondent had in effect acquired the PKZ shares and the associated rights but for its own reason refused to or given up claim its entitlements and rights against CNPC, and consequently for its own reason unable to finish the transfer of shares from CNPC to the Respondent, is contrary to the facts and cannot be used to support the requests.

As previously mentioned, it did not matter the amount of work the Applicant had done, and it did not matter whether the Respondent was indolent in claiming or had waived its right to claim against CNPC or for its own reasons unable to acquire the PKZ shares, according to the Agency Agreement, as long as the Respondent did not acquire PKZ's shares, the Respondent would not pay any agent remuneration.

[*Page 41 of Chinese Original*]

Therefore, the relevant statements made by the Applicant cannot support its arbitration application. Despite this, in an effort to avoid any confusion, the Respondent makes the following defense in response:

1. The Applicant did not complete its obligations under the Agency Agreement. Its claim that it had conducted a large amount of work and played a key role in the successful acquisition of the PK project contradicted the facts.

The Applicant stated in the Arbitration Application that it had done a large amount of work and performed its obligations under the Agency Agreement, and played a "decisive role" in the successful acquisition of the PK project, and submitted at the hearing that it had completed the overseas acquisition work to do with PK Inc. shares.   In fact, the PK project was not accomplished successfully and the Applicant did not play as important a role as it had claimed. The Respondent had paid all the expenses in accordance with the Agency Agreement.

First, the Applicant had submitted to the Arbitral Tribunal the email exchanges, SMS records, and documents delivery note. These demonstrated that, during the Respondent's participation of the PKZ project, what the Applicant had done was mostly hotel reservations, meeting arrangements, and document delivery for the negotiation. Its so called "large amount of high level public relations and preparatory work" in "over 10 months" and "completion of the initial groundwork for acquisition" clearly lacked evidentiary support.

The Applicant had submitted to the Arbitral Tribunal the visa records and passport copies to prove that Ms. Liu had conducted work for the PKZ project by visiting London 8 times and Almaty 22 times. However, these visa records and passport copy cannot show the specific reasons for each visit and the work that she had carried out during the respective visit. They cannot prove that Ms. Liu had travelled to London and Almaty for PKZ project.

[*Page 41 of Chinese Original*]

According to the Agency Agreement, the obligations of the Applicant included providing negotiation strategy to the Respondent, assisting with the negotiations on behalf of the Respondent, providing financial, legal, and technical consulting opinions, assisting in the government approval process, and assisting the Respondent to acquire the PKZ project and so on. But, the evidence submitted by the Applicant cannot prove that it had completed these obligations.

Second, the so-called "decisive role" of the Applicant is contradicted by the facts. In fact, the Applicant's work did not yield any substantial results:

(1)   The MoU, submitted to the court by the Respondent, was issued by the Respondent to PK Inc., requesting PK Inc. to give the Respondent one-year exclusive negotiation status. This MoU shows that the reason why the Respondent and the Applicant had entered into this Agency Agreement was that the Respondent hoped to acquire all PK Inc. shares through the coordination of the Applicant and the exclusive negotiation arrangement. Yet, the Applicant not only failed to arrange for PK Inc. to sign the MoU, but relayed to the Respondent a Confidentiality and Inaction Agreement issued by PK Inc.. The Confidentiality and Inaction Agreement stated that PK Inc. had the right to terminate the negotiation with the Respondent, and PK Inc. had the right to accept or refuse any third party offer, and demanded that the Respondent cannot discuss the acquisition matter with any third party (including the shareholders of PK Inc.) for one year. Clearly, the Applicant did not assist the Respondent in obtaining exclusive negotiation status or in acquiring all PKZ shares. This led to the fundamental change in the transaction form of PKZ project, which was from commercial negotiation to a public bidding process. And this further led to the participation of CNPC and the coordination by the relevant governmental department.

(2)   In accordance with Clause 3.3 of the Agency Agreement, the Applicant must provide to the Respondent financial, legal, and technical consulting opinions. In fact, the Applicant had not provided such service at all.

(3)   In accordance with Clause 3.3 of the Agency Agreement, the Applicant must provide advice on "negotiation strategies," and

[*Page 43 of Chinese Original*]

"use all reasonable means in negotiation to assist the Company in ascertaining a reasonable acquisition price in order to promote the best interests of the Company." In fact, not only the Respondent did not perform as it should, but also failed to assist the Respondent to come up with a reasonable price. This led to the termination of the negotiation.

(4) On 30 May 2005, the adviser of PK Inc., Goldman Sachs International, sent a letter of invitation to tender to the Respondent and expressed that the PK project had transitioned to a public tender. After the Respondent had received the above letter, it immediately consulted the Applicant its authenticity and asked whether other Chinese companies were also issued the invitation. But the Application did not have a clue about the development. This shows that the Applicant did not know the development of PKZ project and failed to perform its basic obligation as an agent.

(5) The short messaging records submitted by the Applicant showed that after learning that the PK project had transformed to public tender, the Respondent went to London to make an offer in the first half of June 2005 in an effort to grasp the last negotiation opportunity. In fact, Ms. Liu Fang failed to persuade the management of the PK Inc. to accept the offer price.   Ms. Liu only got the opportunity to contact the PK Inc. management until after the PK Inc. management had rejected the offer price and the team had been preparing to return home.

(6) After the PK project became a public tender, the CNPC side acquired the PK shares.   Thereafter, SINOPEC Group and CNPC held negotiations on transfer of part of PKZ shares. During this period, there was no evidence suggesting that the Applicant had played any role at all.

(7) On 13 June 2008, the Respondent and the Applicant entered into a Supplementary Agency Agreement in the hope of resolving the matters in relation to the Kazakhstan government's pre-emptive rights and governmental approval. It was only based on the Applicant's statement that "Kazakhstan government's approval would not be a problem" that the Respondent resolved to reject the CNPC 's suggestion that CNPC to compensate by giving other overseas oil & gas projects.

[*Page 44 of Chinese Original*]

Lastly, clause 5 of the Agency Agreement stipulated that the agent's expenses included: (1) initial expenses (US$10,000 per month); (2) those expenses incurred and duly authorized in writing by the Respondent; (3) the agency commission after completion of the deal. The work done by the Applicant belongs to categories 1 and 2, in total of US$159,898, which was paid by the Respondent in accordance with the Agreement. The Applicant has no right to claim the remuneration, which should be paid out by the Respondent only after the deal is successfully completed.

The Applicant claimed in the hearing that the Respondent should pay initial expenses in the amount of US$260,000 but has not paid.   However, this claim should be dismissed.

(1)   The Extension Agreement had amended Clause 5.2.1 of the Agency Agreement to mean that, after informing the agent to start the service, the Respondent was to pay the Applicant initial expenses of US $10,000 per month. This agreement was signed on 2 March 2007, within the validity period of the Agency Agreement. The Applicant did not, at that time, raise that the payable initial expense was US$260,000. Therefore, this change should have retrospective effect.

(2) According to the Agency Agreement, the condition precedent for paying the initial expenses was that the agent had indeed provided services every month. But evidence showed that after June 2005, the Applicant had not provided services every month, therefore it had no right to claim the US$10,000 per month initial expenses.

(3) Even if the payable initial expenses was US$260,000, the Applicant in the hearing had clearly rejected increasing or changing its requests. Its claim should not be included in the present case.

2.   The Applicant's claim that, through government intervention and coordination, CNPC and SINOPEC decided to unite together in acquiring PKZ and the percentage of 60% would go to CNPC and 40% would go to Sinopec Group, with CNPC representing both

[*Page 45 of Chinese Original*]

companies to make a successful bid, is without factual basis and cannot support the Applicant's request.

First, the only evidence submitted by the Applicant relevant to the 60% CNPC, 40% SINOPEC split was "Brief on the PKZ project's situation (2007)". But that document had missing pages, its origin was unknown, and there was no date and stamps. Also, the person drafting the brief and the person to be briefed were also unidentified. The Respondent cannot confirm its authenticity.

The so-called "joint acquisition" means two entities use one offer price and submit one bid. Whereas a "representative bid" means one entity commissions the other entity as agent to participate in the tender. In fact, the Tender Document provided by the Respondent suggested that, not only did CNPC and the Respondent not use one offer price and submit one bid, but also CNPC did not bid as an agent of the Respondent. The relationships of "joint acquisition" and "representative bid" did not exist.

In the "Brief on the PKZ project's situation (2007)" and "Meeting Memorandum," point 6 mentioned that, after CNPC's successful bid, CNPC had negotiated with the Respondent regarding the transfer of PK Inc. shares. This also showed that the so called "join acquisition" and "representative bid" did not exist.

Second, Chinese energy companies, as part of the "going overseas" strategy have to make filing reports and coordinate with relevant government departments as part of the Chinese government's approval system.   The relevant government department, as one of the supervising and approving institutions of such "going abroad" activities, practiced its duty to uphold national interest by intervening and coordinating the matter in June 2005. Because CNPC had constructed the Sino-Kazakhstan oil pipeline, its cost is lower than SINOPEC after the acquisition. Therefore, from the point of protecting the national interest, the relevant government department's coordinating opinion leaned towards CNPC getting the PKZ project.   During the relevant government department's

[*Page 46 of Chinese Original*]

coordination of the relevant department of the government in 2005, despite the parties' will to transfer some of the PK shares to the Respondent after acquisition of PK shares by CNPC, CNPC refused to sign any agreement on this matter. The so-called "joint acquisition" and "representative bid" were not in reality entered into and executed. Therefore, the assertion that "after the coordination of the relevant department of the government, two groups jointly acquired the PK project" and "CNPC successfully bid on behalf of both companies" cannot stand.

Lastly, according to the Agency Agreement, as long as the Respondent did not get any PK Inc. shares, it would not need to pay the agency commission. And regardless of whether government coordination was needed or not, the conclusion that the Respondent had already acquired PK Inc. shares cannot be drawn. Therefore, the Applicant's assertions cannot support its arbitration requests.

3.  The Applicant's submission of "Brief on the PK project's situation (2007)", "NDRC Meeting Memorandum and Opinion Seeking Letter " and the attachment "NDRC Meeting Memorandum", and "Meeting Memorandum" do not reflect the legal consequences of the ownership of PK Inc. shares shares. The Applicant's reliance on these documents to claim that the Respondent had already acquired PKZ shares and the corresponding rights was completely false.

First, as mentioned above, the authenticity of "Brief on the PKZ project situation (2007)" is doubtful. This brief cannot prove that the Respondent had already acquired PK Inc. shares and the corresponding rights. In fact, by looking at "CNPC IPO Prospectus (summary) dated 26 Sep 2007", it can be learned that one of the CNPC's subsidiary had acquired 67% of the PKZ shares, and to date the Respondent has not acquired any PK Inc. shares.

[*Page 47 of Chinese Original*]

Second, the "NDRC Meeting Memorandum and Opinion Seeking Letter" and the attachment "NDRC Meeting Memorandum" are letters from the relevant government department seeking parties' opinions in relation to the transfer of shares from CNPC to SINOPEC. CNPC and SINOPEC did not sign on the "Minutes of NDRC Coordination Meeting Between SINOPEC and CNPC Regarding the Transfer of Shares to PK Inc." to confirm. This piece of evidence itself cannot prove that it had gained the recognition of all parties.   Additionally, this meeting minute was just a record of a negotiation meeting, and it did not confirm that the Respondent already held PK Inc. shares. It obviously does not satisfy the condition for payment under Agency Agreement.

Again, the "Special Meeting Minutes" was a record of a meeting between the CNPC side and SINOPEC side regarding the arrangements for transfer, and does not constitute a contract with binding power. It also does not confirm that the Respondent already held PK Inc. shares, and it did not confirm the legal ownership of the PK Inc. shares.

Lastly, in fact, until March and June of 2008, the Respondent and the Applicant had extended and supplemented the Agency Agreement. Parties agreed that the Applicant would to resolve "matter in relation to the state pre-emptive right and governmental approval". As previously mentioned, "General Manager Zhou's Letter" also indicated that, during the extension of the Agency Agreement, the Respondent had clearly pointed out to the Applicant that the Applicant would get paid its agency commission only after the Respondent acquires PKZ shares, and Ms. Liu of the Applicant accepted this. Therefore, it can be seen that the Applicant itself had confirmed that the Respondent should not pay the agent remuneration prior to the Respondent acquires PKZ shares. If the Respondent had

[*Page 48 of Chinese Original*]

already acquired PKZ shares within the validity period of the Agency Agreement, the Applicant would have claimed the Agent Remuneration already and the extensions and supplementation of the Agency Agreement would have been unnecessary.

4.  The Applicant's claim that "the Respondent had been indolent in claiming it rights or waived its right to claim against CNPC, for its own reasons unable to complete the transfer of shares" is contrary to the facts and cannot be used to support the application.

First, on one hand, the Applicant claimed that the Respondent had already acquired PKZ shares. On the other hand, the Applicant claimed that the Respondent had been indolent in claiming it rights or waived its right to claim against CNPC or for its own reasons unable to complete the transfer of shares.   This is self-contradictory.

Second, after CNPC won the bidding process, SINOPEC negotiated many times regarding the transfer of shares, and extended and supplemented the Agency Agreement many times. Certainly SINOPEC had not been indolent in claiming it rights or waived its right to claim against CNPC.

In the "Extension Agreement", "Second Extension Agreement", and "Supplementary Agreement to the Agency Agreement" submitted by the Applicant on 6 Feb 2013, the Applicant clearly stated under the purpose of submission that, "the Respondent had never mentioned giving up acquisition or terminate agency relationship". Therefore, the Applicant knows itself that the claim cannot stand.

"General Manager Zhou's letter" stated that, during the extension and supplementation of the Agency Agreement, Zhou Baixiu had repeatedly told Ms. Liu Fang that the Respondent cannot transfer the Agency Agreement to the CNPC side because the Respondent was still in the process of claiming its entitlement against CNPC. Therefore, the Respondent had never given up PK project.

Moreover, the terms of the Agency Agreement and the Chinese Contract Law do not restrict the commercial autonomy of the Respondent, and the Applicant has no right to request the Respondent to engage in business deals regardless of cost:

[*Page 49 of Chinese Original*]

I.   Clause 2.2 of the Agency Agreement stipulates that "this Agreement is effective for 2 years starting from the effective date of this Agreement, or at the time when the company giving up the transaction, whichever is earlier". This showed that the Respondent had rights to give up PK project at any time without UNI-TOP's restriction.

II.   Clause 4 of the Agency Agreement stipulates that "the company will conduct financial appraisal, with the assistance of the agent and the information provided by the agent, to arrive a target price to complete the transaction". Clause 5.1 of the Agency Agreement provides, "both parties agree that when the deal is completed within the company's target price…". This indicated that the Respondent had the right to decide on the reasonable price of acquisition.

III.   Clause 5.2.1 of the Agency Agreement stipulates that "the payment of expenses would be stopped at the time when the company inform the agent in writing that it had given up the transaction". Therefore, the Respondent had rights to inform the Applicant to stop working at any time.

IV.   Clause 8.1 of the Agency Agreement deals with termination and provides that "Both parties voluntarily give up their business respectively, including actions or remissness showing self-determined intention intend or agree to terminate business; or show obvious disregard of business operations according to the terms and conditions of the Agreement." Article 399 of the Chinese Contract Law provides that "the agent shall handle the entrusted affairs in accordance with the instruction of the principal"; Article 410 stipulates that "either the principal or the agent may terminate the agency appointment contract at any time". Therefore, the Respondent can terminate the Agency Agreement at any time.

Lastly, whether SINOPEC is indolent in claiming against, waived its right to claim against or for its own reasons was unable to complete the transfer of shares, according to the Agency Agreement, as long as the Respondent did not acquire PK Inc.'s shares, the Respondent would not be required to pay any agency commission.

[*Page 50 of Chinese Original*]

5.  The Applicant's claim that the Applicant had entered into the Extension Agreement and the Second Extension Agreement for the purposes of extending the time of paying the agent remuneration cannot stand.

The Applicant claimed at the hearing that it did not have agency obligation in relation to the transfer of PK Inc. shares from CNPC to the Respondent, and the Applicant only entered into the Extension Agreement and the Second Extension Agreement for the purpose of extending the time of paying the agent remuneration. The Respondent takes the view that this claim contradicted the reasoning of arbitration application and the fact.

First, the Applicant claimed that it performed its agency obligations after the CNPC had successfully bid the PK Inc. project. This was based on the idea that the Respondent and CNPC were in "joint acquisition", such that the acquisition of PK Inc shares by CNPC meant that the Respondent also acquired PK Inc. shares. On this point, we have already made extensive rebuttals.

Second, the Extension Agreement stipulates, "in view of the needs of the project and after negotiation, the parties agree that the validity period of the original Agency Agreement to be extended to 6 March 2008"; the Second Extension Agreement stipulated that "now that the contract period has expired, according to work needs, and after negotiation, the parties agree that the validity period of the original Agency Agreement shall be extended for a second time to 31 December 2008". Therefore, what the Applicant and the Respondent had agreed to extend was the validity period of the Agency Agreement, not the time for paying the agency commission. The Applicant's claim in relation to the extension of the time of paying the agent remuneration does not have any contractual basis. Just think, if the condition for payment had been realized within the validity period of the Agency Agreement, the Applicant would have claimed the agency commission directly and there would be no such need to further extend the Agency Agreement.

Moreover, the Agency Agreement's goal was that the Applicant should "assist the Company in acquiring the shares of PetroKazakhstan directly or indirectly through the Company's affiliated companies according to relevant laws or regulations".

[*Page 51 of Chinese Original*]

assist the company to acquire PK Inc. shares either directly or indirectly through connected company in accordance with the law or regulation". It does not regulate the origin of PK Inc. shares to be acquired. At the time of signing the Agency Agreement, the Respondent had hoped to acquire 100% PK Inc. shares from the original shareholders of PK Inc.. But, the negotiation was not successful, and the Respondent did not acquire any shares. Then the project transitioned to a public bidding process, and it was CNPC who finally bid successfully. According to the Agency Agreement, as long as the Respondent did not acquire any PK Inc. shares, the Applicant cannot claim any agent remuneration against CNPC.

After CNPC obtained the PK Inc. shares, the Respondent intended to obtain part of the shares from CNPC.  Under the Agency Agreement, the Applicant had the obligation to acquire Kazakhstani government approvals. Therefore, the Applicant and the Respondent entered into the Extension Agreement, the Second Extension Agreement, and the Supplementary Agency Agreement. If the Applicant held that it did not have the agent obligation and disagreed the Respondent's change of the deal structure, the parties did not form consensus to continue the agency relationship. Under this circumstance, the Applicant's claims have no contractual basis.

Lastly, the "General Manager Zhou's Letter" submitted by the Applicant mentioned clearly that, "after CNPC had acquired the PKZ project, Ms. Liu Fang had met us and requested us to pay under the Agency Agreement. The legal and contract department's view was that, only after CNPC had transferred the shares to us and the government approval was granted, could the agent remuneration be paid. I agreed with this opinion and had explained this to Ms. Liu Fang together with Lianhua. And Ms. Liu accepted this in the end.   The Agency Agreement is about to expire and Ms. Liu requested us to pay or to transfer the Agency Agreement to CNPC. We researched and believe that, 1. we cannot pay, the reason is the same as previously said.   2. We cannot transfer the Agency Agreement. Because we were still in the process of claiming our entitlements against CNPC, and the only viable solution was to extend the Agreement. We had considered that out main task was to negotiate with CNPC, and only when the need of Kazakhstan government approval arises, would there be a need for UNI-TOP to work. The Agency Agreement was extended in 2008 again

[*Page 52 of Chinese Original*]

the situation was the same"; "in relation to the Supplementary Agency Agreement, CNPC had raised that the transfer of the rights to the PK project shares was restricted by the Kazakhstan government and suggested transferring other overseas oil & gas project as compensation. We did not want to give up the PK project, thus we asked Ms. Liu to learn more about the situation and explore possibilities. Then, the Supplementary Agency Agreement was signed". This shows that, after CNPC's bid, the Applicant continued to act as an agent of the Respondent and recognized repeatedly that the Respondent would only pay the agency commission after it acquires PK Inc. shares.

For all of the above reasons, the Applicant clearly knew that the Respondent had not acquired any PK Inc. shares, but still claimed agency commissions against the Respondent by using self-contradictory and subjective evidence. This is clearly in contravention of the Agency Agreement.

<u>Third, the issue of the crude oil dealership rights and expected lost profits.</u>

(First) The Applicant cannot claim expected lost profits based on Clause 7 of the Agency Agreement.

First, Article 113 of the Chinese Contract Law stipulates that "where a party fails to perform its obligations under the contract or its performance fails to conform to the agreement and cause losses to the other party, the amount of compensation for losses shall be equal to the losses caused by the breach of contract, including the interests receivable after the performance of the contract……" Yet, both PKZ Inc.and Universal Petroleum are not parties to the Agency Agreement. The early termination of the oil dealership contract is obviously irrelevant to the present case, and the loss does not constitute expected lost profits.  According to Clause 7 of the Agency Agreement, after the completion of the transaction, the Applicant would no longer be

[*Page 53 of Chinese Original*]

the dealer of PK Inc's crude oil products in the China market. Therefore, if the transaction had been completed, the Applicant would have terminated the dealership contract. Hence, the profit under the dealership contract was not a benefit obtained based on the performance of the contract.

Second, given that the transaction was not completed and the Respondent did not get any PK Inc. shares, the Applicant should claim against PK Inc. if PK Inc. unilaterally terminated the dealership contract earlier; and if the Applicant terminated the contract, it should bear the responsibility itself and the Applicant is not entitled to claim expected lost profits.

Finally, in the amendments to its Request for Arbitration, the Applicant claimed that "to strictly comply with the Agency Agreement, Universal Petroleum had ended its dealership 8 month earlier, thus it had a loss in total of USD 2,776,000." But, in the Request for Arbitration, the Applicant had stated that PKZ Inc. unilaterally terminated the dealership contract. They are contradictory to each other. Additionally, the dealership contract stipulated that any party might terminate the contract by giving not less than 60 days notice in writing. Therefore, the Applicant's claim in relation to the early termination of the dealership contract contradicted the facts. In fact, CNPC had won the tender for the PK project, and whether it would use the Applicant or Universal Petroleum as the dealer or not had absolutely nothing to do with the Respondent.  From a commercial perspective, it was inevitable that Universal Petroleum would lose its PK Inc. dealership right in China, and the so-called expected lost profits did not exist.

(Second) The Applicant cannot claim the dealership rights outside of China based on Clause 7 of the Agency Agreement.

First, Clause 7 addresses arrangements to do with dealership rights after the completion of the transaction.  Before the Respondent had acquired any PK Inc. shares,

[*Page 54 of Chinese Original*]

the Applicant cannot claim to enjoy the PK Inc. dealership rights outside of China.

Second, CNPC had successfully won the tender, whereas the Respondent had not acquired any PKZ shares up to this moment. Objectively speaking, it was not even possible for the Respondent to award the Applicant PKZ dealership right outside of China.

Fourth, the issue of limitation period

The Agency Agreement was valid until 31 Dec 2008. If the Applicant thought that its right was violated, then the limitation period should start from the expiry date at the latest. But CIETAC only received the Arbitration Application on 24 September 2012, which was outside limitation period. Although the Applicant had demanded the Respondent many times to pay the agent remuneration, the only evidence submitted in relation to the limitation period, "General Manager Zhou's Letter," cannot prove that the litigation limitation period was discontinued. According to Article 135 of the General Principles of Civil Law of the People's Republic of China, the arbitration should be dismissed.

First, "General Manager Zhou's Letter" indicated that from 2009 to 2010, during Ms. Liu's inquiry of the project development and proposal of signing another Extension Agreement, Mr. Zhou had stepped down from the post. Mr. Zhou asked Ms. Liu to discuss the matter with Mr. Zhou Yuqi, the new general manager. This showed that at that time, Mr. Zhou could not represent the Respondent. Therefore, contacting Mr. Zhou Baixiu would not discontinue the limitation period. In fact, from 2009 to 2010, Ms. Liu had never contacted Mr. Zhou Yuqi.

Second, "General Manager Zhou's Letter" cannot be used to support an adverse inference by the Arbitral Tribunal against the Respondent. Because Article 140 of the General Principles of the Civil Law of the People's Republic of China stipulates that a limitation period shall be discontinued if suit is brought or if one party makes a claim for or agrees to fulfillment of obligations.

[*Page 55 of Chinese Original*]

Ms. Liu had only inquired about PKZ project's development and asked to sign an Extension Agreement, but she had not claimed payment of the agent remuneration. Thus, it would not lead to the discontinuation of the limitation period.

Therefore, for all of the above reasons, the Applicant had received the expenses incurred in relation to its agent activities in accordance with the Agency Agreement. Nonetheless, the Applicant demanded the payment of agency commission and the so-called "compensations" while the condition for payment had not yet been realized. Its arbitration requests lack any factual or legal basis. It is hoped that the Arbitral Tribunal would dismiss all the claims and make award that the Applicant to compensate the Respondent for all the legal expenses in an effort to uphold the spirit of contract and the principle of honesty.

## II. Opinion of the Arbitral Tribunal

(First) The applicable law in this case

According to the dispute resolution Clause 10 of the Agency Agreement, specifically Clause 10.3.2, the Applicant referred the dispute to CIETAC for resolution through arbitration.   At the same time, the same clause confirms that Agency Agreement is governed by Chinese Law. During the whole arbitration process, parties' written and oral submissions all cited Chinese law. Therefore, the Arbitral Tribunal believed that Chinese Law is appropriate jurisdiction here.

(Second) The validity of the contract

The Arbitral Tribunal notes that the Agency Agreement entered into on 4 March 2005 and the extension agreements thereafter are based on fairness and voluntariness principles, and no evidence suggests the contrary. Both parties recognized the legal validity of the Agency Agreement, and it has been performed.

[*Page 56 of Chinese Original*]

The parties to the Agreement have appropriate legal capacity, and the contents of the Agreement are not in contravention of relevant Chinese laws, regulations, and other mandatory administrative measures. Therefore, the Arbitral Tribunal believed the Agency Agreement is legally valid, and it can be evidence to resolve the current dispute.

(Three) The Procedural Issues In this Arbitration

1. Whether UNI-TOP ASIA INVESTMENT LIMITED is the appropriate Applicant to this arbitration.

   The Arbitral Tribunal notes that the 2nd page of the Agency Agreement states that, "UNI-TOP ASIA INVESTMENT LIMITED is a company registered in Hong Kong, the office address is Unit 15, 28/F, China Merchants Towers, Shun Tak Centre, 200 Connaught Road Central, Sheung Wan". The Respondent believed that the Applicant UNI-TOP ASIA INVESTMENT LIMITED was a company registered in the British Virgin Islands. The two companies are not the same entity. Therefore, UNI-TOP do not have standing to bring up the arbitration.

   The Applicant had explained this with the following points:

   1) The Agency Agreement adopted the draft provided by the Respondent. Without asking the Applicant, the Respondent mistook the Applicant for a Hong Kong company. Considering that it would not affect the specific obligations in the Agency Agreement, amendments were not made.
   2) From the signing of the Agency Agreement in March 2005 to the signing of Extension Agreement in 2008, both parties had communicated closely over four years of close cooperation. The Respondent knew very well the Applicant's contacts, company stamp, and bank accounts etc. The issue of standing was only brought up as a litigation strategy, and lacks a factual basis.

[*Page 57 of Chinese Original*]

3) The Company Registry of the Hong Kong Special Administrative Region proves that no company called UNI-TOP Asia Investment Limited existed in Hong Kong.

4) The "Statement of Hong Kong Han Qi Sheng Accounting Firm" states that UNI-TOP was a BVI company established in 2004. From 2004-2012, the company had continuously authorized the Accounting Firm to pay the annual registration fees to the BVI government. And the company is still a live company.

The Arbitral Tribunal noted the Respondent's counter argument. However, the Company Registry of the Hong Kong Special Administrative Region's registration search dated 22 Feb 2013 proved that no company called UNI-TOP Asia Investment Limited existed in Hong Kong. Also, the "Statement of Hong Kong Han Qi Sheng Accounting Firm" did confirm that the office address listed in the Agency Agreement was the Applicant's address, and the Applicant has always authorized the Accounting Firm to pay the annual registration fees to the BVI government.

Therefore, the Arbitral Tribunal holds that despite the mistake in the Agency Agreement, the Applicant's explanation was not illogical. And from 2005 to the date of arbitration application, UNI-TOP's responsible personnel, registered address, communication address, and bank information did not change drastically. Besides, in practice, there are many overseas companies established through accounting firms in Hong Kong. They could be very easily mistaken as Hong Kong companies. Under some situations, the shareholders of the company themselves would mistake the overseas company to be a Hong Kong company. Despite the Respondent's disagreement with the Applicant's proof submitted, the Respondent cannot show the contrary with concrete evidence that the Applicant's explanation had been false, mistaken, and not to be trusted.   In these circumstances,

[*Page 58 of Chinese Original*]

the Arbitral Tribunal accepts the Applicant's explanation that the wrong information was due to writing mistakes. Therefore, the Applicant is the appropriate entity to apply for arbitration.

2.   The limitation period issue.

The Agency Agreement was valid until 31 Dec 2008. If the Applicant thought that its rights were violated, then the limitation period should start running from the expiry date at the latest. But CIETAC only received the Arbitration Application on 24 September 2012, which exceeded the litigation limitation period. Although the Applicant had demanded the Respondent many times to pay the agent remuneration, the only evidence submitted in relation to the limitation period "General Manager Zhou's Letter" cannot prove that the limitation period was discontinued. According to Article 135 of the General Principles of the Civil Law of the People's Republic of China, the arbitration should be dismissed.

The Applicant counter-claimed that, from 2008 to 2011, the Applicant has repeatedly demanded the Respondent to perform its obligations. The Respondent had entered into Extension Agreements and a Supplementary Agreement on 2 March 2007, 14 March 2008, and 13 June 2008. The third Supplementary Agreement extended the validity period to 31 December 2008. After the expiry of the Supplementary Agreement, the Applicant had repeatedly demanded for payment, although further Extension or Supplementary Agreements were not signed, the Respondent had never expressed that they would refuse to pay prior to 2011.

At the same time, the evidence submitted by the Applicant showed that, according to the general manager of the Respondent

[*Page 59 of Chinese Original*]

Mr. Zhou Baixiu, Ms. Liu had requested many times that the Respondent to perform its obligation from year 2008 to 2011. Ms. Liu and Mr. Zhou had discussed the postpone payment matter many times. Mr. Zhou said, "I remember there were 2 times in 2009, 1 time in 2010. What I had told her was the same. First, we did not have the shares; Second, we did not give up our claim; In 2009, there was one time she mentioned that to enter into another Extension Agreement, I told her to discuss the matter with general manager Mr. Zhou Yuqi. In 2011, UNI-TOP had sent a letter to the Group company and requested to further extend the Agency Agreement. The same letter was sent to me as well. I forwarded the message to Comrade Yaocang." The Respondent confirmed that they had received the letter from Ms. Liu in 2011, and the leader of the Respondent made instructions that the matter has passed and focus should be put on persuasion.

According to Article 140 of the General Principles of the Civil Law of the People's Republic of China, a limitation period shall be discontinued if suit is brought or if one party makes a claim for or agrees to fulfillment of obligation. A new limitation shall be counted from the time of discontinuance.

Clause 10 of The Provisions of The Supreme People's Court on Several Issues Concerning the Application of Statute of Limitations during The Trial of Civil Cases, which came into force as of 1 Sep 2008, stated that: any of the following circumstances shall be determined as falling within the meaning of the provision of Article 140 of the General Principles of the Civil Law of the People's Republic of China that "one party makes a claim" and having the effect of interruption of statute of limitations:1. A party directly serves a document of claim on the opposite party, the opposite party affixes his signature or seal on the document, or it may be otherwise proved that the document reaches the opposite party which fails to affix his signature or seal on the document;2. A party makes a claim by correspondence or data message, and the letter or data message reaches or should have reached the opposite party;……

The Arbitral Tribunal considered the agreed facts and Mr. Zhou Baixiu's Letter, and confirmed that from 2009 to 2011 the Applicant requested an extension of its rights several times. Considering

[*Page 60 of Chinese Original*]

that the amount of agent remuneration is very huge, the Applicant's strong desire to obtain the agency commission is self-evident. Usually under these circumstances, when the Applicant continually made demands of the Respondent for payment, it was obvious that its intentions were not merely to extend the validity period. The Applicant's claim complies with the regulation in relation to the discontinuance of the limitation period. Therefore, the limitation period has been discontinued and should be recalculated, and there is no limitation period issue in this case.   Therefore, the Arbitral Tribunal does not accept the Respondent's submissions on this issue.

(Fourth) Main issues of dispute

1.  The nature of the Agency Agreement and condition for payment of agent remuneration.

    1)  The Applicant stated in the statement that the Agency Agreement is a kind of agency contract under Chinese Contract Law. The Agency Agreement adopted the draft provided by the Respondent. The definition was clear that the Applicant was the exclusive agent of the Respondent in relation to the acquisition of PKZ project.

        Clause 2.1 of the Agency Agreement stipulates that, 'purpose of the agreement: to assist the company directly or through connected entities acquire PKZ shares in accordance with relevant laws and regulation, and to assist the company acquire relevant government approval (after transaction)'.

        The Applicant further pointed out that, prior to the signing of Agency Agreement and in November 2004, the Respondent had already authorized the Applicant to be the agent by giving Ms. Liu an authorization letter, authorizing Ms. Liu to deliver to PKZ Inc. the MoU and to coordinate matters relating to the acquisition of PKZ Inc. shares. The then general manager Mr. Zhou Baixiu signed the MoU and the authorization letter.

[*Page 61 of Chinese Original*]

The Respondent recognized retrospectively the agent activity of the Applicant by promise in the Agency Agreement to compensate the Applicant the agent expenses incurred prior to the signing (see Agency Agreement clause 1 interpretation, "agent" means the Applicant and its connected companies. Clause 5.2.3 of the Agency Agreement, "taking into account that the Applicant had already started providing agent services to the Respondent, the company agrees to compensate the agent expenses incurred in Jan and Feb 2005, in total US$20,000").

At the same time, clause 3 of the Agency Agreement specifically stipulated the Applicant's service areas. In accordance with Agency Agreement, the Applicant was performing the obligation as an agent of the Respondent.

The Respondent stated that：the nature of the Agency Agreement means to the present case that: 1. Article 405 of the Chinese Contract Law stipulates that, 'upon completion of the commissioned affair by the agent, the principal shall pay the remuneration thereto…… If the parties agrees otherwise, such agreement shall prevail.' Therefore, the Clause 5.1 of the Agency Agreement was effective. 2. Article 399 of the Chinese Contract Law stipulates that, 'the agent shall handle the entrusted affair in accordance with the instruction of the principal', and clause 63 of the General Principles of the Civil Law of the People's Republic of China stipulates that, 'the principal shall bear the civil liability for the agent's acts of agency'. Therefore, the Respondent as the principal should have commercial autonomy.

Based on the Arbitral Tribunal's investigations and in accordance with the submissions of the parties, the Arbitral Tribunal recognizes that the Agency Agreement is a kind of contract of agency under Chinese Contract Law. The contractual relationship between the parties is clear, and the Agreement has set out detailed rights and obligations of both parties. Clause 3 of the Agency Agreement stated the agent obligation as "3.1. The Agent agrees that it shall at all times during the term of this Agreement and any possible extension thereof reasonably perform its obligations under the Agreement, and shall keep using efforts

[*Page 62 of Chinese Original*]

and devote sufficient time and attention to contact the management of PetroKazakhstan, to assist Company in acquiring the project"

"3.2. Pursuant to the Agreement, the Agent shall assist the Company with the analysis, organization, negotiation, and impact of the project., negotiation, and influence. The Agent shall assist the Company in obtaining information including all information of PetroKazakhstan, prepare any possible detailed evaluation required by the Company, and develop relationships with relevant governments, agencies affiliated to governments, or authorities."

"3.3. The Agent agrees: to advise the Company on negotiation strategies, in order to complete the equity transaction; to assist the Company in negotiating with governments and enterprises managed by governments to complete the transaction, and in negotiating with governmental authorities, enforcement supervision agencies, or regulatory agencies; to assist the Company in obtaining any and all documents of concessions, approvals, and all types of documents; to use all reasonable means in negotiation to assist the Company in ascertaining a reasonable acquisition price in order to promote the best interests of the Company; to provide financial, legal, and technical consulting advice for the Company to complete the acquisition; to respond swiftly to all questions raised by the Company; to maintain sufficient staff as far as possible in order to fulfill the obligations under the Agreement; and to carry out other matters relevant to the agency."

Also, Clause 4 of the Agency Agreement stipulates the Respondent's obligation that "4.1 the company will conduct financial appraisal, with the assistance of the agent and the information provided by the agent, to arrive a target price to complete the transaction. 4.2 the company shall provide reasonable assistance and suggestions to the agent. 4.3 payment of the agency commission in accordance with clause 5 of the Agreement".

The above Agreement does not contravene the Chinese Contract Law. The main dispute is whether the obligations were duly performed, and it should be explained in accordance with the Contract Law, particularly the regulations on contract of agent.

2) In relation to the agent remuneration and payment, the Arbitral Tribunal

[*Page 62 of Chinese Original*]

pointed out that parties should take notice of the relevant sections in the Contract Law. Article 405 of the Contract Law sets out that 'upon completion of the commissioned affair by the agent, the principal shall pay the commission thereto. Where the agency appointment contract is terminated or the commissioned affair is not capable of being completed due to any reason not attributable to the agent, the principal shall pay to the agent an appropriate amount of remuneration. If the parties agree otherwise, such agreement shall prevail.'

The Arbitral Tribunal finds that the payment pursuant to the Agency Agreement consist of two parts, initial expense and agent remuneration. Clause 5 of the Agency Agreement stipulated that "5.1 Both parties agree that, upon completion of the transaction within the target price range ascertained by the Company, the Company shall pay commission to the Agent in accordance with the following term: 5.1.1 The commission shall be 1% of the part of the completed transaction price $\leq$ USD 1 billion; 0.5% of the part of the completed transaction price between US\$ 1 billion – $\leq$ US\$ 2 billion; 0.3% of the part of the completed transaction price $\geq$ US\$ 2 billion."

"5.2 Upfront fees, 5.2.1 The Company agrees to pay the Agent an upfront fee of US\$ 10,000 per month from the effective date of the Agreement for services provided by the Agent. 5.2.2 The payment stipulated in this Article shall cease when the Company notifies the Agent in writing of its intention to give up the transaction of the project. 5.2.3 Given fact that the Agent has already provided agency services to the Company before the Agreement comes into force, the Company agrees to pay the Agent a total of US\$ 20,000 as the upfront fee for January and February 2005. The expenses incurred under this clause should be supported by receipts and supporting documents, which must be submitted each month. After completion of the transaction, the expenses under this clause should set-off against the agent remuneration."

Regarding the upfront fees or payment of expenses, the Respondent claimed that the initial expense or expense, was paid by the Respondent in accordance with the Agreement, including all upfront fees and expenses that

[*Page 64 of Chinese Original*]

could be supported by documentation, amounting to a total of US$159,898. The Applicant has no right to claim the remuneration, which should be paid out by the Respondent only after the deal is successfully completed.

The Respondent rejected the Applicant's claim that the Respondent should pay the initial expense in the amount of US$260,000 and was not paid. Yet, the claim should be dismissed:

1) The Extension Agreement had amended clause 5.2.1 of the Agency Agreement. The clause was amended to after informing the agent to start the service, the Respondent to pay the Applicant initial expenses of US $10,000 per month. This agreement was signed on 2 March 2007, within the validity period of the Agency Agreement. The Applicant at that time did not raise that the payable initial expense was US$260,000. Therefore, this change should have retrospective effect.

2) According to the Agency Agreement, the condition precedent for paying the initial expenses was that the agent had indeed provided services every month. But evidence showed that after June 2005, the Applicant had not provided services every month, therefore it had no right to claim the US$10,000 per month initial expenses.

3) Even if the payable initial expense was US$260,000, the Applicant in the hearing had clearly rejected increase or change the arbitration application. Its claim should not be included in the present case.

The Arbitral Tribunal holds that the parties had agreed clearly in relation to the expenses under the Agency Agreement. Paying the initial expense and expense cannot negate the Applicant's right to agent remuneration after the completion of the transaction. Because the Applicant had clearly expressed in the hearing that it would not claim the initial expense. Therefore, the Arbitral Tribunal agrees with the Respondent that the initial expense should not be included in the hearing of the present case. But, the division of expenses clearly showed that in the event the purpose of the Agency Agreement was not achieved yet the agent had already done a large amount of work, the agent is entitled some

[*Page 65 of Chinese Original*]

practical compensation. Therefore, parties had anticipated whether the agent remuneration should be paid in accordance with the Agency Agreement.

The condition for payment is very clearly set out in clause 5 of the Agency Agreement, the parties agreed that after the transaction is completed at a price within the Respondent's expectation, the Respondent shall pay the agency commission to the agent in accordance with the agreed condition. Based on the debates during the hearings and post-hearing submissions in writing made by both parties, the Arbitral Tribunal holds that the payment of the commission is subject to a condition, and the condition is the completion of the transaction. This is in accordance with the objective of the Agency Agreement: to assist the Respondent in acquiring of shares in PKZ either directly or indirectly through Respondent's affiliated companies, and to assist in obtaining the relevant government approvals to complete the transfer (to complete the transaction). According to the evidence and parties' submissions, there is no dispute in relation to this condition.

2. Whether the agreed condition was accomplished?

The parties are greatly divided over this issue.

The Applicant stated that:

(1) After CNPC had acquired PKZ Inc shares, the Respondent had extended 3 times with the Applicant by signing the Extension Agreements and Supplementary Agreement. The Respondent had recognized that the acquisition was completed and promised to pay the agent expense and others.

CNPC had acquired PKZ Inc on 15 August 2005 by paying US$ 4.18 Billion. After one and half year, the Respondent and the Applicant signed Extension Agreement. This was key to the present case.

The purpose of the Agency Agreement was to provide agency services in relation to an overseas acquisition. Because of the participation of the CNPC and the coordination of the relevant government department, the Respondent agreed to the deal structure that involved: first, CNPC acquiring the project; then,

[*Page 66 of Chinese Original*]

the two state-owned enterprises would then transfer the shares internally. For the Respondent, it had become a two-step transaction. With respect to the overseas acquisition phase, the Respondent agreed that the Applicant would act as agent, and CNPC would represent both companies in successfully completing the acquisition. To date, the Applicant's overseas acquisition should be viewed as complete.   In terms of the domestic phase, the Respondent acted unilaterally and together with CNPC, without involvement of the Applicant.   But the Respondent and the Applicant signed extension agreements, confirming that the Applicant still had a right to payment with respect to the overseas agency matters, and had the right to payment after the Respondent had itself obtained in the second-step the shares or equivalent rights, in accordance with the payments for agency services under the Agency Agreement and the rights to dealership of crude oil.

(2) The purpose of the Agency Agreement was to assist the Respondent in acquiring PKZ shares through overseas acquisition. Within the scope of the Agreement, the Applicant should act as agent in conducting overseas acquisition.

The agreed purpose and goal of the Agency Agreement was to assist the Respondent to facilitate negotiation with PKZ, to acquire shares from PKZ, and to complete the overseas acquisition.

(3) In accordance with government coordination, CNPC represented both parties to "bid together" in the tender and completed the overseas transaction.

In the process of performance of the Agency Agreement, due to the sudden expression of interest by CNPC in participating in the acquisition, and due to the coordination of the relevant government department, SINOPEC unilaterally agreed to change the purpose of the Agency Agreement.   Based on the fact that this change was decided upon by the Respondent, after the coordination of the relevant government department, and not due to factors that the Applicant is responsible for, the Respondent confirmed that the Applicant had performed a large amount of work under the Agency Agreement, and orally agreed,

[*Page 67 of Chinese Original*]

that it would not because of its own unliteral changes to its plans cause adverse effects on the Applicant.

(4) After the completion of the overseas project, the Respondent entered into Extension Agreement and Supplementary Agreement 3 times with the Applicant. In effect, the Respondent recognized the completion of agent obligation in relation to the overseas acquisition, and promised to pay agent expense and remuneration.

The Respondent initially entrusted the Applicant with an overseas acquisition, and later, because of the involvement of CNPC and the relevant government department's coordination, this became an acquisition whereby CNPC would make the acquisition on behalf of both parties, with SINOPEC and CNPC agreeing between themselves on a subsequent transfer of shares, becoming a two-step acquisition process.

(5)  The action of signing the Extension Agreement between the Respondent and the Applicant obviously reflected the recognition that the agent obligation had been completely performed (100% shares acquired, does not account the 33% shares CNPC transferred to Kazakhstan government), and the promise that continue to pay the whole amount of agent remuneration and to award the dealership right to the Applicant. But, because the second step, the transfer of shares from CNPC to Sinopec Group had not been completed, the parties would perform the payment obligation and ascertain the dealership right until after the completion of the transfer by entering into the Extension Agreement.

(6) The Respondent refused to pay the agent remuneration while it had obtainable shares or other interest. This should be viewed an impediment from the realization of the payment condition. According to Chinese Contract Law, the condition for payment had already realized.

After successful acquisition, SINOPEC Group started negotiation with CNPC about the transfer of shares. On 21 March 2006, government relevant department held meeting coordinating the transfer of PKZ shares from CNPC to Sinopec Group. During that meeting, the governmental department, CNPC, and Sinopec Group had reached consensus including "in the event that there is not any legal obstacles, the CNPC agrees to transfer the shares to Sinopec Group", "if the legal obstacle cannot be avoided, parties will uphold the national interest and CNPC agrees to transfer other overseas project to SINOPEC Group".

[*Page 68 of Chinese Original*]

> In essence, the Applicant insisted that the Agency Agreement together with 3 Extension Agreements and the Supplementary Agreement are all legally valid. The Respondent for its own reason refused to exercise its right of claim against the CNPC. The Respondent refused to pay agent remuneration while it had obtainable shares or other interest. They are clearly breaches of contract. The condition for payment had already been realized.

> The Respondent rejected the above claims, and explained that:

(1) The Agency Agreement stipulated that the condition for payment was that the Respondent acquires PK Inc. shares. Because the Respondent had yet acquired any PK Inc. shares up to this moment, the condition for payment was not realized. Therefore, the Applicant's arbitration claim had no factual and legal basis.

(2) The condition for payment under the Agency Agreement was that the Respondent acquires PK Inc. shares. The Respondent only signed the Agency Agreement because it wanted to acquire 100% of PK Inc. shares. The Agency Agreement stipulated that the condition for payment is that "when the deal is completed within the company's psychological price, the company will pay the agent remuneration". Completion means the Respondent acquires PK Inc. shares. The above are detailed in the Agency Agreement.

(3) The Respondent had not acquired any PK Inc. shares up to this moment, and the condition for payment was not achieved. The Respondent emphasized that in accordance with international oil industry M&A norms, only after the completion of the share acquisition process, especially the completion of final legal ownership transfer, the transaction can be regarded as completed.

(4) The Applicant's claim that it had conducted a large amount of work and played a key role in the transaction, while the Respondent had in effect acquired the PK Inc. shares and the associated rights but for its own reason refused to or given up claim its entitlements and rights against CNPC, and consequently for its own reason unable to finish the transfer of shares from CNPC to the Respondent, is contrary to the facts and cannot be used to support the application.

[*Page 69 of Chinese Original*]

As previously mentioned, it did not matter the amount of work the Applicant had done, and it is no matter whether SINOPEC was indolent in claiming or waived its right in claiming against CNPC or for SINOPEC's own reasons it was unable to acquire the PK Inc. shares, according to the Agency Agreement, as long as the Respondent did not acquire PK Inc.'s shares, the Respondent would not pay any agent remuneration. Therefore, the relevant statements made by the Applicant cannot support its arbitration application.

(5) The Applicant's claim that, through government intervening and coordination, CNPC and Sinopec Group decided to unite together in acquiring PKZ and the percentage of 60% would go to CNPC and 40% would go to Sinopec Group, is without factual base and cannot support its arbitration application.

The only evidence submitted by the Applicant relevant to the 60%, 40% split was "Brief on the PKZ project's situation (2007)". But that document had missing pages, its origin was unknown, and there was no date and stamps. Also, the person drafting the brief and the person to be briefed were also unidentified. The Respondent cannot confirm its authenticity.

The so-called "joint acquisition" means two entities use one offer price and submit one bid. Whereas "representation bid" means one entity commission the other entity as agent to participate in the tender. In fact, the Tender Document provided by the Respondent suggested, not only that CNPC and the Respondent did not use one offer price and submitted one bid, but also that CNPC did not bid as an agent of the Respondent. The relationships of "joint acquisition" and "representative bid" did not exist.

[*Page 70 of Chinese Original*]

The "Brief on the PKZ project's situation (2007)" and "Meeting Memorandum" point 6 mentioned that after CNPC's successful bid, CNPC had negotiated with the Respondent the issue of transferring PKZ shares. This also showed that the so-called "joint acquisition" and "representative bid" did not exist.

(6) The Applicant's submission of "Brief on the PKZ project's situation (2007)", "NDRC Meeting Memorandum and Opinion Seeking Letter " and the attachment "NDRC Meeting Memorandum", and "Meeting Memorandum" did not reflect on the legal ownership of the PKZ shares. The Applicant's reliance on these documents to claim that the Respondent had already acquired PKZ shares and the corresponding rights was completely false.

(7) The Applicant's claim that "the Respondent had for its own reason refused to or given up claim its entitlements and rights against CNPC, and consequently for its own reason unable to finish the transfer of shares from CNPC to the Respondent" is contrary to the facts and cannot be used to support the application.

First, on one hand, the Applicant claimed that the Respondent had already acquired PKZ shares. On the other hand, the Applicant claimed that the Respondent for its own reason refused to or given up claim its right against CNPC, and consequently for its own reason unable to finish the transfer of shares from the CNPC to the Respondent. It is self-contradictory.

Second, after CNPC wins the tender, Sinopec Group negotiated many times regarding the transfer of shares, and extended and supplemented the Agency Agreement many times with the Applicant. Certainly SINOPEC had not refused to or given up claim its entitlement against CNPC.

Whether the commissioned agent work had been completed is an objective fact, and should be

[*Page 71 of Chinese Original*]

ascertained by the detailed terms outlined in the Agency Agreement. The parties do not deny that the condition for payment was to complete the acquisition of PKZ shares and complete the final share transfer. The parties do not deny that the acquisition of PKZ shares had been completed by CNPC. But, on the issue of whether the CNPC's completion of acquisition could be treated as the Respondent's completion of acquisition of PKZ shares, the parties hold differing opinions.

The Arbitral Tribunal finds that the focus should be on whether the anticipated result at the time of entering into the Agreement was achieved. Any interpretation tried to insert additional meaning without the support of concrete evidence would not be accepted by the Arbitral Tribunal.

The most essential point is whether CNPC and SINOPEC had agreed to acquire PKZ shares together in union. The Arbitral Tribunal takes the view that there is no concrete evidence showing that, in relation to acquisition of PKZ, CNPC and Sinopec established a written legal relationship concerning the acquisition of the shares of PK Inc. during the course of the acquisition of the shares of PK Inc., and reached an agreement on the issues such as allocation of rights and obligations, undertaking of risks and responsibilities, sharing of financing fees and other matters. Although there are signs showing that Sinopec had claimed against CNPC for its right after CNPC completed the acquisition of the shares in PKZ Inc., but, without clear evidence demonstrating the alliance between the above two groups, the Arbitral Tribunal the Arbitral Tribunal could not come to the conclusion that there exists joint bidding or joint acquisition in this case.

At the same time, the Arbitral Tribunal holds that no matter the amount of work the Applicant had done, it did not change the fact that the Respondent had not acquired any PKZ shares or any associated rights pursuant to the Agency Agreement.

[*Page 72 of Chinese Original*]

Therefore, the Respondent did not complete the acquisition of PKZ Inc. shares or obtain equivalent compensation, so the condition for payment of the Agency Agreement was not achieved.   There is no legal or contractual basis to ask the Respondent to perform the contractual obligation.

The Arbitral Tribunal holds that the Applicant's argument, that the acquisition process should be divided into overseas acquisition and domestic transfer, and that by inference the Respondent had already acquired PKZ shares in accordance with the Agency Agreement, lacks a factual basis. As to the point of whether the Respondent had given up claiming its entitlement against the CNPC, the Arbitral Tribunal holds that it is both illogical and lacks a sufficient factual basis. Because from a practical prospective, the Respondent, as a body corporate, would try its best endeavor to achieve maximum interest. It would be absurd for the Respondent to give up a huge economic interest just to evade paying the Applicant the agency commission.

In summary, the Arbitral Tribunal does not agree that the condition for paying the commission has been satisfied. In circumstances where the Respondent has not actually obtained the rights and interests resulting from the acquisition of the shares of PKZ Inc. or compensation of other related rights and interests, the Claimant's claim for the agency commission lacks legal basis, which the Arbitral Tribunal does not support. Yet, after the Respondent actually obtains the rights and interests resulting from the acquisition of the shares of PKZ Inc. or compensation of other related rights and interests, the Claimant is entitled to claim for the commission, and the Respondent is obligated to pay the commission under the Agency Agreement.

[*Page 73 of Chinese Original*]

Therefore, the Arbitral Tribunal also refuses the Claimant's claim on other compensation arising from the payment of the agency commission under relevant clauses of the Agency Agreement for the time being.

3.   Whether the Respondent would be liable for the Applicant's connected company's loss in relation to the anticipated dealership income?

The Applicant held that:

(1) The loss of oil trade business, which the Applicant originally had with PKZ, caused by the strict compliance with the obligation under the Agency Agreement. The Applicant stated that since 2002, Universal Petroleum had oil trade cooperation with PKZ, and it was Universal Petroleum who had opened up the western oil transportation channel. At the time the Applicant undertook the agent work, the oil trade contract between Universal Petroleum and PKZ was still valid.

Clause 7.1 of the Agency Agreement stipulates, "the Agent guarantees that it would no longer be the China Market dealer for PKZ's product after the completion of acquisition, and the Agent shall not receive any dealer fees whatsoever." In order to cooperate with the Respondent's acquisition activity, Universal Petroleum ended the oil trade cooperation with PKZ ahead of time.

According to the trade contract signed between Universal Petroleum and PKZ, the contract is valid until 30 April 2006. Universal Petroleum had ended the contract 8 month ahead in September 2005. Therefore, Universal Petroleum had at least lost 8 months' sale profit in total US$2,776,000. Universal Petroleum now specifically authorizes the Applicant to demand remedy for the loss caused by early termination of the oil trade contract with PKZ.

(2) The Respondent should afford relevant dealership rights to the Applicant in accordance with the contract, or to compensate the Applicant for the expected lost profits caused by the Respondent's breach.

Clause 7.2 of the Agency Agreement stipulated, for the dealership right outside of China, parties agrees that the agent will be awarded the dealership with separately negotiated terms. Parties confirmed this upon signing the second extension agreement. But, due to the fact that SINOPEC

[*Page 74 of Chinese Original*]

had not disclosed to CNPC the significant role that the Applicant had performed in this project and the promise that it had made to the Applicant, CNPC did not award the dealership right to the Applicant after completion of the transaction. Due to the significant breach by SINOPEC, it should follow the Agency Agreement and awarded the dealership to the Applicant. If this cannot be performed for the Respondent's own reason, the Respondent should remedy the anticipatory profit loss.

The sales quantity outside China was 45,250,974.242 tons, which originally should have been operated by the Applicant. If calculated based on a profit margin of at least US$3.47 per ton, the Applicant's anticipatory profit could have been more than US$157,020,880.619.

The Respondent responded that:

(1) The Applicant cannot claim anticipatory profit loss based on Clause 7 of the Agency Agreement. First, Article 113 of the Chinese Contract Law stipulates that "where a party fails to perform its obligations under the contract or its performance fails to conform to the agreement and cause losses to the other party, the amount of compensation for losses shall be equal to the losses caused by the breach of contract, including the interests receivable after the performance of the contract……" Yet, both PKZ and Universal Petroleum are not parties to the Agency Agreement. The early termination of the oil dealership contract was obviously irrelevant to the present case, and the loss was not anticipatory profit loss. According to clause 7 of the Agency Agreement, after the completion of the transaction, the Applicant would no longer be the dealer of PKZ's product in China. Therefore, if the transaction had been completed, the Applicant would have terminated the dealership contract. Hence, the profit under the dealership contract was not interests receivable after the performance of the contract.

(2) Second, the transaction was not completed and the Respondent did not get any PKZ shares, the Applicant should claim rights against PKZ if PKZ unilaterally terminated the dealership contract earlier; and if the Applicant terminated contracted, it should bear the responsibility itself and the Applicant cannot claim anticipatory profit loss.

[*Page 75 of Chinese Original*]

(3) Lastly, in the Changes in the Arbitration Application, the Applicant claimed that "to strictly comply with the Agency Agreement, Universal Petroleum had ended its dealership 8 month earlier, thus it had a loss in total of USD 2,776,000." But, in the Arbitration Application, the Applicant had stated that PKZ unilaterally terminated the dealership contract. They are contradictory to each other. Additionally, the dealership contract stipulated that any party might terminate the contract by giving not less than 60 days advance notice in writing. Therefore, the Applicant's claim in relation to the early termination of the dealership contract contradicted the facts. In fact, CNPC had won the tender, and whether it would use the Applicant or Universal Petroleum as the dealer or not had absolutely nothing to do with the Respondent. From commercial perspective, it was inevitable that Universal Petroleum had lost its PKZ dealership right in China, and the so-called anticipatory profit loss did not exist.

(4) The Applicant cannot claim the dealership right outside of China based on clause 7 of the Agency Agreement. First, clause 7 was aimed to arrange the dealership affairs after the completion of the transaction. Before the Respondent had acquired PKZ shares, the Applicant cannot claim to enjoy the PKZ dealership outside of China.

Second, CNPC had successfully won the tender, whereas the Respondent had not acquired any PKZ shares up to this moment. Objectively speaking, it was not even possible for the Respondent to award the Applicant PKZ dealership right outside of China.

The Arbitral Tribunal holds that Universal Petroleum fits the definition of an affiliate in the Agency Agreement. However, the Arbitral Tribunal takes the view that there are two issues in relation to the Universal Petroleum's authorization to the Applicant to claim the loss in relation to the early termination of the crude oil trading contract with PKZ Inc. on its behalf.

[*Page 76 of Chinese Original*]

First, although Universal Petroleum is a connected company of the Applicant, can it authorize the Applicant to take the action against the Respondent here? The definition of agent in the Agency Agreement included the connected company of the Applicant, thus it would be OK. Yet, Universal Petroleum must prove that there is a direct causation relationship between the loss and the alleged breach of contract. Second, clause 7.1 of the Agency Agreement stipulated that the Agent guarantees that it would not be the China Market dealer for PKZ's product after the completion of acquisition. Both parties know the definition of completion of acquisition very well, which is that the Respondent acquires PKZ shares with a psychological price. Obviously, as the acquisition was not completed as agreed, no matter it was Universal Petroleum's own decision to terminate the contract with PKZ or the contract was terminated by PKZ, the loss that Universal Petroleum had sustained cannot be compensated by clause 7 of the Agency Agreement.

In relation to the Applicant's dealership right outside of China, clause 7.2 of the Agency Agreement stipulated, for the dealership right outside of China, parties agrees that the agent will take the dealership with separately negotiated terms. The Arbitral Tribunal agrees with the Respondent that, "CNPC had successfully won the tender, whereas the Respondent had not acquired any PKZ shares up to this moment. Objectively speaking, it was not even possible for the Respondent to award the Applicant PKZ dealership right outside of China." The Arbitral Tribunal holds that the Respondent has not breached Clause 7 of the Agency Agreement because there is no evidence establishing that the Respondent had been intentionally indolent in performing the contractual obligation, had abandoned the opportunity to acquire the shares of PK Inc., or concealed the joint acquisition between the Respondent and CNPSC and thus losing the right to acquire the shares of PK Inc.

[*Page 77 of Chinese Original*]

(Sixth) Other arbitration application proposed by the Applicant

In relation to the Applicant's legal fees, because the arbitration application was not support by the Arbitral Tribunal, the Arbitral Tribunal cannot support its claim for legal fees.

(Seventh) The cost of this arbitration and other actual expense

Based on the same reason above, the Arbitral Tribunal holds that the arbitration cost should be borne by the Applicant.

Arbitrator Mr. Tao Jinzhou's actual expense is to be borne by the Respondent.

## **Arbitration Award**

Based on the Arbitral Tribunal's comment above, the award is:

1. Dismiss all the Applicant's Application
2. The cost of arbitration in the amount of US$ 277,289 is to be paid by the Applicant. The amount was duly prepaid to the CIETAC.
3. Arbitrator Tao's actual expense of RMB 156,000 is to be paid by the Respondent. The amount was duly prepaid to the CIETAC.

This arbitration award is final, and takes effect from the date of this award.

*English translation*

[*Page 77 of Chinese Original*]

Presiding Arbitrator: [Signature]

Arbitrator: [Signature]

[Stamp]

Arbitrator: [Signature]

2013 December 30, Beijing



# 裁 决 书

## Arbitral　Award



**CIETAC**

中国国际经济贸易仲裁委员会

CHINA INTERNATIONAL ECONOMIC AND TRADE ARBITRATION COMMISSION

# 中国国际经济贸易仲裁委员会

# 裁　决　书

申　请　人：UNI-TOP Asia Investment Limited
注 册 地 址：OMC Chambers, Road Town, Tortola, British
　　　　　　Virgin Islands
办 公 地 址：Unit D, 26/F., Morrison Plaza 5-9 Morrison Hill
　　　　　　Road Wanchai, Hong Kong
仲裁代理人：王纯、王蓓菁


被 申 请 人：中国石化集团国际石油勘探开发有限公司
注 册 地 址：北京市海淀区北四环中路 263 号
办 公 地 址：北京市朝阳区惠新东街甲 6 号 1 楼
仲裁代理人：刘凌云、顾洁、姚驰、董铁英、李阿敏


北　京

二〇一三年十二月三十日

# 裁 决 书

〔2013〕中国贸仲京裁字第 0907 号

中国国际经济贸易仲裁委员会（以下简称"仲裁委员会"）根据申请人 UNI-TOP Asia Investment Limited（以下简称"申请人"）与被申请人中国石化集团国际石油勘探开发有限公司（以下简称"被申请人"；申请人和被申请人以下合称为"双方当事人"）于 2005 年 3 月 4 日签订的《代理协议》中的仲裁条款以及申请人于 2012 年 8 月 30 日向仲裁委员会提交的《仲裁申请书》，受理了上述协议项下的本争议仲裁案。本案编号为 X20120680。

本案仲裁程序适用仲裁委员会自 2012 年 5 月 1 日起施行的《中国国际经济贸易仲裁委员会仲裁规则》（以下简称"《仲裁规则》"）。

2012 年 9 月 24 日，仲裁委员会秘书局以特快专递的方式分别向双方当事人寄送了本案仲裁通知、《仲裁规则》和《仲裁员名册》，并同时向被申请人寄送了申请人提交的《仲裁申请书》及所附证据材料。

2012 年 11 月 13 日，被申请人提交了《答辩书》及其所附证据材料。

申请人选定安红旗先生担任本案仲裁员。被申请人选定陶景洲（TAO, Jingzhou）先生担任本案仲裁员。由于双方当事人未在规定的期限内共同选定或共同委托仲裁委员会主任指定首席仲裁员，仲裁委员会主任根据《仲裁规则》之规

定指定夏军先生担任本案首席仲裁员。该三位仲裁员签署声明书后，于 2012 年 12 月 4 日成立仲裁庭，审理本案。同日，仲裁委员会秘书局向双方当事人寄送了本案组庭通知。

仲裁庭经商仲裁委员会秘书局，决定于 2013 年 2 月 6 日在仲裁委员会对本案进行开庭审理。2012 年 12 月 24 日，仲裁委员会秘书局向双方当事人寄送了本案开庭通知。

2013 年 2 月 6 日，仲裁庭如期在北京开庭审理本案。双方当事人均委派仲裁代理人出席了庭审。庭审中，申请人提交了《变更仲裁请求申请书》及证据材料，双方当事人陈述了各自的主张，出示了证据原件，进行了质证和辩论，并回答了仲裁庭提出的问题。

庭后，申请人补缴了变更仲裁请求相应的仲裁预付金，申请人变更后的仲裁请求获得了受理。

2013 年 3 月 7 日，申请人提交了补充证据。

仲裁庭经商仲裁委员会秘书局，决定于 2013 年 4 月 3 日在仲裁委员会就本案调解等事宜征询双方当事人的意见。2013 年 3 月 20 日，仲裁委员会秘书局向双方当事人寄送了有关通知。

2013 年 3 月 25 日，被申请人提交了《延期调解的申请》。

2013 年 3 月 29 日，申请人提交了《关于不同意对 X20120680 号仲裁案延期调解的意见》。

经考虑本案的实际情况，仲裁庭决定延期至 2013 年 4 月 8 日在仲裁委员会就本案调解等事宜征询双方当事人的意见。2013 年 3 月 29 日，仲裁委员会秘书局向双方当事人寄

送了延期通知。

2013 年 4 月 8 日，双方当事人均委派仲裁代理人如期至仲裁委员会。鉴于双方均有调解意愿，仲裁庭在双方当事人之间就本案争议事项进行了调解。根据调解情况，并经征询双方意见，仲裁庭决定将本案仲裁程序中止 40 个工作日以便双方当事人进一步协商调解解决争议的相关事宜。

中止期限届满后，双方当事人均就调解进展致函仲裁庭。申请人表示，未收到被申请人关于和解的任何答复意见；被申请人则表示双方和解立场差距巨大，无和解与调解的基础，也无和解和调解的前途。

鉴于上述情况，仲裁庭决定于 2013 年 8 月 8 日在仲裁委员会对本案进行第二次开庭审理。2013 年 6 月 24 日，仲裁委员会秘书局向双方当事人寄送了本案开庭通知。

2013 年 8 月 8 日，仲裁庭如期在仲裁委员会对本案进行了第二次开庭审理本案。双方当事人均委派仲裁代理人出席了庭审。庭审中，双方当事人陈述了各自的主张，出示了证据原件，进行了质证和辩论，并回答了仲裁庭提出的问题。

庭后，双方当事人均于规定期限内提交了补充意见。

本案的所有文件材料均已根据《仲裁规则》之规定有效送达双方当事人。

本案作出裁决的期限，应仲裁庭申请并经仲裁委员会秘书长批准，延长至 2013 年 12 月 30 日。

本案现已审理终结，仲裁庭根据本案现有书面文件以及庭审所查清的事实和证据，依据《仲裁规则》的有关规定，

经合议，依法作出本裁决。

现将本案案情、仲裁庭意见和裁决内容分述如下：

# 一、案　情

经庭审查明，申请人与被申请人于 2005 年 3 月 4 日签署《中国石化集团国际石油勘探开发有限公司与 UNI-TOP ASIA INVESTMENT LIMITED 代理协议》（以下简称"《代理协议》"）。双方约定由被申请人委托申请人作为排他代理人协助直接或通过被申请人的关联公司间接获得 PetroKhazakstan 公司的股份并获得相关政府的批准，完成转让。股权转让完成后，除给予前期费用外，按约定的比例委托人向代理人支付代理酬金和给予预期的权益。

申请人和被申请人就本案争议所陈述的事实和理由如下：

申请人在申请书中称，申请人的关联公司香港环球石油发展有限公司（以下简称"环球公司"）自 2002 年开始同哈萨克斯坦 PETROKAZAKHSTAN 公司（以下简称"PKZ"或"PK 公司"）做原油贸易合作。2004 年，申请人通过香港环球公司获知 PKZ 公司股东将出售公司的资产后，即将此信息告知中国石油化工集团公司（以下简称"中石化集团"）。中石化集团随即指示其下属公司，即被申请人，代表中石化集团负责收购事宜。同时，授权申请人代理被申请人与 PKZ 公司的股东进行沟通、协调并参与谈判等事宜。2005 年 3 月 4 日申请人（UNI-TOP 公司）与被申请人签署关于收购的《代理协议》。申请人在长达 10 个多月的收购过程中，协助各方沟

通信息、转达文件，还做了大量重要的高层公关和斡旋及谈判准备工作。协助中石化集团方面完成收购必须的全部前期工作。

通过申请人的工作，被申请人与 PKZ 公司股东进行了多次洽商谈判。期间，由于中国石油天然气集团公司（以下简称"中石油集团公司"）明确表明收购 PKZ 公司股权的意向，为避免内部竞争，维护国家利益，2005 年 6 月 27 日在政府相关部门主持下，中石化集团公司和中石油集团公司协商同意确定在中石化集团公司已完成得前期工作的基础上，两家集团公司联合收购 PKZ 公司股权。同时，明确了收购后，双方所占股份的比例中石油集团公司为 60%，中石化集团公司为 40%。2005 年 8 月 15 日，中石油集团公司代表两家集团公司成功竞标，完成对 PKZ 公司股权的收购。PKZ 公司资产项目不仅保障了国家能源安全，获取海外优质石油资源，也产生了稳定的巨额收益。

但是，完成 PKZ 公司股权收购至今，申请人多次要求被申请人按照《代理协议》的约定支付代理酬金。被申请人虽然认可申请人所做的全部工作并多次承诺将对以中石油集团公司名义收购的全部 PKZ 公司股份支付代理酬金，但是却一直以正在与中石油集团公司方面商讨 PKZ 公司股权转让而尚未实际办理过户手续为由未予支付。事实上，PKZ 公司股权成功收购后，中石油集团公司与中石化集团公司方面曾多次磋商 PKZ 公司股权转让事宜，2007 年 5 月 17 日两集团公司签署《专题会议纪要》，中石油集团公司明确承诺将原商定的股份转让给中石化集团公司。如未能转让 PKZ 公司的股权，则中石油集团公司承诺将向中石化集团公司转让海外

其他项目的股权。中石化集团公司亦授权由被申请人负责具体转让事宜。据此，可以认定 PKZ 公司部分股份及相应的权益实际上已为被申请人所享有，《代理协议》约定的合同目的已经实现。

申请人认为，被申请人成功收购 PKZ 公司资产项目的原因在于申请人提供的机会信息，申请人在整个收购期间做了大量的工作，已经履行《代理协议》约定的全部义务，为最终成功收购 PKZ 公司项目发挥了决定性的作用。被申请人实际获得 PKZ 公司股份及相应的权益是确定无疑的。被申请人不应由于自身怠于或放弃向中石油集团公司方面主张该确定权益的权利，或由于其自身的原因未能完成中石油集团公司向其转让股权的过户手续而拒绝向申请人履行《代理协议》约定的义务。

申请人称：签订《代理协议》前，申请人的关联公司环球公司已与 PKZ 公司保持多年的原油贸易合作，由环球公司将 PKZ 公司产出的原油销往中国。2005 年，在中石油集团公司收购 PKZ 公司股权后，PKZ 公司单方面终止了环球公司的代理权，也未再授予申请人或环球公司关于 PKZ 公司产出原油在中国以外地区销售代理权。申请人认为，由于被申请人的原因，申请人完全丧失了享有的 PKZ 公司的销售代理权以及可实现的预期经济利益，导致申请人及环球公司业务来源中断，经济损失巨大。

为此，申请人提出仲裁请求：

（一）被申请人向申请人支付代理酬金 17,049,000 美元；

（二）被申请人向申请人支付逾期付款利息损失

14,586,366.67 美元（按年利率 14%暂计算自 2006 年 8 月 23 日起至 2012 年 8 月 31 日止，最终计算至仲裁裁决确定的履行日止）及预期利益损失；

（三）被申请人向申请人支付汇率损失人民币 27,907,508.10 元；

（四）被申请人向申请人支付申请人因本案支出的律师费；

（五）被申请人承担本案仲裁费。

申请人提出如下关于索赔金额的计算和各项计算算数值的说明和依据：

（一）关于应付代理酬金：《代理协议》第 5.1 条约定，双方同意在公司确定的心理价位范围内完成交易后，公司应按如下条件向代理支付酬金：完成交易价格≦10 亿美元部分按 1%计算；完成交易价格 10-≦20 亿美元部分，超过 10 亿美元部分按 0.5%计算；完成交易价格≧20 亿美元部分，超过 20 亿美元部分按 0.3%计算。2007 年 9 月 26 日中国石油天然气股份有限公司签署的《首次公开发行 A 股股票招股意向书》确认，2006 年 8 月 23 日中石油集团公司集中石油股份公司的下属公司以 213.76 亿元现金自中石油集团公司购买了 PKZ 公司 67%的股份。根据中国人民银行公布的交易当天的外汇中间价，PKZ67% 股份的交易价格为 26.83 亿美元。申请人认为应以该价格作为被申请人《代理协议》第 5.1 条约定的"完成交易价格"，以此计算应支付代理酬金为 17,049,000 美元。

（二）关于逾期付款的利息损失：根据《合同法》第 107 条规定，当事人一方不履行合同义务或者履行合同义务不符

合约定的，应当承担继续履行、采取补救措施或者赔偿损失等违约责任。被申请人应向申请人支付逾期付款的利息损失。2005 年 8 月，被申请人与案外人中石油集团公司联合购买《代理协议》约定的收购项目 100%股份，2006 年 7 月，哈萨克斯坦国家石油公司自中石油购买了该项目 33%的股份。申请人认为，申请人已经履行完毕《代理协议》约定的代理义务，被申请人于 2005 年 8 月 15 日收购完成后已实际享有约定收购项目的相应股份权益。申请人在此要求自 2006 年 8 月 23 日开始计算被申请人逾期付款利息，暂计算至 2012 年 8 月 31 日为 2200 天。按年利率 14%计算，申请人发生的利息损失为 14,586,366.67 美元。

（三）关于汇率损失：根据中国银行公告的外汇牌价，2006 年 8 月 23 日 1 美元兑换 7.9672 元人民币，2012 年 7 月 30 日 1 美元兑换 6.3303 元人民币，据此计算申请人发生的汇率损失为人民币 27,907,508.10 元。

（四）关于律师费：《中国国际经济贸易仲裁委员会仲裁规则（2012 版）》第五十条第（二）款规定：仲裁庭有权根据案件的具体情况在裁决书中裁定败诉方应补偿胜诉方因办理案件而支出的合理的费用。律师费属于前述规定的"因办理案件而支出的合理的费用"。根据申请人与北京尚公律师事务所签订的《委托代理合同》的约定，申请人委托律师事务所代理进行本案纠纷的仲裁活动，申请人应支付的律师费计算标准为申请人自被申请人处取得金额的 6%。

申请人于 2013 年 2 月 6 日提交《变更仲裁请求申请书》，变更后的仲裁请求如下：

（一） 被申请人向申请人支付代理酬金 21,540,000 美

元；

（二）被申请人向申请人支付逾期利息损失16,934,628.33 美元（暂计算至 2012 年 8 月 31 日止，最终计算至仲裁裁决确定的履行日止）；

（三）被申请人向申请人支付预期利益损失 2,776,000.00 美元；

（四）被申请人向申请人支付申请人因本案支出的律师费；

（五）被申请人继续履行《代理协议》，由申请人享有PETROKAZAKHSTAN 公司在中国以外地区销售原油的代理权；

（六）被申请人承担本案仲裁费。

申请人变更了计算标准，具体为：

（一）根据中石化方面的内部报告记载，2005 年 8 月中石油中标收购 PKZ 公司 100%股权的交易价格为 41.8 亿美元。申请人认为应以 41.8 亿美元作为《代理协议》第 5.1 条约定的"完成交易价格"，以此计算应支付代理的酬金为21,540,000 美元。

（二）被申请人应支付自 2005 年 8 月 15 日开始至实际支付日止的逾期付款利息，按年利率 11%计算，暂计算至2012 年 8 月 31 日为 2573 天，该部分利息损失为 16,934,628.33 美元。

（三）申请人的关联公司香港环球石油发展有限公司原代理的将 PKZ 公司的原油运往中国销售给中石化联合公司的利润为每桶 0.45 美元（1 吨=7.7 桶），即每吨利润为 3.47 美元。至 2005 年，环球公司将 PKZ 公司的原油运往中国销

售给中石化联合公司的月销售额已经达到 10 万吨。按照与中石化联合公司约定的固定利润 0.45 美元/桶计算，环球公司的月销售利润至少达 347,000 美元。为严格履行《代理协议》的约定，环球公司于 2005 年 9 月即提前 8 个月中止了代理合同的履行，因此至少损失的销售利润共计 2,776,000 美元。

（四）根据申请人与北京市尚公律师事务所签订的《民事委托代理合同》，申请人委托北京市尚公律师事务所代理进行本案纠纷的仲裁活动，律师费计算标准为案件胜诉标的金额即申请人自被申请人实际取得赔偿金额的 8%。

（五）关于继续履行《代理协议》由申请人享有 PETROKAZAKHSTAN 公司原油在中国以外地区销售的代理权。《代理协议》第 7.2 款约定，"PetroKhazakstan 公司产出的原油中在中国以外地区销售的部分，双方同意根据另行商定的条件，由公司委托代理人作为销售代理商。"中石油集团公司收购 PKZ 公司后，并未将该款约定的原油销售代理授予申请人。申请人要求被申请人继续履行《代理协议》，由申请人享有 PETROKAZAKHSTAN 公司原油在中国以外地区销售的代理权。

被申请人反驳称，申请人 UNI-TOP Asia Investment Limited 在仲裁申请书中主张其已经履行了《代理协议》项下的全部义务，在成功收购 PZK 项目中发挥了决定性作用，被申请人（中石化集团国际石油勘探开发有限公司）应向申请人支付代理酬金并赔偿损失。对此，被申请人认为申请人的主张与《代理协议》中的约定及本案事实不符，其仲裁请求没有任何法律依据，应予以驳回。

申请人提出了被申请人应支付代理酬金、逾期付款利息损失、逾期利益损失、汇率损失、律师费和仲裁费共计六项仲裁请求。其中申请人提出的预期利益损失是基于 PetroKazakhstan Inc.公司单方面提前终止了其与环球公司的原油销售代理合同这一事由。显然，该事由与本案并无关联，不应纳入本案审理的范围。剩余五项请求中，基本的仲裁请求是支付代理酬金，其他仲裁请求均为该项请求所衍生。因此，被申请人只需驳斥其支付代理酬金的仲裁请求即可。

被申请人认为支付代理酬金的仲裁请求应予以驳回：

（一）依据《代理协议》关于酬金支付的条件的约定，被申请人只有获得了 PK 公司股权后，才有义务向申请人支付协议约定的代理酬金。然而，被申请人及关联公司至今未获得 PK 公司的任何股权。因此，无需支付任何酬金；

（二）《代理协议》约定的合同有效期早已届满，合同权利义务业已终止。申请人的诉请没有合同依据；

（三）申请人的仲裁请求因超过诉讼时效而应当驳回；

（四）申请人的主体资格存在瑕疵，不符合提起仲裁的条件。

被申请人对其上述陈述提出如下理由：

（一）《代理协议》约定支付代理酬金的条件是被申请人获得 PK 公司的股权

被申请人至今未获得 PK 公司股权，支付酬金的条件未能成就，申请人的仲裁请求没有事实和法律依据：

1、在申请人与被申请人签署的《代理协议》第 5.1 条规定代理酬金的支付条件为"在公司确定的心理价位内完成交易后，公司向代理人支付报酬。"完成交易是指被申请人获

得 PK 公司股权，对此双方在《代理协议》的目的条款和代理人的义务条款中亦有明确规定。

《代理协议》第 2.1 条规定"协助公司根据有关法律或规定直接或通过公司的关联公司间接获得 PK 公司股份，并协助公司得到相关政府批准（以下称完成转让）"。《代理协议》第 3 条规定申请人的义务是"代理人同意，在此期间以及任何可能的展期内，其应始终合理地履行本协议的义务并不断努力，运用充分的时间和注意力于 PK 公司管理层联系以协助公司获得项目"。可见，《代理协议》约定的酬金支付条件就是被申请人获得 PK 公司的股权。

根据国际石油行业并购交易的惯例，股权收购的整个交易流程包括签约（尽职调查、评价估值、谈判或竞标、签署股权购买协议）、满足交割条件（包括但不限于获得优先权豁免和政府审批）和交割（完成资金交付和股权的权属变更）。显然，只有完成上述流程直至完成股权的权属变更，才能视为完成交易。然而，被申请人未就股权收购与 PK 公司的原股东签约，至今也没有获得 PK 公司的任何股权。根据《中华人民共和国合同法》第 405 条的规定，被申请人尚未获得 PK 公司的股权，所以被申请人无需支付申请人任何代理酬金。

2、申请人关于其在整个收购期间做了大量工作，发挥了决定性作用，而被申请人实际已经享有 PK 公司的股份即相应权益，但怠于或放弃主张权利以及因自身原因未能取得股权等说法既没有任何证据支持，也自相矛盾，完全不符合事实，不能支持其仲裁请求。

被申请人指出，根据《代理协议》的约定，只要被申请

人没有取得 PK 公司的股权，申请人便无权主张代理酬金，无论申请人做了多少工作，发挥了何等作用，也无论被申请人是否怠于或放弃权利，还是因为何种自身原因未取得 PK 公司股权，均不能视为被申请人已经取得了股权而要求被申请人支付代理酬金。

3、被申请人对申请人有关本案事实的陈述反驳道：

（1）申请人关于其做了大量工作，为成功收购 PK 项目发挥了决定性作用的说法与事实不符。事实上，PK 项目既未能成功收购，申请人公司也没有发挥其所谓的"决定性作用"。被申请人已按照《代理协议》约定就申请人所做工作支付了全部费用。

首先，被申请人参与 PK 公司股权收购期间，申请人所做的工作主要是为被申请人与 PK 公司的协商谈判提供了酒店预订和会议安排，转交了部分资料。申请人主张"在长达 10 个多月的收购过程中……做了大量重要的高层公关和斡旋及谈判准备工作"，缺乏证据支持。

其次，申请人所谓其起到了"决定性"作用的说法不符合事实。被申请人之所以与申请人签署《代理协议》，是期望借助申请人的协调安排，通过排他性协商谈判自 PK 公司的股东取得 PK 公司全部股权。然而，申请人所做的工作既未能协助被申请人取得排他谈判的地位，更未能通过其代理工作取得谈判成果。在 PK 项目有协商谈判转为公开招标后，"中石油方面"通过竞标获得了 PK 公司股权。至此，《代理协议》的合同目的未能实现。此后，"中石油方面"与"中石化方面"协商转让部分 PK 公司股权，但至今未获成功。对此，申请人未能起到任何作用。

最后，《代理协议》第 5 条约定的代理人费用包括：①前期费用（每月 1 万美元）；②被申请人认可并书面授权事项的费用；③完成交易后的酬金。申请人所做的工作属于前期费用服务事项和被申请人认可并书面授权事项，被申请人也依约支付了全部费用，包括前期费用和被申请人认可并书面授权事项的费用，共计 159,898 美元。申请人无权基于被申请人已经付费的工作主张本应在完成交易后才能支付获得的酬金。

（2）申请人关于"经政府相关部门协调，由两家集团联合收购 PK 项目，……收购后双方所占股份比例按中石油集团占 60%，中石化集团占 40%划分。……中石油集团代表两家集团成功竞标"的说法没有事实依据，而且这种说法也不能支持其仲裁请求。

首先，申请人关于"联合收购"和"代表竞标"的说法没有证据支持。

此次，根据被申请人与 PK 公司所签订的《保密及不行动协议》的约定，被申请人不得与其他主体以任何方式联合。事实上，被申请人和中石化方面在 2005 年 6 月 30 日的招投标中分别投标，不存在"联合收购"和"代表竞标"的关系。

最后，根据《代理协议》的约定，被申请人只要未能取得 PK 公司股权，便无需向申请人支付任何代理酬金。无论是联合收购还是代表竞标，均不能得出被申请人已经获得 PK 公司股权的结论。

（3）申请人提交的《专题会议纪要》不发生确认股权归属的法律后果，其据以主张的被申请人实际上已经享有 PK 公司的股份及相应权益的说法，完全不符合事实。事实上，

在 2007 年 5 月《专题会议纪要》之后，直至 2008 年 3 月和 6 月，被申请人与申请人还对《代理协议》进行了延期和补充，约定由申请人解决"资源国政府优先购买权和政府批准问题"。可见，申请人也确认被申请人尚未取得 PK 公司的任何股份或相应的权益。

（4）申请人关于被申请人"怠于或放弃向中石油集团方面主张该确定权益的权利、由于其原因未完成中石油集团向其转让股权的过户手续"的说法与事实不符，不能支持其请求。

首先，申请人一方面主张被申请人已实际获得了 PK 公司的股权，另一方面又主张被申请人怠于或放弃向中石油集团方面主张该确定权益的权利，由于其原因而未能完成中石油集团方面向其转让股权的过户手续，自相矛盾。

其次，在中石油集团方面中标后，中石化方面多次与其协商讨论转让股份事宜，既未取得对 PK 公司股权的确定权益，也没有怠于或放弃主张申请人所谓的确定权益。

再次，《代理协议》和法律均不限制被申请人作为委托人的商业自主性，申请人作为代理人无权要求被申请人不计代价地进行交易。

最后，无论被申请人是否怠于或放弃向中石油集团方面主张该确定权益得权利，或由于其自身原因未完成"中石油集团方面"向其转让股权的过户手续，依据《代理协议》的约定，被申请人只要未获得 PK 公司的股权，就无需支付任何代理酬金。

（二）《代理协议》有效期早已届满，合同权利义务业已终止，申请人的主张没有合同依据

《代理协议》第 2.2 条明确约定代理协议的有效期限为两年，经被申请人与申请人两次延期，协议有效期被延长至 2008 年 12 月 31 日。现在双方约定的合同有效期早已届满，酬金付款条件至今未成就，《代理协议》业已终止。因此，申请人主张代理酬金没有合同依据。

（三）申请人的仲裁请求已超过诉讼时效期间，应予以驳回

如上所述，《代理协议》的有效期限至 2008 年 12 月 31 日已届满。而中国国际经济贸易仲裁委员会于 2012 年 9 月 24 日才收到申请人的仲裁申请，抛开代理酬金支付条件未成就的基础问题，申请人仲裁申请实际上已超过诉讼时效。申请人主张曾多次要其被申请人支付代理酬金，但其未能提供任何证据予以证明。根据《中华人民共和国民法通则》第 135 条的规定，其仲裁申请应予以驳回。

（四）申请人的主体资格存在瑕疵

《代理协议》约定的代理人 UNI-TOP 公司为一家在香港注册登记的公司。而在《仲裁申请书》中，申请人 UNI-TOP 公司是一家在英属维京群岛注册的公司。申请人与《代理协议》中的代理人可能并非同一主体，如经查实，则其无权依据《代理协议》主张代理酬金，不具备仲裁的主体资格。

综上所述被申请人认为，申请人基于其代理活动已经获得了相应的费用，在《代理协议》中约定的支付酬金的条件为成就的情况下，仍然无端索要巨额代理酬金和所谓的"损害赔偿"，其仲裁请求毫无事实和法律依据。所以请求仲裁庭驳回申请人的全部仲裁申请。

经过两次开庭审理，申请人和被申请人提交了最后的陈

诉意见。

申请人在其最后陈诉意见中表示：本案争议的哈萨克斯坦"PKZ 公司"，原名为 Hurricane Marketing Limited 股权收购项目，系申请人接受被申请人委托，代理并帮助中方与 PKZ 公司建立联系，付出了大量的时间、人力及资金，进行了关键性的公关及代理工作，协助中方全面完成了实质性的收购工作，使得中方按照政府相关部门协调的既定方案顺利取得 PKZ 公司股权，实现了国家的战略发展安排。申请人履行了《代理协议》约定的海外收购代理义务，被申请人通过联合收购已完成了对 PKZ 公司海外收购的全部事宜，已实现了约定的合同目的，被申请人理应向申请人支付代理费用，还应补偿因被申请人违约给申请人造成的全部实际损失及预期利益损失。

（一）本案争议的股权收购项目得以顺利开展并完成完全系因申请人方面的介绍引入，申请人与被申请人签订《代理协议》前已为项目收购进行了大量关键性的公关及代理工作

申请人的关联企业环球石油发展有限公司（以下简称环球石油）总裁刘方女士与哈萨克斯坦政界、商界上层均有十分友好和密切的合作关系。2002 年，环球公司与本案争议的股权收购目标公司 PKZ 公司（HURRICANE）开始原油贸易合作，打通了中国与哈萨克斯坦之间的第一条石油换装运输铁路线，并保持了稳定的合作关系。

正是基于环球公司与 PKZ 公司的长期良好合作，2004年 9 月，PKZ 公司的总裁 Bernard F. Isautier 先生向环球公司总裁刘方女士（亦为申请人的总裁）提出欲转让部分股权，

请刘方女士代为寻找买家。由于环球公司与中国石油化工集团公司（简称"中石化集团"）亦存在长期合作关系，刘方女士首先想到的是将该信息提供给中石化集团。中石化集团领导高度重视，立即责成其下属的被申请人代表集团进行收购，由被申请人周佰修总经理具体负责。（由于在整个项目收购过程中被申请人均是在中石化集团的授权下开展工作，包括收购完成后亦是由中石化集团与中石油集团协商转股事宜，因此在本代理意见中将体现中石化集团意志的行为时均称为"中石化方面"。）

2004 年 11 月，被申请人向刘方女士出具了授权委托书及拟递交 PKZ 公司的收购意向书。在刘方女士的斡旋工作下，中石化方面向 PKZ 公司争取到了转让 PKZ 公司全部股权及独家谈判的条件，被申请人与 PKZ 公司签署了《保密及不行动协议》，正式启动收购前期的准备及谈判工作。在被申请人已对 PKZ 公司展开尽职调查等工作并与 PKZ 公司总裁 Bernard F. Isautier 先生进行了实质性沟通会谈后，被申请人与申请人于 2005 年 3 月方才签署《代理协议》。

需要强调的是，由于 PKZ 公司所属的油田，距中国新疆边境仅 1500 公里，具有良好而稳定的原油资源储备，原油产量高质量极优，收购 PKZ 公司股权就成为中国为保障国家能源安全，打开西部能源通道、获取海外优质石油资源的战略性行动。中石化集团在启动收购的前期准备工作之前，已就该收购事项向政府相关部门进行了正式备案，取得了政府相关部门的批准。也就是说，本案争议的收购项目不仅仅是简单的商业个案行为，还体现的是中国的战略安排和国家意志（即国家行为）。申请人方面正是本着为中方争取利益最

大化的目的，积极促成中石化方面与 PKZ 公司达成合作。

（二）申请人已履行了《代理协议》约定的代理义务

《代理协议》第 3 条约定，"代理义务"包括：

1、"3.1 代理人同意，在此期间以及任何可能的展期内，其应始终合理地履行本协议的义务，并不断努力，运用充分的时间和注意力与 PK 公司管理层联系，以协助公司获得项目。"

2、"3.2 根据本协议条款，代理人要在项目的分析、组织、协商、影响方面协助公司。

代理人要协助公司获取信息，包括 PK 公司的所有资料，并按照公司要求准备任何可能的详细评价；与相关政府、政府附属机构或权力机构发展关系。"

3、"3.3 代理人同意：在谈判战略上向公司提供建议，以完成权益交易；协助公司为完成交易与政府、政府管理的企业协商；与政府权力机构执行监督或管理机构进行协商；协助公司获取任何和所有特许、批准和所有类型的文件；在协商中采取所有合理手段，协助公司确定收购的合理价位以促成公司的最佳利益；为公司完成收购提供财务、法律和技术咨询意见；迅速回应公司提出的所有问题；尽可能保持足够的员工以履行本协议中的义务；其他与代理相关的事务。"

申请人从始自终按照上述约定，积极、全面地履行代理义务，开展的工作包括：

1、申请人全面负责被申请人与 PKZ 公司方面的沟通、协调。

如果如被申请人答辩所称，申请人仅仅负责酒店预订和会议安排，则根本无需与 PKZ 公司方面保持深度沟通，更无

需多次往返哈萨克斯坦（PKZ公司所在地）和英国（PKZ公司股东及公司管理层办公所在地）开展工作。但是，本案的事实是，除两次正式谈判外，PKZ公司及 Bernard F. Isautier 先生与被申请人之间都是通过刘方女士与被申请人进行沟通联系，包括日常邮件往来、电话沟通，因为 PKZ公司是一间在美国等四国的上市公司，为了确保收购前期的保密性，许多事情需要面谈。自 2004 年 11 月至 2009 年 4 月期间，刘方女士二十二次赴哈萨克斯坦、2004 年 11 月至 2005 年 8 月八次赴英国与 PKZ公司原股东及 Bernard F. Isautier 先生会面沟通，并全程跟进被申请人与 PKZ公司的接洽、谈判及与哈萨克斯坦政府方面的沟通协调，对此被申请人虽在庭审中仅承认了部分事实，但仅就该部分事实已足以认定刘方女士在整个收购过程中开展了深入、实质性的代理工作。

　　2、申请人负责接收并向被申请人转递审查收购项目所必须的 PKZ公司相关文件、资料。

　　被申请人与 PKZ公司之间相关信息、文件和资料的转达、转递均由申请人负责。由于项目的高度保密性及数量之大，申请人在大部分情况下并未留存书面文件。目前可以看到的是：刘方女士于 2005 年 2 月 25 日向被申请人转交了对 PKZ公司展开尽职调查所必须的相关资料目录，包括地理数据、有关环境保护的数据和 HSE（健康、安全与环境管理体系）、相关法律事项、经济数据以及财务、会计、税收等方面的资料。根据被申请人的要求，刘方女士还于 2005 年 4 月 25 日向被申请人提交了与 PKZ 公司涉及纠纷诉讼有关的相关法律文件及资料。

　　3、申请人为中石化方面争取到全部转让及独家谈判条

件，参与了股权收购准备工作及洽商、谈判的全过程，是中方最终成功完成收购项目的关键。

获知 PKZ 公司将转让部分股权后，中石化方面提出希望能够收购 PKZ 公司的全部股份，并向 PKZ 公司出具了排他性独家谈判的意向书。刘方女士将该意向书呈交 PKZ 公司总裁 Bernard F. Isautier 先生，PKZ 公司还要求被申请人签署了《保密及不行动协议》。后经过刘方女士的说服工作，PKZ 公司同意了中石化方面的要求，为中石化方面争取到了独家排他性谈判的权利，并将 PKZ 公司出具的相关文件转交了被申请人周佰修总经理。在中石化方面与 PKZ 公司商谈收购的工作期间，PKZ 公司未对外披露股权出让计划，也未公开招标，更未与被申请人之外的任何第三方进行过股权转让的谈判，PKZ 公司完全遵守了排他性独家谈判的约定义务（后被申请人主动去信给 PKZ 公司放弃独家排他谈判权）。

被申请人代理人称 5 月份被申请人收到 PKZ 公司邀标书，来说明代理人未给被申请人争取到独家排它权，但事实上，PKZ 公司并不认可委托其他公司向中石化发过邀标书。且直到 2005 年 6 月 17 日被申请人副总经理周玉琦还率团去伦敦当面同 PKZ 报价，而且 PKZ 公司也还了价格，说明当时并没有进入公开投标。PKZ 公司一直希望同中石化董事长陈东海见面会谈，力求在价格上达成一致，完成此交易。但是由于中石化自身的原因，其总经理并未再次与 PKZ 公司会晤洽商，反而于 6 月 27 日接受了政府相关部门的协调意见，不再继续报价，而是改为与中石油联合收购。因此代理人在整个收购前期尽职尽责地完成了代理义务，被申请人是自行变更收购方案，不能因此说代理人没有起到关键作用。

对于申请人及刘方女士为 PKZ 收购项目开展的各项工作及取得的成果，中石化方面当时参与工作的人员非常清楚，尤其是周佰修总经理、周玉琦副总经理均对刘方女士的工作给予了肯定。在被申请人向 PKZ 公司报价前的关键时期，刘方女士正在哈萨克斯坦同时开展工作，周佰修总经理 2005 年 6 月 12 日向刘方女士致短信表示："希望你能赶往伦敦，与玉琦单线联系，必要时提供帮助。谢谢你所做的一切。"周玉琦副总经理 6 月 13 日向刘方女士致短信表示："双方商定先交流后谈价，预计明天或后天报价。您的到来相信能进一步推动双方的配合。"

此外，针对被申请人答辩中提到的该公司收购"心理价位"问题还需要另外说明的是：2005 年 6 月被申请人周玉琦副总和被申请人当时的法律部经理张连华带队到伦敦与 PKZ 公司协商报价。报价当天的 PKZ 公司股票价格每股 30.44 美元，一共是 7,600 万股，被申请人报价 28 亿美元（相当于每股约 36.84 美元），PKZ 公司则初步提出在 PKZ 公司当天股价每股 30.44 美元加 10 美元的基础上，溢价 25%，也即总价约为 38 亿美元。经过前期的长期工作，刘方女士确认 PKZ 公司的报价有明显的协商空间，得知消息后即建议周玉琦副总经理和对方就价格方面商量一下，周说暂时不用了，他这次报价的授权暂时只有 28 亿美元，要回去商量。周副总决定暂时不商谈价格的最主要的原因是，他认为即使投标，也不会有其它公司有他们的优势，完全可以以投标的方式向对方压价，一方面，截止报价时只有他们对 PK 公司做了尽职调查，在这么短的时间内国外其它公司不可能盲目出高价投标；另一方面，由于 PK 公司在最初答应 100%股份全部转让时，提出要一次性现金支付，国外公司很难做的到；

而且，在国内中石化在启动该项目时，已向政府相关部门做了备案，按照政府相关部门的规定，这个项目不可能有其它国内公司再参与投标。

而其后，中石油方面出乎意料地介入，且最终收购 PKZ 公司的价格为 41.8 亿美元，也就是说即使按照 PKZ 公司单方提出的报价（38 亿元）被申请人也有机会在自己的心理价位内成交，但被申请人未能抓住机会。

自 2004 年 11 月至 2005 年 6 月的七个月期间内，申请人方面协助被申请人完成了严密的收购准备工作，并为 2005 年 8 月中方成功完成 41.8 亿美元的收购奠定了坚实的基础。

申请人提请仲裁庭予以注意的是，本案收购项目的交易价格达 40 多亿美元，且交易各方均为大型跨国上市公司，不仅对本行业，还对相关国家及国际关系均具有重大影响力。因此，在如此重大的国际收购中，必须严格遵守保密及适当披露义务，通常交易各方均是通过"面对面"的沟通，在谈判过程中，尤其是关于关键性条件比如价格等方面的商谈，更不可能以书面、邮件的形式进行沟通、确认。被申请人仅因没能留存完整的书面证据而否定申请人开展的实质性工作及工作成果，是完全不尊重客观事实的，违背了公平、诚实、信用的基本原则。

（三）《代理协议》约定的海外收购合同目的已经达到

1、中石化集团同意与中国石油天然气集团公司（简称"中石油集团"）"联合竞标"，并由双方按比例享有 PKZ 公司股权。

中石化方面第一次同 PKZ 公司在伦敦当面报价结束后，中石油集团亦明确了收购 PKZ 公司股权的意向。在中石化方

面的内部报告中记载："为了维护国家利益，避免内部竞争，2005 年 6 月 27 日，相关政府部门领导主持会议，听取了中石化收购 PK 的前期工作汇报，会上明确由中石油和中石化两家公司联合收购 PK 项目。2005 年 6 月 28 日，政府相关部门组织两家公司具体协调联合投标事宜，明确股比按中石油 60%、中石化 40%划分。此后，两家公司密切配合开展了联合收购。为维护国家利益，确保中方公司中标，双方商定 8 月 15 日第二轮报价由中石油一家代表双方投标，中标后向中石化转让股份。"对此，在庭审过程中，被申请人已承认，政府相关部门协调联合投标，中石化方面与中石油方面相比处于弱势，当时中石油方面正在建中哈石油管线，这也是政府相关部门协调要求联合投标的原因，为了国家利益中石化方面只能同意。

这充分说明了，中石化方面与中石油集团仅在形式上分别投标，实质上是两大集团以实现双方约定的中方收购利益为目的，严重违反保密协议及招投标基本规则而实施的所谓"联合竞标"的串标行为。因此，本案争议项目中《代理协议》约定的协议目的已被中石化方面单方变更为与他方联合收购，并仍承诺将对申请人继续支付代理费用。

2、中石油集团已代表中石化方面取得 PKZ 公司股权并办理完毕所有交割手续。

《中国石油天然气股份有限公司首次公开发行 A 股票招股说明书》和中石化方面的内部报告《关于 PK 项目有关情况的汇报》显示，中石油集团于 2005 年 8 月份以 41.8 亿美元中标收购 PKZ 公司 100%股份。2006 年 7 月，哈萨克斯坦国家石油公司从中石油集团购买了 PKZ 公司的 33%股

份。2006 年 8 月，中石油集团将其拥有的 PKZ 公司 67%股份转入其绝对控股的上市公司中国石油天然气股份有限公司（简称"中石油股份"），该部分资产已并入中石油股份合并报表。

也就是说，中方已事实上完成了被申请人答辩中所称的股权收购包括签约、交割在内的整个交易流程。中石油股份对该部分资产的披露即是最好的证明。同时，自中石油集团收购 PKZ 公司股份当年开始，PKZ 公司即持续盈利，已产生稳定的巨额收益，中石油股份招股说明书披露，三年获得利润共计人民币 182.7 亿元，应该说已完全可以实现了中方的收购目的。

3、中方股权收购成功是基于被申请人已经完成的前期工作，也是建立在申请人履行代理协议义务的工作基础上的。

被申请人自 2004 年 11 月开始，在申请人的帮助下，对 PKZ 公司展开收购的前期准备工作，完成了项目的尽职调查。根据中石化方面的内部报告，"根据政府相关部门的协调意见，2005 年 7 月 21 日，中石化向中石油介绍了前期尽职调查的结果，为中石油的尽职调查奠定了基础"。后由中石油集团一家代表双方在 8 月 15 日进行投标。

对于交易标的数额如此巨大的跨国收购，中石化方面用了七个月的时间方始完成尽职调查及前期准备工作，中石油集团代表中石化方面进行投标，完全是双方紧密合作并以中石化方面前期工作为基础的结果。可以说，中石油集团代表中石化方面中标，不仅是实现了中方的利益，更是实现了中石化方面在《代理协议》中约定的协议目的。

需要进一步说明的是，被申请人称其 2005 年 4 月一度中止协商谈判，5 月收到 PKZ 公司发出的《邀标函》，收购即转入公开招投标阶段。庭审中对申请人提交的证据 12 质证时，被申请人已认可了刘方女士参与此次谈判的事实。2005 年 5 月 31 日，Bernard Isautier 先生函复刘方女士，其不知道向被申请人发出《邀标函》的 Akshay Prasad、Nigel Robinson 以及高盛国际公司的情况，并确认他们不能代表 PKZ 公司，在此情况下 2005 年 6 月 12 日周玉琦副总经理带队至伦敦与 PKZ 公司进行了面对面第一次报价谈判，在被申请人准备第二次报价时，因中石油方面的介入，政府相关部门于 6 月 27 日召集两集团开会协调收购，遂改变了收购方式。因此根本不存在被申请人与 PKZ 公司协商谈判不能进行并转入公开招投标程序的事实。

4、中石化方面基于 PKZ 公司股权收购项目应当享有的权益是充分、确定的。

中石油集团与中石化方面在收购前后多次就联合收购 PKZ 公司股权及利益分配事宜达成一致意见并形成协议，不仅得到双方的有效确认，还已得到中方国家主管部门的批准，其中几次重要的协调会议及确认为：

（1）如前所述，在被申请人第一次报价后，2005 年 6 月 27 日由政府相关部门开会协调两集团联合竞标，并明确收购后双方所占股份比例按中石油集团 60%、中石化方面 40%划分。

（2）2005 年 8 月收购成功后，2006 年 3 月 21 日政府相关部门召开专题会议，协调中石油集团向中石化方面转让 PKZ 公司股份事宜。在该次会议上，政府相关部门、中石油、

中石化三方就股权转让达成一致意见,包括"在没有法律障碍情况下,中石油同意将商定的股份转让给中石化"、"若法律障碍不可逾越,双方将以国家利益为重。中石油同意将其它海外项目的股权转让给中石化。"

（3）2006 年 5 月 10 日，双方就 PKZ 公司转股事宜的工作安排进行了确认。双方确认了各自工作小组的组成成员；确定以 2006 年 12 月 31 日为资产评估基准日；以在年内完成转股交易为目标。该次会议纪要由中石油集团总经理助理汪东进与被申请人原总经理周佰修（时任中石化总经理助理）签署。

由于申请人没有参与中石油与中石化之间的股权转让交易过程，对于双方因什么原因导致转股事宜未能完成，并不清楚。但可以确认的是，直至目前，在中石油与中石化没有明确合同的情况下，中石化仍然认为中石油有义务向其转让 PKZ 公司股权或相当的其他权益，并声称未放弃追索，证明中石化是认可中石油当年系代表其进行了联合海外收购，并应当按约定分配给中石化股权或利益。因此，中石化方面自 PKZ 股权收购中应当享有的权益是有效且确定的，政府相关部门的历次协调会议及会议纪要、双方为转让达成的会议纪要均具有效力。除非中石化方面单方放弃或故意怠于行使其权利，否则中石化方面有充分权利享有 PKZ 公司相应的股权权益，有充分理由可以行使基于该权益的请求权。

（四）在本案提请仲裁前，中石化方面及被申请人均确认申请人履行的代理义务与中方获得 PKZ 公司股权之间的关联性，并承诺向申请人支付代理酬金：

1、被申请人在完成 PKZ 公司股权收购后三次与申请人

签署补充协议。2005 年 8 月中石油集团代表中石化方面完成收购后，申请人多次向被申请人要求支付代理酬金，被申请人均以两集团尚未完成向中石化方面转股工作为由，希望迟延向申请人付款，申请人刘方女士考虑到双方配合关系尚且融洽以及今后的长期合作预期，为最大程度减轻中石化方面的压力，申请人同意配合中石化方面分别在 2007 年 3 月 2 日、2008 年 3 月 14 日、2008 年 6 月 13 日签署延期协议，并在第三次延期时签订了补充协议，增加约定为中石化方面开展哈萨克斯坦政府方面的协调工作。

从三个延期和补充协议可以看出，被申请人并未在补充协议中变更原《代理协议》约定的包括协议目的、代理酬金计算标准及支付方式等在内的实质性条款，也未对申请人已完成的工作提出任何实质性的异议，更未提及终止代理协议、放弃对 PKZ 公司股份的权利要求，通过该三份补充协议事实上确认了申请人的已完成海外代理工作的情况，以及中石化方面仍愿意继续履行《代理协议》并支付代理酬金的意思表示。

2、中石化方面及被申请人多次向申请人确认将按照《代理协议》约定支付代理酬金，申请人的仲裁请求并未超过诉讼时效期间。申请人在与被申请人签署补充协议后至本案提起仲裁程序前，申请人向中石化方面发函、刘方女士多次当面向被申请人领导催要履行代理协议，还提出如被申请人不能履行代理协议应向中石油集团披露申请人的代理情况并将《代理协议》项下的相关权利义务转至中石油集团，并要求中石化方面兑现《代理协议》约定的承诺，由申请人作为 PKZ 公司在中国以外地区销售的代理商。中石化方面每次均

向刘方女士表示，认可申请人在项目收购中发挥的重要作用，并将按照中石油集团取得的 100%PKZ 公司股份的交易价格支付代理酬金，就是希望能在自中石油集团获得股权后支付。

以上均得到被申请人总经理周佰修的证实，刘方女士自2008 年至 2011 年间多次要求被申请人履行《代理协议》约定的义务，被申请人与刘方女士商谈延期履行事宜。周佰修称："我记得 2009 年有 2 次，2010 年有 1 次。我对她介绍的几乎一样，一是还没有拿到；二是我们也没有放弃。2009 年有一次她提出了再签延期协议的要求，我建议她去找玉琦总经理谈。2011 年，UNI-TOP 曾给集团公司发函，要求把《代理协议》再延期。此函也寄了一份给我，我转报给耀仓同志了。"对此，被申请人在庭审中也明确确认收到刘方女士2011 年的来函后，中石化集团分管国勘（被申请人）的领导进行了批示。被申请人代理人当庭表明不放弃向中石油主张，但即使拿到股权，事情已经过去，也将不付款。综上可以认定，本案并未超过诉讼时效，申请人的合法权益理应受到有效保护。

（五）因中石化方面及被申请人违约给申请人造成巨额经济损失并已无法继续正常经营

1、中石化方面及被申请人严重违反诚实、信用及公平原则，怠于或放弃向中石油集团主张合法权益，造成本案争议项目在形式上未能达到申请人可向被申请人主张权利。中石化方面为了体现其工作业绩，在与中石油集团联合收购前后均未能向中石油集团披露申请人的参与及重要作用，更未提交其向申请人承诺的贸易补偿条件。为了确保中方利益，

中石化方面违反商业道德与中石油集团进行联合收购，单方变更《代理协议》约定的履行方式，更为恶劣的是完全不顾申请人的合法利益，放弃或怠于行使《代理协议》项下已实际享有的权益，试图完全割裂、否定申请人与项目成功收购之间的关系，该做法应予强烈谴责，并应对造成的结果承担全部责任。

在此强调的是，中石化方面及被申请人是否向中石油集团主张了权利以及其不向中石油集团主张权利的原因不得而知。但显而易见的是，中石化方面在放任其公司利益损失扩大。由于 PKZ 公司在持续不断的生产经营并且盈利能力逐年递增，中石化方面每迟延一天主张权利，也就意味着对于 PKZ 公司股权价值及收益的评估、计算的难度以及交易成本将持续增加。当然，作为中国的两大国家控股公司，无论是中石化方面还是中石油集团享有该股权，从大的方面讲确未造成国家利益的损失，但却给申请人造成了不可挽回的损失。

2006 年 8 月 23 日，中石油集团将其持有的 PKZ 公司股权转让给其控股的上市公司中国石油天然气股份有限公司所属的子公司 Pervinage Holding B.V.，PKZ 公司股权最终成为上市公司的资产。在此情况下，中石化方面怠于或放弃行使权利不仅是对申请人的不负责任，更是对中石化方面及中石油方面众多股东及股民的不负责任。

2、被申请人应赔偿其违约给申请人造成的实际利益损失。

《合同法》第一百零七条规定，当事人一方不履行合同义务或者履行合同义务不符合约定的，应当承担继续履行、

采取补救措施或者赔偿损失等违约责任。本案纠纷中，被申请人单方面违约给申请人造成的实际损失包括但不限于：

（1）申请人未能取得的代理酬金本金。依据《代理协议》的规定并根据中石化方面的内部报告中记载，2005 年 8 月中石油集团中标收购 PKZ 公司 100%股权的交易价格为 41.8 亿美元。申请人认为应以 41.8 亿美元作为《代理协议》第 5.1 条约定的"完成交易价格"，以此计算应支付代理酬金为 21,540,000 美元（10 亿×1%+10×1.5%+21.8×0.3%）。

（2）申请人未能取得的代理酬金部分的利息损失。被申请人应支付自 2005 年 8 月 15 日（第二次投标中标）开始至实际支付日止的逾期付款利息，按年利率 11%计算，暂计算至 2012 年 8 月 31 日为 2573 天，该部分利息损失为 16,934,628.33 美元（21,540,000×11%/360×2,573）。

（3）申请人方面因严格履行《代理协议》约定义务而提前终止与 PKZ 公司原开展的贸易业务活动造成的原油贸易损失。如前所述，至申请人代理本案争议收购项目时，环球公司与 PKZ 公司的原油贸易合作合同尚在有效期内。

《代理协议》第 7.1 条约定，"代理承诺，在完成交易后，不再作为将 PetroKhazakstan 公司产出原油运往中国市场的代理，并不得收取任何代理费用。"为了积极配合被申请人的收购，履行前述约定，环球公司提前终止了与·PKZ 公司的原油贸易合作。2002 年时，由环球公司将 PKZ 公司的原油运往中国销售给中石化联合石化公司的月销售额达 2 万公吨，当时的利润为 0.45 美元/桶（1 吨=7.7 桶），每吨利润为 3.47 美元，月销售利润至少达 69,400 美元。至 2005 年，由环球公司将 PKZ 公司的原油运往中国销售给中石化联合石化公

司的月销售额已达 10 万公吨，按照与中石化联合公司约定的固定利润 0.45 美元/桶计算，环球公司的月销售利润至少达 347,000 美元。

根据环球公司与 PKZ 公司签署的贸易合同，该合同有效期至 2006 年 4 月 30 日，环球公司于 2005 年 9 月即提前终止了该合同的履行，因此至少损失了 8 个月的销售利润共计 2,776,000 美元。环球公司特授权申请人向被申请人行使要求赔偿该部分因提前终止贸易合同而遭致损失的主张权利。

此外，本案《代理协议》中，《代理协议》第 1 条名词解释，明确约定了"代理人"是指申请人及其所有的关联公司。因此，环球公司作为申请人的关联公司，其损失应当计入申请人的仲裁申请范围。

（4）申请人为提起本案纠纷仲裁支付的律师费。考虑到申请人目前面临无以为继的经营局面，根本无法再先行支付律师代理费用，因此与律师事务所签订了纯风险代理方式的《委托代理合同》。律师费计算标准为案件胜诉标的金额即申请人自被申请人实际取得赔偿金额的 8%。

3、被申请人应按合同约定给予申请人相关代理权，或者赔偿其违约给申请人造成的预期利益损失。

《代理协议》第 7.2 款约定，"PetroKhazakstan 公司产出的原油中在中国以外地区销售的部分，双方同意根据另行商定的条件，由公司委托代理人作为销售代理商。"对此，双方在 2008 年 3 月 14 日签署的《第二次延期协议》予以了再次确认。但是，由于中石化方面并未向中石油集团披露申请人在项目收购中发挥的重要作用，也未向中石油集团披露向申请人作出的该项承诺，因此中石油集团收购 PKZ 公司后，并

未将该款约定的原油销售代理授予申请人。由于中石化方面存在重大违约情形，应当按照《代理协议》约定，授予申请人销售代理权，如因其原因不能履行，应向申请人赔偿该部分预期利益损失。

根据《关于 PK 项目有关情况的汇报》记载，PKZ 公司自 2005 年起的年产原油量为 1,000 万吨；根据中国检验认证集团新疆有限公司阿拉山口分公司提供的数据显示，PKZ 公司 2006 年至 2012 年 9 月运往中国的原油量共计 14,749,025.758 吨，也就是说原本应由申请人代理的运往中国以外地区的原油销售量为 45,250,974.242 吨。按照每吨利润至少 3.47 美元计算，申请人可得预期利益达到 157,020,880.619 美元以上。

《代理协议》的实际履行情况，尤其是申请人履行代理义务取得的重大工作成绩与中方最终获得 PKZ 公司股权的结果之间的关联性事实上得到了中石化方面的确认，被申请人时任总经理周佰修已予以了明确书面确认，申请人要求被申请人兑现承诺代理协议并支付费用事实、理由充分。而被申请人狡辩称"只要被申请人没有取得 PK 公司的股权，申请人便无权主张代理酬金，无论申请人做了多少工作，发挥了何等作用，也无论被申请人是否怠于或放弃权利，还是因为何种自身原因未取得 PK 公司股权，均不能视为被申请人已经取得了股权而要求被申请人支付代理酬金。"可以看出，中石化方面是以服从国家利益为借口肆意罔顾《代理协议》的约定，完全背弃了基本的诚实信用原则、否定客观真实事实，是在为自己给公司、公司股东及国有资产造成的巨额损失寻找开脱的借口。

被申请人亦针对申请人作出如下陈述意见：

申请人在提起仲裁申请时，主张被申请人应支付代理酬金、逾期付款的利息损失、预期利益损失、汇率损失、律师费和仲裁费共计六项仲裁请求。2013 年 2 月 6 日，申请人变更了仲裁请求，主张被申请人应支付代理酬金、逾期付款的利息损失、预期利益损失、律师费、仲裁费和给予其"PK 公司"原油在中国以外地区销售的代理权。

被申请人认为，申请人的主要仲裁请求是：（1）支付代理酬金；（2）向中国地区销售原油的预期利益损失以及取得 PK 公司在中国以外地区销售原油的代理权，其余仲裁请求均为该两项仲裁请求所衍生。

被申请人在对申请人提出相应抗辩的同时，认为申请人不能证明其为《代理协议》中的代理人，也未能证明其仲裁请求的诉讼时效发生中断，从而主张驳回申请人的全部仲裁请求。

因此，被申请人认为本案的主要争议为：申请人的主体问题；被申请人是否应当支付代理酬金问题；被申请人是否应当偿付原油销售的预期利益损失和给予申请人原油销售代理权问题；申请人的仲裁申请是否超过诉讼时效期间问题。

第一关于主体问题：

（一）申请人不能证明其为《代理协议》约定的代理人 UNI-TOP 公司。

《代理协议》约定的代理人 UNI-TOP 公司为一家在香港注册的公司，而在《仲裁申请书》中，申请人所称的 UNI-TOP 公司为一家在英属维京群岛注册的公司。申请人目

前提供的证据未形成证据链，无法证明申请人与《代理协议》中的代理人为同一主体，因此，其无权依据《代理协议》主张代理酬金。

1、申请人向仲裁庭递交的书证不能证明申请人即为代理人。申请人为证明其与《代理协议》中代理人为同一民事主体，向仲裁庭递交了《香港特别行政区政府公司注册处之证明》、《香港韩启盛会计师楼之〈声明书〉》和申请人在BVI的注册证书。然而，被申请人认为该等证据均无法证明申请人与代理人为同一民事主体，理由如下：

（1）申请人在BVI的注册证书，只能证明申请人为一家在英属维京群岛注册的公司，但其无法证明申请人与《代理协议》中的代理人为同一主体。

（2）《香港特别行政区政府公司注册处之证明》可以证明，香港并不存在一家依法注册的名为"UNI-TOP AISA INVESTMENT LIMITED"的公司，但该证据无法证明，除BVI以外，其他国家或地区不存在名为"UNI-TOP AISA INVESTMENT LIMITED"的公司。

（3）申请人提交了《香港韩启盛会计师楼之〈声明书〉》，意图用"办公地址"将申请人与《代理协议》中的代理人相关联。香港韩启盛会计师楼声称，据其"认知"，申请人成立时在香港的办公地址即为《代理协议》中的代理人地址。然而，香港韩启盛会计师楼对申请人成立时办公地址的陈述源于其主观认识，并没有任何客观依据。根据《香港韩启盛会计师楼之〈声明书〉》，香港韩启盛会计师楼之所以能够获得对申请人地址的认知，是由于其为申请人提供通讯地址服务。既然如此，申请人和香港韩启盛会计师楼在香港的通讯

地址应该相同，而香港韩启盛会计师楼代理向维尔京群岛交纳周年政府费用的大量凭证也表明，自 2004 年开始，香港韩启盛会计师楼和申请人的通讯地址相同。正是从这些凭证中，被申请人看到，自 2004 年开始，香港韩启盛会计师楼和和申请人的通讯地址中均没有"香港上环干诺道中 200 号信德中心招商局大厦 28 字楼 15 室"（代理人签约时所声称的地址）。可见，香港韩启盛会计师楼关于申请人成立时在香港的办公地址即为代理人地址的主观认知被其提供的客观证据所否定。

2、申请人在庭审中主张，被申请人向申请人支付过四次费用，从《代理协议》的履行情况可以看出，申请人为《代理协议》中的代理人。然而，根据《付款通知》及发票可知，被申请人付费的支付凭证并不显示 UNI-TOP 公司的地址和注册国家，其不能证明作为收款方的 UNI-TOP 公司与本案的申请人为同一主体。

3、申请人在庭审中主张，申请人与《代理协议》中 UNI-TOP 公司的董事长和法定代表人均为刘方，这表明申请人与《代理协议》中的代理人为同一主体。然而，首先，申请人没有提供任何客观证据（例如公司登记资料）证明刘方在申请人或代理人中的任职。其次，即使刘方确实是二者的法定代表人，由于同一自然人可以担任多家公司的董事长和法定代表人，被申请人也无法依据法定代表人相同的事实就判断申请人与代理人为同一主体。申请人提交的申请人与被申请人之间的短信记录（2005 年 6 月 12 日至 6 月 17 日）并附《公证书》以及刘方签证记录及护照复印件显示，刘方本人同时具有至少两个身份：一是刘珺，其持有中华人民共和

国居民身份证，号码为 110101196405062088；二是刘方，其持有香港特别行政区护照，号码为 HA9052174。刘方自称是申请人的法定代表人和实际控制人，她的身份存疑进一步印证申请人的主体资格存在瑕疵。

最后，申请人在庭审中主张，《代理协议》上的印章与本案申请人的印章相同，因此，二者为同一主体。然而，国勘公司认为，仅凭印章无法判断申请人和代理人是否为同一家公司：（1）没有鉴定两个印章是否一致；（2）英美法系国家并不存在将公司的印章进行备案的管理制度，不应当凭印章判断《代理协议》中代理人与本案申请人为同一主体。

鉴于本案申请人 UNI-TOP 公司的主体资格存在瑕疵，仲裁庭不应支持申请人的仲裁请求。

为了便于表述，在以下代理意见中在提及 UNI-TOP 公司时不区分其为申请人还是代理人，即假设其主体适格。

（二）环球公司与申请人不应混为一谈。

申请人提供了部分环球公司签署的原油销售代理合同以及合同履行的证据，并据以主张相关权益，我们认为申请人混淆了主体：

首先，申请人没有充分的证据证明其与环球公司是关联公司。一是，申请人并未提供判断两家公司是否为关联公司的客观依据（例如公司的注册登记资料）；二是，其提供的《情况说明》是由刘方以申请人和环球公司授权代表身份签署的，试图证明刘方是申请人和环球公司的董事长、实际控制人，进而证明申请人和环球公司是关联公司。然而，申请人没有提供刘方在申请人和环球公司任职的客观证据（例如公司注册登记资料），同时申请人也没有提供任何证明刘方

是申请人和环球公司授权代表的文件（例如董事会决议）。因此，《情况说明》至多属于刘方借申请人和环球公司的名义自说自话，不具备证明力。

其次，即使环球公司是申请人的关联公司，也不是《代理协议》的合同主体，理由如下：第一，环球公司的名称并没有在《代理协议》上披露；第二，环球公司也未在《代理协议》上签章；第三，环球公司没有做出接受《代理协议》的意思表示；第四，被申请人从未与环球公司达成缔结《代理协议》的合意。

最后，即使环球公司享有《代理协议》项下的合同权益，由于环球公司没有提出仲裁申请，申请人也无权主张相关权益。

第二、被申请人是否应当支付代理酬金问题：

（一）《代理协议》约定，代理酬金的支付条件是被申请人（国勘公司）获得 PK 公司股权。由于被申请人至今未获得 PK 公司任何股权，支付酬金的条件未成就，申请人的仲裁请求没有事实和法律依据。

1、《代理协议》的性质和效力。

本案双方当事人之间所签署的《代理协议》无论是名称，还是内容，尤其是双方当事人在 2013 年 8 月 8 日庭审时的明确表示，都表明其性质为委托代理合同。该协议系双方真实意思表示，并未违反法律的规定，对双方具有法律约束力。

《代理协议》的性质对本案而言意味着：第一，我国《合同法》第 405 条规定，受托人完成委托事务的，委托人应当向其支付报酬……当事人另有约定的，按照其约定。因此，《代理协议》第 5.1 条约定的代理酬金条款"在公司确定的心

38

理价位内完成交易后，公司向代理人支付报酬"是有效的。第二，我国《合同法》第399条规定，受托人应当按照委托人的指示处理委托事务，我国《民法通则》第63条规定，被代理人对代理人的代理行为承担民事责任。因此，被申请人作为委托人具有商业自主性。

2、代理酬金的支付条件是被申请人获得PK公司股权。

首先，为收购PK公司的全部股权，被申请人与申请人签署了《代理协议》。《代理协议》第5.1条规定代理酬金的支付条件是在公司以确定的心理价位内完成交易后，公司向代理人支付报酬完成交易后被申请人获得PK公司股权，对此，协议的目的条款和代理人的义务条款亦有明确规定。具体而言，《代理协议》第2.1条规定协议目的是"协助公司根据有关法律或规定直接或通过公司的关联公司间接获得PK公司股份，并协助公司得到相关政府批准（完成转让）。《代理协议》第3条规定申请人的义务是代理人同意，在此期间以及任何可能的展期内，其应始终合理地履行本协议的义务并不断努力，运用充分的时间和注意力与PK公司管理层联系，以协助公司获得项目"。可见，《代理协议》约定的酬金支付条件就是被申请人获得PK公司股权。

其次，申请人提交的《周总信函》提到"中石油获得PK项目权益后，刘方曾找过我们，要求按《代理协议》付款，法律合同部研究认为，只有中石油按协调意见把项目部分权益转给我们并得到哈国政府批准后，才能支付，我同意这个意见，并和连华一起向刘方做了说明，最后对方接受了"。"《代理协议》将到期时，刘方提出要么付款，要么将《代理协议》转让给中石油，我们研究认为：一、不能付款，理由同前，......

经谈判对方也接受了"；"2008 年又延期了一次，情况是一样的"。这表明，无论是在《代理协议》有效期内，还是在《代理协议》终止之后，申请人均一再认可代理酬金的支付条件是被申请人取得 PK 公司的股权。申请人在《周总信函》的证明内容中的第 2 点也确认"中石油方面获得 PK 项目权益后，刘方要求国勘公司按《代理协议》付款，国勘公司表示在中石油方面向国勘公司转让项目权益后支付"。

最后，申请人在本案 2013 年 2 月 6 日的庭审过程中，明确承认代理酬金的支付方式是"成功取费"。

3、被申请人至今未获得 PK 公司任何股权，支付酬金的条件未成就。

申请人并未根据国际石油行业并购的交易惯例，完成股权收购的整个交易流程。被申请人未就股权收购与 PK 公司股东签约，至今也没有获得 PK 公司的任何股权。依据《中华人民共和国合同法》第 405 条的规定，被申请人无需支付任何代理酬金。

（二）申请人关于其在整个收购期间做了大量工作，发挥了决定性作用，而被申请人实际上已经享有 PK 公司的股份及相应权益、怠于或放弃主张权利以及因自身原因未取得股权等说法既没有任何证据支持，也自相矛盾，完全不符合事实，而且该等说法也不能支持其仲裁请求。

如前所述，根据合同的约定，只要被申请人没有取得 PK 公司的股权，申请人便无权主张代理酬金，无论申请人做了多少工作，发挥了何等作用，也无论被申请人是怠于或放弃权利，还是因为何种自身原因未取得 PK 公司股权，均不能视为被申请人已经取得了股权而要求被申请人支付代理酬

金。因此，申请人的有关陈述完全不能支持其仲裁请求。尽管如此，为了避免其混淆视听，被申请人仍对其主张反驳如下：

1、申请人没有完成《代理协议》约定的义务，其关于做了大量工作，为成功收购 PK 项目发挥了决定性作用的说法与事实不符。

申请人在《仲裁申请书》中声称，其做了大量工作，已履行《代理协议》全部义务，为最终成功收购 PK 项目发挥了"决定性"的作用，在庭审中主张其已成功完成了海外收购 PK 公司股权的工作。事实上，PK 项目既未成功收购，申请人也没有发挥其声称的作用，完成其所做工作，被申请人已按《代理协议》支付了全部费用。

首先，申请人向仲裁庭递交的往来电子邮件、短信记录、文件交接单表明，在被申请人参与 PK 公司股权收购期间，申请人所做的工作主要是为被申请人与 PK 公司的协商谈判提供了酒店预订和会议安排、转交了部分资料，其所谓的"在长达 10 个多月的收购过程中……作了大量重要的高层公关和斡旋及谈判准备工作"和"完成收购前期工作"，显然缺乏证据支持。

申请人向仲裁庭递交了刘方签证记录及护照复印件，意图证明刘方女士 8 次赴伦敦、22 次赴阿拉木图为 PK 项目开展工作。然而，该等签证记录及护照的复印件无法反映刘方出境的具体原因以及出境后所从事的具体工作，根本无法证明刘方至伦敦和阿拉木图是否从事了与 PK 项目相关的工作。

根据《代理协议》的约定，申请人应当履行的代理义务包括在谈判战略上向被申请人提供建议，协助被申请人与哈国政府协商，提供财务、法律和技术咨询意见，协助获取政府批准文件，协助被申请人获得 PK 项目等等，但其提供的证据并未证明其已经完成了代理义务。

其次，申请人所谓起到了"决定性"作用的说法不符合事实。实际上，申请人未能通过其代理工作取得实质性成果：

（1）被申请人递交的《意向书》是被申请人签发给 PK 公司的、要求 PK 公司给予被申请人一年排他期谈判的函。该函表明，被申请人之所以与申请人签署《代理协议》，是期望借助申请人的协调安排，通过排他性协商谈判自 PK 公司的股东取得 PK 公司全部股权。然而，申请人非但未能安排 PK 公司签署《意向书》，反而转交了 PK 公司出具的《保密及不行动协议》，该《保密及不行动协议》约定，PK 公司有权随时终止与被申请人的交易谈判，有权接受或拒绝任何第三方的要约，同时要求被申请人一年之内不得与任何第三人（包括 PK 公司的股东）商谈股权购买事宜。可见，申请人未能协助被申请人取得排他谈判的地位并通过协商谈判取得 PK 公司股权，从而导致 PK 项目的交易模式发生了根本性的改变，即由协商谈判模式转为公开招标模式，并进而引致"中石油方面"参与竞标和政府相关部门进行协调。

（2）根据《代理协议》第3.3条的约定，申请人需要为被申请人完成收购提供财务、法律和技术咨询意见，事实上，申请人并未提供该等服务。

（3）根据《代理协议》第3.3条的约定，申请人需要在"谈判战略上向公司提供建议，以完成权益交易"、"需要在协

商中采取所有合理手段，协助公司确定收购的合理价位以促成被申请人的最佳利益"。事实上，申请人既未在协商谈判阶段发挥应有的作用，亦未能协助被申请人确定收购的合理价位，导致谈判一度终止。

（4）2005 年 5 月 30 日，PK 公司顾问高盛国际公司向被申请人发出《邀标函》并表示 PK 项目已转为公开招标，被申请人收到《邀标函》后，随即向申请人询证该函是否属实以及是否同时发给了其他中国公司，但申请人对此毫不知情。这表明，在 PK 项目转为公开招标时，申请人并不了解 PK 项目进展情况，未能履行基本的代理义务。

（5）申请人提交的短信记录表明，2005 年 6 月初，在得知 PK 项目转为公开招标后，被申请人至伦敦向 PK 公司管理层报价，以争取最后的独家谈判机会。事实上，申请人方面的刘方未能说服管理层接受报价，直到被申请人报价被拒绝并准备回国时，其才与 PK 公司的管理层取得联系。

（6）在 PK 项目转为公开招标后，"中石油方面"通过竞标获得了 PK 公司股权，此后，"中石化方面"与"中石油方面"曾协商转让部分 PK 公司股权，在此期间，没有证据表明申请人发挥了作用。

（7）2008 年 6 月 13 日，为解决从 6 月 13 日中标后 PK 公司股权仍涉及哈国政府优先购买权和政府审批等问题，被申请人与申请人签署了《代理协议补充协议》，正是基于申请人表示"哈国政府的批准不会有障碍"，被申请人才下决心拒绝了"中石油方面"关于用其他国家的油气项目进行补偿的建议。

最后，《代理协议》第 5 条约定的代理人费用包括：（1）前期费用（每月 1 万美元）；（2）被申请人认可并书面授权事项的费用；（3）完成交易后的酬金。申请人所做的工作属于前期费用服务事项和被申请人认可并书面授权事项，被申请人已依约支付了全部费用，包括前期费用和被申请人认可并书面授权事项的费用，共计 159,898 美元。申请人无权基于被申请人已经付费的工作主张本应在完成交易后才能获得的酬金。

申请人在庭审中主张，根据《代理协议》的约定，被申请人应支付的前期费用为 26 万美元，目前尚未支付完毕。然而，其主张不应获得仲裁庭的支持：

（1）《延期协议》将原协议 5.2.1 项修改为公司自通知代理人开始提供服务时起每月向代理人支付前期费用一万美元，该协议的签署时间为 2007 年 3 月 2 日，处于《代理协议》的有效期内，申请人此时并未主张应支付的前期费用为 26 万美元。因此，该等变更具有溯及既往的效力。

（2）按照《代理协议》的约定，被申请人支付前期费用的前提是申请人每月提供了代理服务，而申请人提供的证据显示，在 2005 年 6 月份以后，其并未每月提供服务，无权主张每月 1 万美元的前期费用。

（3）即使被申请人应支付的前期费用总额为 26 万美元，申请人在庭审中明确拒绝增加或变更仲裁请求，其主张不属于本案审理范围。

2、申请人主张 PK 项目收购后双方所占股份比例按中石油集团占 60%、中石化集团占 40%划分，中石油集团代表两

家集团成功竞标，这种说法没有事实依据，而且也不能支持其仲裁请求。

首先，申请人提交的唯一与所占股份比例按中石油集团占 60%、中石化集团占 40%的证据为《关于 PK 项目有关情况的汇报（2007 年）》。但该汇报文件的页码缺失、出处不明、没有形成时间和印章，也无法识别汇报人和接受汇报的主体，被申请人对其作为载体的真实性不予确认。

所谓的"联合收购"是指两个主体作为联合投标主体，以同一个报价、提交同一份竞标文件参与竞标，而所谓"代表竞标"是指一个主体委托另一个主体作为其代理人参加竞标。事实上，被申请人提交的《投标书》表明，"中石油方面"既未与被申请人作为共同的收购方以同一个报价参与竞标，也未作为被申请人的代理人参加竞标，双方不存在"联合收购"和"代表竞标"的关系。

申请人在《关于 PK 项目有关情况的汇报（2007 年）》证明内容中的第 6 点和《专题会议纪要》的证明内容中也提到，"中石油方面"竞标成功后，曾与被申请人协商转让 PK 公司股权，这也表明所谓的"联合收购"或"代表竞标"的说法不能成立。

其次，中国能源企业在"走出去"战略中存在着政府相关部门的备案协调机制以及代表中国政府的审批机制。政府相关部门作为"走出去"的主管和审批机关之一，其于 2005 年 6 月份的协调是基于国家利益的职权行为，由于中石油方面在哈萨克斯坦建设有中哈石油管线，其竞标后的原油成本较低，因此，从维护国家利益考虑，政府相关部门的协调意见倾向于由"中石油方面"竞得 PK 项目。在政府相关部门于

2005 年进行协调时，各方虽然有意在"中石油方面"取得 PK 公司股权后再转让一部分股权给被申请人，但"中石油方面"拒绝签署任何协议，所谓"联合收购"或"代表竞标"并未实际签约和执行，"中石油方面"至今也未向被申请人转让 PK 公司任何股权。因此，"经政府相关部门协调，由两家集团联合收购 PK 项目"和"中石油集团代表两家集团成功竞标"的说法不能成立。

最后，根据《代理协议》的约定，被申请人只要未取得 PK 公司股权，便无需向申请人支付任何代理酬金。而无论是政府相关部门协调还是无需向政府相关部门协调，都无法得出被申请人已经获得 PK 公司股权的结论，因而，申请人的说法不能支持其仲裁请求。

3、申请人提交的《关于 PK 项目有关情况的汇报（2007年）》、《国家发展和改革委员会关于会议纪要征求意见的函》及其附件《国家发展改革委办公厅关于协调中国石油天然气集团公司和中国石油化工集团公司转让 PK 公司股份的会议纪要》和《专题会议纪要》不发生确认股权归属的法律后果，其据以主张被申请人实际上已经享有 PK 公司的股份及相应权益的说法，完全不符合事实。

首先，如上所述，《关于 PK 项目有关情况的汇报（2007年）》真实性不予认可，该汇报无法证明被申请人实际上已经享有 PK 公司的股份及相应权益。实际上，结合证据《中国石油天然气股份有限公司首次公开发行 A 股股票招股说明书（摘要）2007 年 9 月 26 日》可知，中石油集团公司的下属公司中油勘探公司取得了 PK67% 的股权，被申请人至今未取得 PK 公司任何股权。

其次，《国家发展和改革委员会关于会议纪要征求意见的函》及其附件《国家发展改革委办公厅关于协调中国石油天然气集团公司和中国石油化工集团公司转让 PK 公司股份的会议纪要》是政府相关部门就"中石油方面"与"中石化方面"转让 PK 公司股权进行协商形成的工作会议记录向双方征求意见的函件，"中石化方面"和"中石油方面"未在《国家发展改革委办公厅关于协调中国石油天然气集团公司和中国石油化工集团公司转让 PK 公司股份的会议纪要》上签章确认，该证据本身不能证明其已经获得各方认可。另外，该纪要是政府相关部门就"中石油方面"与"中石化方面"转让 PK 公司股权交易进行协商的工作会议记录，其未确认 PK 公司股权已经为被申请人享有，显然不能满足《代理协议》约定的酬金支付条件。

再次，《专题会议纪要》是"中石油方面"和"中石化方面"对股权转让交易谈判工作进行安排的会议记录，不构成具有强制执行力的合同，也没有确认 PK 公司股权或相应价值的权益已经为被申请人享有，不发生确认股权归属的法律后果。

最后，事实上，直至 2008 年 3 月和 6 月，被申请人与申请人还对《代理协议》进行了延期和补充，约定由申请人解决"资源国政府优先购买权和政府批准问题"。如上所述，《周总信函》也表明，《代理协议》延期和补充时，被申请人一直向刘方明确表示只有取得 PK 公司股权，才会支付代理酬金，而刘方对此一再表示接受。可见，申请人自己也确认被申请人尚未取得 PK 公司的任何股份或相应权益，不应支付代理酬金。如果在《代理协议》的有效期内，被申请人

已经取得 PK 公司股权，申请人直接主张代理酬金即可，根本无需签署任何延期或补充协议。

4、申请人关于被申请人"怠于或放弃向中石油集团方面主张该确定权益的权利、由于其原因未完成中石油集团向其转让股权的过户手续"的说法与事实不符，并且不能支持其请求。

首先，申请人一方面主张被申请人已实际获得了 PK 公司股权，另一方面又主张被申请人怠于或放弃向 PK 公司股权，由于其原因未完成"中石油集团方面"向其转让股权的过户手续，自相矛盾。

其次，在"中石油集团方面"中标后，"中石化方面"多次与其协商讨论转让股权事宜，并与申请人对《代理协议》进行延期和补充，可见，被申请人既未取得对 PK 公司股权的确定权益也没怠于或放弃主张申请人所谓的"确定权益"

申请人在 2013 年 2 月 6 日提交的《延期协议》、《第二次延期协议》和《代理协议补充协议》的证明目的中明确表示，"被申请人从未提出放弃收购或解除代理关系"。可见，申请人明知其关于"怠于向中石油方面主张确定权益的权利"的说法不能成立。

《周总信函》表明，在《代理协议》延期和补充时，周佰修一直向刘方表示，被申请人不能向"中石油方面"转让《代理协议》，因为被申请人还在向中石油方面追索该项目的权益。可见，被申请人一直未放弃 PK 项目。

再次，根据《代理协议》的如下约定以及《合同法》的规定，被申请人作为委托人具有商业自主性，申请人作为代理人无权要求被申请人不计代价地进行交易：

（1）《代理协议》第2.2条协议期限条款约定"自本协议生效之日起在两年内有效，或者公司放弃转让的意愿之时，以较早实现的时间为准"。这表明被申请人有权随时放弃收购PK项目，不受代理人UNI-TOP公司的制约。

（2）《代理协议》第4条公司义务条款约定"4.1公司根据代理人的协助及代理人提供的相关信息，进行经济评估，确定完成收购合理的心理价位。"《代理协议》第5.1条酬金条款约定"双方同意，在公司确定的心理价位范围内完成交易后……。"这表明，被申请人有权决定收购PK项目价格的合理价位。

（3）《代理协议》第5.2.1条约定"公司书面通知代理人放弃该项目交易之时停止支付本款规定的费用"。可见，被申请人有权随时通知申请人停止工作。

（4）《代理协议》第8.1条终止条款约定"双方自动放弃各自业务，包括行动或显示出自主意愿的懈怠；希望或同意终止业务；或依照本协议条款和条件规定对业务操作有明显漠视"。我国《合同法》第399条规定"受托人应按照委托人的指示处理委托事务"，第410条规定"委托人或者受托人可以随时解除委托合同"。因此，被申请人有权随时解除《代理协议》。

最后，无论被申请人是否怠于或放弃向"中石油集团方面"主张该确定权益的权利，由于其原因未完成"中石油集团方面"向其转让股权的过户手续，依据《代理协议》的约定，被申请人只要未获得PK公司股权，就无需支付任何代理酬金。

5、申请人关于在"中石油方面"竞标成功后，其与被申请人签署《延期协议》和《第二次延期协议》是为了延长代理酬金的付款期限的说法不能成立。

申请人在庭审中主张，在"中石油方面"竞标成功后，其完成了《代理协议》项下海外收购 PK 公司股权的代理义务，申请人对被申请人与"中石油方面"之间的股权转让没有代理义务，其与被申请人签署《延期协议》和《第二次延期协议》是为了延长代理酬金的付款期限，被申请人认为该等说法既抛弃了其在《仲裁申请书》中的代理思路，也与事实不符：

首先，申请人之所以主张在"中石油方面"竞标成功后，其完成了海外收购 PK 公司股权的代理义务，究其实质是其认为"中石油方面"与被申请人属于"联合收购"，"中石油方面"取得 PK 公司股权，就意味着被申请人取得 PK 公司股权。对此，我们在上述意见中已充分反驳，不再赘述。

其次，《延期协议》约定"根据项目需要，经双方协商一致，同意将原协议的有效期延长至 2008 年 3 月 6 日"，《第二次延期协议》约定"现协议期满，根据工作需要，双方协商一致，将协议的有效期再次延长至 2008 年 12 月 31 日"。可见，申请人与被申请人是对《代理协议》的有效期进行相应延长，并非延长代理酬金的付款期限，申请人关于延长代理酬金付款期限的说法没有合同依据。试想，如果在《代理协议》的有效期内，被申请人支付代理酬金的条件已经成就，申请人直接主张代理酬金即可，完全不必对《代理协议》进行延期。

再次，《代理协议》协议目的条款规定申请人应"协助公司根据有关法律或规定直接或通过公司的关联公司间接获

得 PK 公司股份"，其并未规定从何处获得 PK 公司股份。被申请人在签署《代理协议》时，期望通过协商谈判的方式从 PK 公司原股东处受让 PK 公司 100%的股权，但事实上最终协商谈判未果，随后 PK 项目转为公开招标并由"中石油方面"竞得，被申请人未取得 PK 公司任何股权。如果此时申请人认为代理义务已经完成，那么根据《代理协议》的约定，既然被申请人未取得 PK 公司任何股权，其便无权主张任何代理酬金。

在"中石油方面"获得 PK 公司股权后，被申请人拟从"中石油方面"受让 PK 公司部分股权，基于《代理协议》的约定，申请人仍有取得哈国政府审批的义务，被申请人与申请人签署了《延期协议》、《第二次延期协议》和《代理协议补充协议》。如果此时申请人认为其没有代理义务，并且不同意被申请人改变 PK 股权收购方式，则双方未达成继续代理的合意，申请人主张代理酬金没有合同依据。

最后，申请人提交的《周总信函》明确提到 "中石油获取 PK 公司项目权益后，刘方曾找过我们，要求按《代理协议》付款，法律合同部研究认为，只有到中石油按协调意见把项目部分权益转给我们并得到哈国政府批准后，才能支付，我同意这个意见，并和连华一起向刘方做了说明，最后对方接受了。到协议将到期时，刘方提出，要么付款，要么将《代理协议》转给中石油，我们研究认为，一不能付款，二不能转让，因为我们还在向中石油方面追索该项目权益，这样唯一的解决办法是把协议延期，考虑到当时的主要内容是我方向中石油方面交涉，只有到需要哈国政府批准时，UNI-TOP 公司才有工作内容。协议 2008 年又延期了一次，

情况是一样的"；"至于补充协议，是由于中石油方面提出，转让 PK 项目的权益在哈国方面走不通，建议用其他国家的油气项目来补充给我们，我们不愿意放弃 PK 项目，就要刘方去哈国摸情况，做工作，才签订的"。这表明，在中石油方面竞标成功后，申请人继续担任被申请人的代理人，并一再认可只有被申请人取得 PK 公司股权，才会支付代理酬金。申请人所谓对被申请人与"中石油方面"之间的股权转让没有代理义务，与被申请人延长《代理协议》期限，是指延长代理酬金的付款期限的说法显然不符合事实。

综上可见，申请人在明知被申请人至今未取得 PK 公司任何股权，无需支付任何代理酬金的情况下，利用所谓的"中石油集团代表两家集团成功竞标"、"中方完成了收购 PKZ 公司的股权"、 "被申请人事实上已经享有 PKZ 公司股份或相应价值的权益"等自相矛盾、主观臆断的说法,企图生拉硬拽、牵强附会的索取高额代理酬金，明显违背《代理协议》的约定。

第三、与原油销售代理有关的预期利益损失和代理权授予问题：

（一）申请人无权基于《代理协议》第 7 条主张预期利益损失。

首先，我国《合同法》第 113 条规定的预期利益是指由于合同一方当事人违约，合同另一方当事人丧失了合同履行后可以获得的利益。然而，PK 公司与环球公司并非《代理协议》的合同主体，他们之间原油销售代理合同提前终止，显然与本案无关，不属于申请人的预期利益损失。根据《代理协议》第 7 条的约定，交易完成后，申请人将不再作为将

PK 公司产出原油运往中国市场的代理。因此，如交易完成，申请人应依约放弃利益，终止原油销售代理合同，其主张的原油销售代理合同项下的利益并非合同履行后可以获得的预期利益。

其次，在被申请人未取得 PK 公司的任何股权，交易至今未完成的情况下，如果 PK 公司单方提前终止原油销售合同，则申请人应向 PK 公司主张权益；如申请人主动终止原油销售合同，则其应自行承担责任，申请人无权主张预期利益损失。

最后，申请人在《变更仲裁请求申请书》中主张"为严格履行《代理协议》的约定，环球公司于 2005 年 9 月即提前 8 个月终止了代理合同的履行"，据此，其向被申请人主张预期销售利润损失 2,776,000 美元。而在《仲裁申请书》中，申请人却声称系 PKZ 公司单方提前终止了环球公司的代理权"，其主张明显自相矛盾。另外，申请人提交的原油销售合同表明，该等合同的任何一方当事人提前 60 天书面通知后，均有权单方终止合同。因此，申请人关于提前终止代理合同的说法，不符合事实。实际上，"中石油方面"竞得 PK 项目，其是否聘用申请人或环球公司作为销往中国或中国以外地区的原油代理商，显然与被申请人无关。从商业角度而言，环球公司丧失 PK 公司在中国的原油销售代理权实属必然，不存在所谓的预期利益损失。

（二）申请人无权基于《代理协议》第 7 条主张享有 PK 公司原油在中国以外地区销售的代理权。

其一、《代理协议》第 7 条是对交易完成后 PK 原油销售代理事宜的安排，在被申请人未取得 PK 公司的任何股权，

交易未完成的情况下，申请人无权主张享有 PK 公司原油在中国以外地区销售的代理权。

其二、"中石油方面"成功竞标并实际取得PK公司股权，被申请人至今未取得 PK 公司的任何股权，客观上无法将 PK 公司原油在中国以外地区销售的代理权给予申请人。

第四、诉讼时效问题：

《代理协议》的有效期间至 2008 年 12 月 31 日已届满，如果申请人认为其合同权利受到侵害，那么其至迟应当于此时起算诉讼时效期间，而中国国际经济贸易仲裁委员会于 2012 年 9 月 24 日才收到申请人的仲裁申请，抛开代理酬金支付条件未成就的基础问题不谈，申请人仲裁申请实际上已超过诉讼时效期间。虽然，申请人主张曾多次要求被申请人支付代理酬金，但是，其所递交唯一与诉讼时效相关证据材料即《周总信函》无法证明诉讼时效已中断，根据《中华人民共和国民法通则》第135条的规定，申请人仲裁申请应当被驳回。

首先，《周总信函》显示，2009 年至 2010 年期间，周佰修在刘方向其了解 PK 项目权益追索的进展情况和提出再次签署延期协议的建议时，已经从国勘公司的岗位上退了下来，其让刘方找时任国勘公司总经理周玉琦协商，这说明周佰修此时已不能代表国勘公司，刘方与周佰修联系不能导致本案的诉讼时效发生中断，事实上，2009 年到 2010 年期间，刘方从未找过周玉琦。

其次，《周总信函》不能支持仲裁庭作出不利于被申请人的推论，因为根据《民法通则》第一百四十条的规定，诉讼时效因提起诉讼当事人一方提出要求或者同意履行义务

而中断，刘方仅仅是向周佰修了解 PK 项目权益追索的进展情况和提出再签延期协议的要求，并未主张代理酬金，不会导致本案的诉讼时效中断。

综上所述，申请人基于其代理活动已经获得了相应的费用，在《代理协议》约定的支付酬金条件未成就的情况下，仍然索要巨额代理酬金和所谓的"损害赔偿"，其仲裁请求毫无事实和法律根据。恳请仲裁庭立即驳回申请人的全部仲裁申请，并根据《仲裁规则》第五十条的规定，裁定申请人补偿被申请人因办理案件而支出的律师费，以维护契约精神和诚信原则。

## 二、仲裁庭意见

（一）关于审理本案合同应适用的法律

本案申请人根据本案《代理协议》的第 10 条争端解决的第 10.3.2 款的约定，将本案发生的争议交中国国际经济贸易仲裁委员会进行仲裁解决。同时，该条款明确约定本案中的《代理协议》适用中国法。且在整个仲裁过程中双方在庭审过程中口头及其书面提交的陈述等法律文件中均引用中国法律。故此，仲裁庭认为将相关的中国法律适用于本案争议的审理是适当的并且是有依据的。

（二）关于本案合同的有效性

仲裁庭注意到，申请人与被申请人于 2005 年 3 月 4 日签署的本案《代理协议》及其后的延期协议没有证据表明不是在平等自愿的基础上签订的。申请人和被申请人双方也都承认该《代理协议》是合法有效的并已经得到了履行。签订

本案合同的双方均具备法律规定的主体资格，本案合同的内容并不违反中国的相关法律、行政法规的强制性规定。本案涉及的《代理协议》应该代表了当事双方的真实意思表示。因此，仲裁庭认为本案《代理协议》是合法有效的。可以作为本案裁判双方当事人权利义务的依据。

（三）关于本案程序上的问题

1. UNI-TOP ASIA INVESTMENT LIMITED 是否为本案的适格仲裁申请人？

仲裁庭注意到在双方签署的《代理协议》的第 2 页写道：UNI-TOP ASIA INVESTMENT LIMITED 依据香港法律设立并存续，注册地址为：香港上寰干诺道中 200 号信德中心招商局大厦 28 字楼 15 室。被申请人据此认为：现作为本案申请人的 UNI-TOP ASIA INVESTEMENT LIMITED 公司为一家在英属维京群岛注册的公司。两者并非同一公司。故此，UNI-TOP 公司作为本案《代理协议》争议仲裁申请人并不适格。

申请人从如下几个方面对此加以解释：

（1）《代理协议》采用被申请人所拟文本，在没有要求申请人提供注册资料的情况下，错误地将申请人写成香港公司。考虑到并不影响《代理协议》中的具体的权利义务，没有对此进行修改。

（2）双方从 2005 年 3 月签署《代理协议》至 2008 年签署最后的延期协议，四年多的合作中双方密切联系，被申请人完全了解申请人的联系人、公司公章、银行帐户等。现在提出可能存在申请人适格问题，是诉讼策略，缺乏事实依据。

（3）香港特别行政区注册处的公司登记证明文件证明香港不存在一家注册名称为 UNI-TOP Asia Investment Limited 的公司。

（4）香港韩启盛会计师楼的声明书表明 UNI-TOP 公司 2004 年在英属维尔京群岛注册成立，自 2004 年至 2012 年均委托该会计师楼代为向维尔京群岛缴纳周年政府费用，公司至今有效存续。

仲裁庭注意到被申请人对于申请人上述解释的反驳。但是，香港政府公司注册处于 2013 年 2 月 22 日出具的查询登记记录表明截止上述日期在香港并无名称为 Uni-Top Asia Investment Limited 公司的登记注册记录。同时，申请人提供的会计师楼的声明书明确证实在《代理协议》中标明的 Uni-Top 公司的办公地址就是申请人所在地址，且申请人一直委托该会计师楼缴纳公司的政府费用。

据此，仲裁庭认为虽然双方签署的《代理协议》中将申请人的公司注册地错误地写为香港，但是申请人提供的上述证据和依据上述证据做出的解释并非不符合逻辑。且从 2005 年开始至申请人提出仲裁申请之日，与被申请人联系并发生业务往来的 UNI-TOP 公司的具体负责人员及公司的登记注册地址、联系地址、银行信息资料并没有发生重大变化。此外，实践中在香港地区有诸多海外公司通过会计师楼开立并登记设立，这些公司很容易被混淆为香港公司。在某些情况下，这些公司的股东甚至也会将自己的公司误认为是香港公司。被申请人尽管对于申请人提交的上述证据所证明的事项仍有存疑并且表示不接受，但是其未能提出相反的证据证明申请人的证据和解释是虚假、错误并不可信的。在此情况下，

仲裁庭接受申请人关于《代理协议》中关于申请人的注册登记信息是错误书写所致的解释，认为申请人作为本案《代理协议》争议仲裁申请方并不存申请人主体不适格的问题。

2. 关于诉讼时效的问题

仲裁庭就被申请人提出的本案存在诉讼时效的问题听取了双方的意见。

被申请人提出本案争议的《代理协议》的有效期至 2008 年 12 月 31 日已届满。如果申请人认为其合同权利受到侵害，那么其至迟应当于此时起算诉讼时效期间，而中国国际经济贸易仲裁委员会于 2012 年 9 月 24 日才收到申请人的仲裁申请，抛开代理酬金支付条件未成就的基础问题不谈，申请人仲裁申请实际上已超过诉讼时效期间。虽然，申请人主张曾多次要求被申请人支付代理酬金，但是，其所递交唯一与诉讼时效相关证据材料即《周总信函》无法证明诉讼时效已中断，根据《中华人民共和国民法通则》第 135 条的规定，申请人仲裁申请应当被驳回。

申请人则反驳：在中石油完成 PKZ 公司的海外收购，被申请人一方面与中石油协商如何二次转让股权，一方面与申请人于 2007 年 3 月 2 日、2008 年 3 月 14 日、2008 年 6 月 13 日三次签订代理协议延期协议及补充协议，第三次补充协议有效期延长至 2008 年 12 月 31 日。补充协议到期后，申请人公司的刘方多次向被申请人（中石化集团的全资子公司）及其母公司中石化集团主张权益，被申请人虽然未与其继续签订延期协议或补充协议，但在 2011 年之前从未表示过拒绝付款的意思。

同时，申请人提供相关证据表明，根据被申请人原总经

理周佰修的证实，刘方女士自 2008 年至 2011 年间多次要求被申请人履行《代理协议》约定的义务。周佰修称刘方曾几次到其在中石化集团的办公室追索权益，周佰修告诉她中石化尚未从中石油拿到股权，并让她去找被申请人公司的周玉琦。"我记得 2009 年有 2 次，2010 年有 1 次。我对她介绍的几乎一样，一是还没有拿到；二是我们也没有放弃。2009 年有一次她提出了再签延期协议的要求，我建议她去找玉琦总经理谈。2011 年，UNI-TOP 曾给集团公司发函，要求把《代理协议》再延期。此函也寄了一份给我，我转报给耀仓同志了。"对此，被申请人在庭审中也确认收到申请人 2011 年10 月的来函，对于该次来函，中石化集团分管被申请人公司的领导进行了批示，强调事情已经过去，要求做好说服工作。

根据我国《民法通则》第一百四十条的规定：诉讼时效因提起诉讼、当事人一方提出要求或者同意履行义务而中断。从中断时起，诉讼时效期间重新计算。

自 2008 年 9 月 1 日起施行的《最高人民法院关于审理民事案件适用诉讼时效制度若干问题的规定》第十条规定：具有下列情形之一的，应当认定为符合《民法通则第一百四十条规定》：（一）当事人一方直接向对方当事人送交主张权利文书，对方当事人在文书上签字、盖章或者虽未签字、盖章但能够以其他方式证明该文书到达对方当事人的;（二）当事人一方以发送信件或者数据电文方式主张权利，信件或者数据电文到达或者应当到达对方当事人的；……。

仲裁庭认为根据申请人和被申请人均认可的事实，并由被申请人前任总经理周佰修提供的书面证据证实 2009 年到2011 年申请人曾几次向被申请人提出延长期限权利要求。鉴

于《代理协议》约定的酬金非常优厚，申请人对此酬金的欲望是不言而喻的。通常这样的情况下，申请人不断到被申请人处提出要求，显然不单单限于继续延长协议的期限。申请人的此类向被申请人提出的权利主张基本符合我国法律关于诉讼时效中断的规定。因此，在诉讼时效中断而又重新计算期限的情况下，本案争议的《代理协议》仲裁的诉讼时效应该不存在超期的问题。故此，仲裁庭不认可被申请人关于本案存在诉讼时效过期的陈述。

（四）本案争议的几个问题

1、《代理协议》的性质和关于代理酬金的支付条件

（1）关于争议《代理协议》的合同性质，申请人在其陈述意见中表明：本案涉及到的《代理协议》属于我国合同法中的委托合同，本案《代理协议》采用的是被申请人方面提供的格式文本，清晰地定义为代理合同，申请人是被申请人的独家委托收购 PKZ 公司股权的排他性代理人。

《代理协议》第 2.1 款规定："协议目的：公司（被申请人）独家委托代理人（申请人）且代理人同意作为公司的排他的代理人，协助公司根据相关法律或规定直接或通过公司的关联公司间接获得 PKZ 公司股份，并协助公司得到相关政府批准（下称"完成转让"）。"

申请人进一步指出：在本案《代理协议》签订之前，2004 年 11 月被申请人已经向申请人的董事长刘方女士出具了授权委托书，委托其作为代理人，向 PKZ 公司递交收购意向书，代为向 PKZ 公司联系收购 PKZ 公司股权事宜，时任被申请人总经理的周佰修签署授权书及意向书。

此后被申请人在签订《代理协议》时，通过相关条款追认了此前的代理行为，并承诺将此前的代理费用补偿给申请人（见《代理协议》第1条名词解释，"代理人"是指申请人及其所有的关联公司。《代理协议》第5.2.3条"鉴于代理人在本协议生效前已为公司提供代理服务，公司同意向代理人补偿 2005 年 1 月和 2 月的前期费用，共计贰万美元。"）

同时，双方签署的《代理协议》第 3 条具体约定了申请人应当提供的代理服务内容。这些代理协议中的约定，足以证明在本案《代理协议》的履行过程中，申请人是在以被申请人的代理人身份在履行代理义务。

被申请人表示：《代理协议》的委托合同性质对本案而言意味着：第一，我国《合同法》第 405 条规定，受托人完成委托事务的，委托人应当向其支付报酬……当事人另有约定的，按照其约定。因此，《代理协议》第 5.1 条约定的代理酬金条款"在公司确定的心理价位内完成交易后，公司向代理人支付报酬"是有效的。第二，我国《合同法》第 399 条规定，受托人应当按照委托人的指示处理委托事务，我国《民法通则》第 63 条规定，被代理人对代理人的代理行为承担民事责任。因此，被申请人作为委托人具有商业自主性。

仲裁庭经庭审调查和根据本案争议双方的陈述，认可本案双方争议涉及的《代理协议》的性质为我国《合同法》中的委托合同。合同双方的法律关系是明确的，且在《代理协议》中对合同双方的委托及代理的具体事项和权利义务都作了具体的规定。《代理协议》的第 3 条规定申请人的代理义务为 "3.1 代理人同意，在此期间以及任何可能的展期内，其应始终合理地履行本协议的义务，并不断努力，运用充分

的时间和注意力与 PK 公司管理层联系，以协助公司获得项目。"

"3.2 根据本协议条款，代理人要在项目的分析、组织、协商、影响方面协助公司。代理人要协助公司获取信息，包括 PK 公司的所有资料，并按照公司要求准备任何可能的详细评价；与相关政府、政府附属机构或权力机构发展关系。"

"3.3 代理人同意：在谈判战略上向公司提供建议，以完成权益交易；协助公司为完成交易与政府、政府管理的企业协商；与政府权力机构执行监督或管理机构进行协商；协助公司获取任何和所有特许、批准和所有类型的文件；在协商中采取所有合理手段，协助公司确定收购的合理价位以促成公司的最佳利益；为公司完成收购提供财务、法律和技术咨询意见；迅速回应公司提出的所有问题；尽可能保持足够的员工以履行本协议中的义务；其他与代理相关的事务。"

同时在《代理协议》的第 4 条也规定了被申请人的合同义务: "4.1 公司根据代理人的协助及代理人提供的相关信息，进行经济评估，确定完成收购合理的心理价位。4.2 义务协助，公司须保证向代理人提供有关的合理协助和建议；不得另行聘请任何顾问。4.3 支付酬金，公司应按照本协议第 5 条规定向代理人支付酬金。"

上述约定与《合同法》中委托合同是委托人和受托人约定，由受托人处理委托人事务的合同及受托人应当按照委托人的指示处理委托事务的规定并不相悖。本案争议的委托和受托的义务是否得到履行，应该根据《合同法》中关于委托合同的规定对双方各自应该负担的责任作出判断。

（2）关于代理酬金及支付问题，仲裁庭认为本案争议

的双方应注意到《合同法》委托合同的规定中关于委托人支付报酬义务的规定。《合同法》第四百零五条：受托人完成委托事务的，委托人应当向其支付报酬。因不可归责于受托人的事由，委托合同解除或者委托事务不能完成的，委托人应当向受托人支付相应的报酬。当事人另有约定的，按照其约定。

经庭审查明，本案双方对委托代理的报酬的支付实际上是分成两部分，前期费用和酬金。《代理协议》的第 5 条酬金、前期费用和报告规定："5.1 酬金，双方同意，在公司确定的心理价位范围内完成交易后，公司应按如下条件向代理支付酬金：5.1.1 完成交易价格 10 亿美元部分按 1%计算；完成交易价格 10-20 亿美元部分，超过 10 亿美元部分按 0.5%计算；完成交易价格 20 亿美元部分，超过 20 亿美元部分按 0.3%计算。5.1.2 如完成交易价格低于公司的心理价位时，应另行向代理人支付低于心理价位部分的 2%的奖励。"

"5.2 前期费用，5.2.1 公司同意自本协议签订生效之时起为代理人所提供的服务每月向代理人支付前期费用壹万美元。5.2.2 公司书面通知代理人放弃该项目交易之时停止支付本款规定的费用。5.2.3 鉴于代理人在本协议生效前已为公司提供代理服务，公司同意向代理人补偿 2005 年一月和二月的前期费用，共计贰万美元。本款所规定费用代理人应每月提交一次发票和支持性文件。在完成项目交易时本款规定费用全额冲抵酬金。"

对于前期费用或费用的支付，被申请人称，申请人所做的工作属于前期费用服务事项和被申请人认可并书面授权事项，被申请人已依约支付了全部费用，包括前期费用和申

请人认可并书面授权事项的费用，共计 159,898 美元。申请人无权基于被申请人已经付费的工作主张本应在完成交易后才能获得的酬金。

被申请人更认为，申请人在庭审中主张根据《代理协议》的约定，被申请人应支付的前期费用为 26 万美元，目前尚未支付完毕。但是，其主张不应获得仲裁庭的支持。理由是：

（1）《延期协议》将原协议 5.2.1 项修改为"公司自通知代理人开始提供服务时起每月向代理人支付前期费用一万美元"，该协议的签署时间为 2007 年 3 月 2 日，处于《代理协议》的有效期内，申请人此时并未主张应支付的前期费用为 26 万美元。因此，该等变更具有溯及既往的效力。

（2）按照《代理协议》的约定，被申请人支付前期费用的前提是申请人每月提供了代理服务，而申请人提供的证据显示，在 2005 年 6 月份以后，其并未每月提供服务，无权主张每月 1 万美元的前期费用。

（3）即使被申请人应支付的前期费用总额为 26 万美元，申请人在庭审中明确拒绝增加或变更仲裁请求，其主张不属于本案审理范围。

仲裁庭认为，本案争议的双方对于《代理协议》的费用支付进行了明确的约定。向申请人作前期费用和费用的支付，并不能如被申请人所称可否定申请人根据《代理协议》的约定在完成交易后得到酬金的权利。由于申请人在庭审中确实表示其并不对前期费用提出请求。故此，仲裁庭同意被申请人关于前期费用不在本案中审理的辩解。但是，双方对费用的两部分的划分表明双方对于《代理协议》的目的如果没有达到，代理人又做了大量的代理事务还是应该得到一些

实际补偿的。因而，双方对于代理酬金是否可以依据协议得到支付是有合同条款准备的。

关于酬金支付的条件在《代理协议》的第五条已经明确约定，双方同意在被申请人确定的心理价位范围内完成交易后，被申请人应按协议约定的条件向代理人支付酬金。仲裁庭从双方在庭审过程中的辩论和其后提交的书面陈词，认定酬金的支付是有条件的。而代理事项即完成交易就是酬金支付应该成就的条件。这符合双方签署的《代理协议》的目的：协助被申请人根据相关的法律或规定直接或通过被申请人德关联公司间接获得 PetroKhazakstan 公司股份，并协助被申请人得到相关政府批准（完成转让）。根据现有的证据及双方发表的代理意见表明对于这个酬金支付的条件，双方均表明是无争议的。

2、《代理协议》中约定的代理事项是否完成？

本案争议的双方对于代理事项是否完成有极大的分歧。申请人认为：

（1）在中石油公司取得 PKZ 公司股权后，被申请人曾三次与申请人签订延期协议及补充协议，以实际行为认可申请人原代理协议的海外收购代理事项已经完成，并承诺将支付代理费用及其他。

中石油公司 2005 年 8 月 15 日以 41.8 亿美元价格收购 PKZ 公司成功，而时隔一年半后，被申请人又与申请人签订代理协议的《延期协议》这是本案至关重要的关键。

本案被申请人与申请人签订《代理协议》的本意是委托申请人代理海外收购。由于中石油介入，政府相关部门协调，被申请人同意变成先由中石油代表双方进行海外收购，再由

中石油中石化两家国企进行内部股权转让，对于被申请人而言分成了海外收购和国内二次转让两个阶段。其中，在海外收购阶段，被申请人同意仍由申请人代理，以中石油代表双方收购成功视为海外收购完成，至此，申请人的海外代理工作也视为完成；在国内二次转让阶段，由被申请人自行与中石油进行，未委托申请人代理。但被申请人以与申请人签订延期协议的方式，确认申请人对原代理协议约定的海外代理事项具有付款请求权，有权期待被申请人以自身取得二次转让的股权或者其他相当权益后向其继续按原代理协议支付代理费用、原油经销权。

（2）《代理协议》的目标是协助被申请人通过海外收购获得 PKZ 公司股份，在此合同范围内，申请人应代理被申请人进行海外收购事宜。

《代理协议》约定的代理目标和收购标的，是帮助被申请人与"PKZ 公司"联系谈判、从"PKZ 公司"手中收购股权，完成海外收购。

（3）根据政府相关部门的协调，中国石油天然气集团公司代表中石油和中石化两家联合竞标，已经完成了对 PKZ 公司股权的海外收购。

在本案《代理协议》履行过程中，由于中石油集团突然介入表示收购意向收购，经政府相关部门协调，中石化同意由单方收购变为与中石油联合收购。在此情况下，被申请人单方对其在原《代理协议》中确定的目标做了变更。鉴于该变化是经政府相关部门协调后被申请人自己同意的，并非由于申请人的因素导致，被申请人对申请人基于《代理协议》所做的大量代理工作表示认可，同时对申请人口头承诺，不

会因其自身收购计划的变更造成对申请人权益的影响。

（4）在海外收购已经完成的情况下，被申请人三次与申请人签订延期协议及补充协议，实质上是认可海外收购代理义务已经完成，并承诺应向申请人支付代理费和报酬。

本案被申请人最初是委托申请人进行海外收购，后由于中石油介入、政府相关部门协调，变成先由中石油代表双方进行海外收购，再由中石油中石化两家国企进行内部股权转让，分成了海外收购和国内二次转让两个阶段。

（5）被申请人与申请人签订延期协议的行为，显然是认可申请人海外收购代理义务完成（按完成收购 100%计，不计其后中石油另行转回给哈萨克斯坦政府 33%），并履行此前的口头承诺，承诺继续支付全部海外收购代理报酬和交付石油经销代理权，但因尚未完成股权二次转让，故通过延期协议的方式，将支付报酬、确定原油代理权等义务延期到完成二次转让后履行。

（6）本案被申请人在可以取得股权或其他权益的情况下，明确拒绝向申请人支付代理费，应视为恶意阻止付款条件成就，则根据《合同法》的约定，本案已经达到付款条件。

中方海外收购完成后，中石化（国勘）已经开始与中石油协商关于 PKZ 公司的股权转让事宜。2006 年 3 月 21 日政府相关部门召开专题会议，协调中石油集团向中石化方面转让 PKZ 公司股份事宜在该次会议上，政府相关部门、中石油、中石化三方就股权转让达成一致意见，包括"在没有法律障碍情况下，中石油同意将商定的股份转让给中石化。"、"若法律障碍不可逾越，双方将以国家利益为重。中石油同意将其它海外项目的股权转让给中石化。"

综上，申请人认为，申请人与被申请人签订的《代理协议》以及此后三份延期协议和补充协议均为合法有效，被申请人怠于行使对中石油的追索权，并在可能取得权益的情况下明确拒绝支付其承诺的代理费用和报酬，属于明显的违约行为，应视为付款条件已成就。

被申请人对申请人上述陈述表示反对，辩称：

（1）《代理协议》约定，代理酬金的支付条件是被申请人获得 PK 公司股权。由于被申请人至今未获得 PK 公司任何股权，支付酬金的条件未成就，申请人的仲裁请求没有事实和法律依据。

（2）《代理协议》中规定代理酬金的支付条件是被申请人获得 PK 公司股权。被申请人正是为收购 PK 公司的全部股权，才与申请人签署《代理协议》。《代理协议》规定代理酬金的支付条件是"在公司确定的心理价位内完成交易后，公司向代理人支付报酬"。完成交易是指被申请人获得 PK 公司股权，对此，协议的目的条款和代理人的义务条款亦有明确规定。

（3）被申请人至今未获得 PK 公司任何股权，支付酬金的条件未成就。被申请人强调依国际石油行业并购的交易惯例，只有完成股权收购的流程尤其是最终完成股权的权属变更，才能视为完成交易。

（4）申请人关于其在整个收购期间做了大量工作，发挥了决定性作用，而被申请人实际上已经享有 PK 公司的股份及相应权益、怠于或放弃主张权利以及因自身原因未取得股权等说法既没有任何证据支持，也自相矛盾，完全不符合事实，而且该等说法也不能支持其仲裁请求。

如前所述，根据《代理协议》的约定，只要被申请人没有取得 PK 公司的股权，申请人便无权主张代理酬金，无论申请人做了多少工作，发挥了何等作用，也无论被申请人是急于或放弃权利，还是因为何种自身原因未取得 PK 公司股权，均不能视为被申请人已经取得了股权而有权要求被申请人支付代理酬金。因此，申请人的有关陈述完全不能支持其仲裁请求。

（5）申请人关于"经政府相关部门协调，由两家集团联合收购 PK 项目，…收购后双方所占股份比例按中石油集团占 60%、中石化集团占 40%划分。…中石油集团代表两家集团成功竞标"的说法没有事实依据，而且这种说法也不能支持其仲裁请求。

申请人关于"联合收购"和"代表竞标"的说法没有证据支持，与事实不符。申请人提交的唯一与"联合收购"和"代表竞标"相关的证据是《关于 PK 项目有关情况的汇报（2007 年）》。但该汇报文件的页码缺失、出处不明、没有形成时间和印章，也无法识别汇报人和接受汇报的主体，被申请人对其作为载体的真实性不予确认。

所谓的"联合收购"是两个主体作为联合投标主体，以同一个报价、提交同一份竞标文件参与竞标，所谓"代表竞标"是指一个主体委托另一个主体作为其代理人参加竞标。事实上，被申请人提交的《投标书》表明，被申请人和"中石油方面"是单独竞标，"中石油方面"既未与被申请人作为共同的收购方以同一个报价参与竞标，也未作为被申请人的代理人参加竞标，双方不存在"联合收购"和"代表竞标"的关系。

申请人在《关于 PK 项目有关情况的汇报（2007 年）》证明内容中的第 6 点和《专题会议纪要》的证明内容中也提到，"中石油方面"竞标成功后，曾与被申请人协商转让 PK 公司股权，这也表明所谓的"联合收购"或"代表竞标"的说法不能成立。

（6）申请人提交的《关于 PK 项目有关情况的汇报（2007 年）》、《国家发展和改革委员会关于会议纪要征求意见的函》及其附件《国家发展改革委办公厅关于协调中国石油天然气集团公司和中国石油化工集团公司转让 PK 公司股份的会议纪要》和《专题会议纪要》不发生确认股权归属的法律后果，其据以主张被申请人实际上已经享有 PK 公司的股份及相应权益的说法，完全不符合事实。

（7）申请人关于被申请人"怠于或放弃向中石油集团方面主张该确定权益的权利、由于其原因未完成中石油集团向其转让股权的过户手续"的说法与事实不符，并且不能支持其请求。

首先，申请人一方面主张国勘公司已实际获得了 PK 公司股权，另一方面又主张被申请人怠于或放弃向"中石油集团方面"主张该确定权益的权利、由于其原因未完成"中石油集团方面"向其转让股权的过户手续，自相矛盾。

其次，在"中石油集团方面"中标后，"中石化方面"多次与其协商讨论转让股权事宜，并与申请人对《代理协议》进行延期和补充，可见，被申请人既未取得对 PK 公司股权的"确定权益"，也没有怠于或放弃主张申请人所谓的"确定权益"。

本案代理事项是否完成是一个客观的事实，并且应该根

据《代理协议》的具体条款中的约定来作出判断。本案争议的双方并不否认，代理酬金的支付是要完成对 PKZ 公司股权的收购并完成股权的受让和变更。双方均不否认 PKZ 公司股权的收购已经由中石油集团公司方面完成。但是，在中石油集团公司完成对 PKZ 公司股权的收购是否可以认定为被申请人完成对 PKZ 公司股权收购的问题上，双方各自持立场。

仲裁庭认为，对于本案《代理协议》中确定的目的是否达到应该仅限于对本案协议中规定的当事人是否取得其签署本《代理协议》希望取得的结果。任何对协议规定的扩大解释，在没有确凿证据的情况下，仲裁庭不能接受这类扩大或延伸的解释。

本案中尤为关键的是，有关中石油集团方面和中石化集团方面是否达成一致采取联合收购 PKZ 公司股权问题，经两次庭审基于现有的证据和双方的陈述查明，迄今为止尚没有确凿的证据表明中石油集团公司方面在收购 PKZ 公司股权的过程中与中石化集团双方已经建立了针对 PKZ 公司股权收购相关的书面的法律关系，对各自的权利义务划分、风险、责任的承担、金融财务费用的分担等均作出了约定。虽然有迹象表明在中石油集团方面完成对 PKZ 公司股权收购后，中石化集团方面有索求权益的行为，但是，在没有发现明确的证据显示上述两家集团公司在上述方面存在联合的情况下，仲裁庭不能仅据此得出本案存在联合竞标或联合收购的结论。

同时，仲裁庭认为依据《代理协议》的约定，不论申请人在本案涉及到的股权收购案项目中作了多少工作，也并不能改变被申请人没有取得《代理协议》约定其希望得到的

PKZ 公司股权或以与此相关的其他权益进行的补偿的事实。如前所述，被申请人没有根据《代理协议》的约定取得 PKZ 公司的股权或以与此相关的其他权益进行的补偿，协议约定的目标应该说就没有达到。那么要依据协议的规定要求被申请人履行协议义务就缺乏法律和合同基础。

申请人关于本案收购程序应该分成股权的国外收购和国内收购的两段论的分析，以及由此推论出《代理协议》中确定的被申请人收购股权的目的已经达到的结论并没有事实基础。对于被申请人是否怠于或放弃应得权益的问题，庭审双方均认可本案确实存在被申请人根据本案涉及的收购案向中石油集团公司方面主张权益的事实且被申请人表示在本案审理的过程中其仍然没有放弃向中石油集团方面追索权益的努力。申请人不能仅从结果来判断被申请人的行为。从实践中看，被申请人作为一个企业，从公司经营管理、追求公司的最大利益的角度出发，放弃对其可以获得的巨大权益以规避对申请人支付代理酬金的责任是十分荒唐的。申请人指责被申请人怠于履行或放弃权利的说法不符合逻辑也没有事实基础。

综上所述，仲裁庭不认为《代理协议》规定的酬金支付的条件已经成就。在被申请人没有实际取得因本案涉及的 PKZ 公司的股权收购所应得的权益或以与此相关的其他权益进行的补偿之前，申请人对代理酬金的索取缺乏法律依据，仲裁庭不能给予支持。但是，在被申请人实际取得因本案涉及的 PKZ 公司的股权收购所应得的权益或与此相关的其它权益进行补偿之后，申请人有权对代理酬金进行索取，被申请人也有义务向申请人支付代理协议约定的酬金。由

此，仲裁庭对于申请人现在就依据《代理协议》的相关规定对酬金支付而产生的其他赔偿请求，也不能给予认可。

3. 被申请人是否应该对申请人关联公司和代理权预期收益的损失承担赔偿责任？

申请人认为：

（1）申请人方面因严格履行《代理协议》约定义务而提前终止与 PKZ 公司原开展的贸易业务活动造成的原油贸易损失。申请人称其关联公司-环球公司从 2002 年就与 PKZ 公司开始原油贸易合作，是环球公司打通了中国与哈萨克斯坦的西部运油通道。申请人代理本案争议收购项目时，环球公司与 PKZ 公司的原油贸易合作合同尚在有效期内。根据《代理协议》第 7.1 条约定，"代理承诺，在完成交易后，不再作为将 PetroKhazakstan 公司产出原油运往中国市场的代理，并不得收取任何代理费用。"基于前述约定，环球公司提前终止了与 PKZ 公司的原油贸易合作。

根据环球公司与 PKZ 公司签署的贸易合同，该合同有效期至 2006 年 4 月 30 日，环球公司于 2005 年 9 月即提前终止了该合同的履行，因此至少损失了 8 个月的销售利润共计 2,776,000 美元。环球公司特授权申请人向被申请人行使要求赔偿该部分因提前终止贸易合同而遭致损失的主张权利。

（2）被申请人应按合同约定给予申请人相关代理权，或者赔偿其违约给申请人造成的预期利益损失。

《代理协议》第 7.2 款约定，"PetroKhazakstan 公司产出的原油中在中国以外地区销售的部分，双方同意根据另行商定的条件，由公司委托代理人作为销售代理商。"对此，双方的《第二次延期协议》予以了再次确认。但是，由于中石化

方面并未向中石油集团披露申请人在项目收购中发挥的重要作用，也未向中石油集团披露向申请人作出的该项承诺，因此中石油集团收购 PKZ 公司后，并未将该款约定的原油销售代理授予申请人。由于中石化方面存在重大违约情形，应当按照《代理协议》约定，授予申请人销售代理权，如因其原因不能履行，应向申请人赔偿该部分预期利益损失。

原本应由申请人代理的运往中国以外地区的原油销售量为 45,250,974.242 吨。按照每吨利润至少 3.47 美元计算，申请人可得预期利益达到 157,020,880.619 美元以上。

被申请人反驳：

（1）申请人无权基于《代理协议》第 7 条主张预期利益损失。我国《合同法》第 113 条规定的预期利益是指由于合同一方当事人违约，合同另一方当事人丧失了合同履行后可以获得的利益。然而，PK 公司与环球公司并非《代理协议》的合同主体，他们之间原油销售代理合同提前终止，显然与本案无关，不属于申请人的预期利益损失。根据《代理协议》第 7 条的约定，交易完成后，申请人将不再作为将 PK 公司产出原油运往中国市场的代理。因此，如交易完成，申请人应依约放弃利益，终止原油销售代理合同，其主张的原油销售代理合同项下的利益并非合同履行后可以获得的预期利益。

（2）其次，在被申请人未取得 PK 公司的任何股权，交易至今未完成的情况下，如果 PK 公司单方提前终止原油销售合同，则申请人应向 PK 公司主张权益；如申请人主动终止原油销售合同，则其应自行承担责任，申请人无权主张预期利益损失。

（3）最后，申请人在《变更仲裁请求申请书》中主张"为严格履行《代理协议》的约定，环球公司于 2005 年 9 月即提前 8 个月终止了代理合同的履行"，据此，其向被申请人主张预期销售利润损失 2,776,000 美元。而在《仲裁申请书》中，申请人却声称系"PKZ 公司单方提前终止了环球公司的代理权"，其主张明显自相矛盾。另外，申请人提交的原油销售合同表明，该等合同的任何一方当事人提前 60 天书面通知后，均有权单方终止合同。因此，申请人关于提前终止代理合同的说法，不符合事实。实际上，"中石油方面"竞得了 PK 项目，其是否聘用申请人或环球公司作为销往中国或中国以外地区的原油代理商，显然与被申请人无关。从商业角度而言，"中石油方面"竞得了 PK 项目，环球公司丧失 PK 公司在中国的原油销售代理权实属必然，不存在所谓的预期利益损失。

（4）申请人无权基于《代理协议》第 7 条主张享有 PK 公司原油在中国以外地区销售的代理权。其一、《代理协议》第 7 条是对交易完成后 PK 原油销售代理事宜的安排，在被申请人未取得 PK 公司的任何股权，交易未完成的情况下，申请人无权主张享有 PK 公司原油在中国以外地区销售的代理权。

其二、"中石油方面"成功竞标并实际取得 PK 公司股权，被申请人至今未取得 PK 公司的任何股权，客观上无法将 PK 公司原油在中国以外地区销售的代理权给予申请人。

经庭审查明，申请人的关联公司环球公司符合本案争议的《代理协议》中规定的关联公司的概念。但是，仲裁庭认为申请人提出的经环球公司的委托提出提前终止其与 PKZ

公司的原油代理协议造成预期的损失存在两方面的问题。其一，环球公司虽然是申请人的关联公司但是其是否可以在本案中对被申请人请求赔偿即使其授权申请人代其行使权利。仲裁庭注意到在《代理协议》的定义中对代理人的解释是包括所有的关联公司。环球公司作为《代理协议》当事人一方的组成部分，委托申请人作为代理人出庭就自己为在本仲裁案中向被申请人提出因履行《代理协议》而遭受的损失要求赔偿是可以的。但是，环球公司必须证明其损害的形成与被申请人违约存在直接的因果关系。其二，申请人主张的损害赔偿是基于《代理协议》的第 7 条交易后保证提出的。仲裁庭注意到根据该条 7.1 款的规定，代理人承诺，在完成交易后不再作为 PKZ 公司产出原油运往中国市场的代理。对于完成交易双方对其定义是十分清楚的，即被申请人在其心理价位取得 PKZ 公司的股权。在交易没有完成的情况下，环球公司无论是自行终止与 PKZ 公司之间关于代理运往中国的原油的协议或合同还是被 PKZ 公司终止合同，显然其受到的损失是无法依据本案《代理协议》中的第 7 条的条款规定进行索赔的。

关于申请人依据《代理协议》第 7 条 7.2 款 PKZ 公司产出的原油在中国以外地区销售的部分，双方同意根据另行商定的条件，由被申请人委托申请人作为销售代理商。仲裁庭同意被申请人关于在目前情况下，中石油集团公司方面已经取得了 PKZ 公司的股权，被申请人没有实现《代理协议》确定的目标，客观上无法将申请人希望得到的销售代理权授予申请人的说法。在没有证据表明被申请人是故意怠于履行合同义务、放弃或隐瞒联合竞标收购真相而丧失收购 PKZ 公司股权的情况下，仲裁庭不认为被申请人违反了《代理协议》

的第 7 条条款规定，因违约给申请人造成了不能作为 PKZ 公司的原油销售代理商而受到的预期利润的损失。

（六）关于申请人的其他仲裁请求

关于支付申请人律师费的请求，基于申请人提出的仲裁请求未能得到仲裁庭的认可，故此申请人关于律师费的请求不应得到仲裁庭的支持。

（七）关于本案仲裁费和实际费用的承担

基于上述支持律师费相同的理由，仲裁庭认为，本案仲裁费应全部由申请人承担。

陶景洲仲裁员的实际费用，全部由被申请人承担。

## 三、裁　决

基于上述仲裁庭意见，仲裁庭裁决如下：

（一）驳回申请人的全部仲裁请求。

（二）本案仲裁费为 277,289 美元，全部由申请人承担。上述费用已经由申请人向仲裁委员会全额预交。

（三）陶景洲仲裁员的实际费用为人民币 156,000 元，全部由被申请人承担。上述费用已经由被申请人向仲裁委员会全额预交。

本裁决为终局裁决，自作出之日起生效。

（此页无正文）

首席仲裁员：

仲　裁　员：

仲　裁　员：

二○一三年十二月三十日于北京



**中国国际经济贸易仲裁委员会**
CHINA INTERNATIONAL ECONOMIC AND TRADE ARBITRATION COMMISSION