# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNI-TOP ASIA INVESTMENT LIMITED,<br><br>                        Petitioner,<br><br>      v.<br><br>SINOPEC INTERNATIONAL PETROLEUM<br>EXPLORATION AND PRODUCTION<br>CORPORATION,<br><br>                   Respondent. | Civ. Action No. 1:20-cv-01770-DLF |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PETITIONER'S MOTION FOR LEAVE TO CONDUCT JURISDICTIONAL DISCOVERY

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ....................................................................................................................... 1

BACKGROUND ......................................................................................................................... 1

ARGUMENT ............................................................................................................................... 5

   I.   UNI-TOP IS ENTITLED TO JURISDICTIONAL DISCOVERY ................................... 5

     A.   Jurisdictional Discovery Is Available If Plaintiff Has A "Good-Faith Belief" That It
Will Establish Jurisdiction ................................................................................................... 5

     B.   UNI-TOP Has A Good-Faith Belief That Jurisdictional Discovery Will Enable It to
Establish Jurisdiction ........................................................................................................... 7

   II.   JURISDICTIONAL DISCOVERY SHOULD BE CONDUCTED ACCORDING TO U.S.
LAW AND THE FEDERAL RULES OF CIVIL PROCEDURE ........................................... 25

     A.   Chinese Law Does Not Preclude the Court from Ordering Jurisdictional Discovery
According to the Federal Rules of Civil Procedure ............................................................ 26

     B.   The Court Should Not Require the Use of the Hague Evidence Convention ................ 29

     C.   SIPC Cannot Meet Its Burden of Demonstrating That Discovery Should Proceed Under
the Hague Evidence Convention ........................................................................................ 31

CONCLUSION ......................................................................................................................... 34

## TABLE OF AUTHORITIES

### CASES

Page(s)

*AF Holdings, LLC v. Does 1-1058*, 752 F.3d 990 (D.C. Cir. 2014) ................................................5

*Caribbean Broadcasting Systems, Ltd. v. Cable & Wireless P.L.C.*, 148 F.3d 1080
    (D.C. Cir. 1998) ....................................................................................................5, 14

*Crane v. Carr*, 814 F.2d 758 (D.C. Cir. 1987) ...............................................................5

*Crist v. Republic of Turkey*, 995 F. Supp. 5 (D.D.C. 1998) .....................................................15, 21

*Daventree Ltd. v. Republic of Azerbaijan*, 349 F. Supp. 2d 736 (S.D.N.Y. 2004) .........................7

*EIE Guam Corp. v. Long Term Credit Bank of Japan, Ltd.*, 322 F.3d 635 (9th Cir.
    2003) ..............................................................................................................15

*El-Fadl v. Central Bank of Jordan*, 75 F.3d 668 (D.C. Cir. 1996) ...................................................6

*Foremost–McKesson v. Islamic Republic of Iran*, 905 F.2d 438 (D.C. Cir. 1990) .......................23

*GSS Group Ltd. v. National Port Authority*, 2011 WL 13121428 (D.D.C. Aug. 10,
    2011) ................................................................................................................6

*GTE New Media Services Inc. v. BellSouth Corp.*, 199 F.3d 1343 (D.C. Cir. 2000) .....................5

*Helmerich & Payne Int'l Drilling Co. v. Bolivarian Republic of Venezuela*, 185 F.
    Supp. 3d 233 (D.D.C. 2016) ......................................................................................7, 21

*In re Air Cargo Shipping Services Antitrust Litigation*, 278 F.R.D. 51 (E.D.N.Y.
    2010) ..............................................................................................................31

*In re Terrorist Attacks on September 11, 2001*, 349 F. Supp. 2d 765 (S.D.N.Y.
    2005) ................................................................................................................7

*In re Vitamins Antitrust Litigation*, 120 F. Supp. 2d 45 (D.D.C. 2000) .....................28, 29, 30, 32

*Intelsat Global Sales & Marketing, Ltd. v. Community of Yugoslav Posts
    Telegraphs & Telephones*, 534 F. Supp. 2d 32 (D.D.C. 2008) ..............................7, 14, 15

*Internationl Society for Krishna Consciousness, Inc. v. Lee*, 105 F.R.D. 435
    (S.D.N.Y. 1984) .................................................................................................32, 33

*Labadie Coal Co. v. Black*, 672 F.2d 92 (D.C. Cir. 1982) ...........................................................22

*Mazza v. Verizon Washington DC, Inc.*, 852 F. Supp. 2d 28 (D.D.C. 2012) ................................22

*NBC-USA Housing, Inc. v. Donovan*, 2011 WL 1204759 (D.D.C. Mar. 31, 2011) ......................6

*Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340 (1978)............................................................5

*Pain v. United Technologies Corp.*, 637 F.2d 775 (D.C. Cir. 1980) ...........................................33

*Peninsula Asset Management v. Hankook Tire Co.*, 476 F.3d 140 (2d Cir. 2007).......................14

*Phoenix Consulting, Inc. v. Republic of Angola*, 216 F.3d 36 (D.C. Cir. 2000).................6, 21, 34

*Roeder v. Islamic Republic of Iran*, 333 F.3d 228 (D.C. Cir. 2003)..............................................9

*Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379 (D.D.C. 2015)...........................................9

*Schindler Elevator Corp. v. Otis Elevator Co.*, 657 F. Supp. 2d 525 (D.N.J. 2009)....................32

*Societe Nationale Industrielle Aerospatiale v. United States District Court for Southern Distrcit of Iowa*, 482 U.S. 522 (1987)....................................................28, 29, 32

*Strauss v. Credit Lyonnais, S.A.*, 249 F.R.D. 429 (E.D.N.Y. 2008) .............................................31

*TMR Energy Ltd. v. State Property Fund of Ukraine*, 411 F.3d 296 (D.C. Cir. 2005) ......................................................................................................................24

*USX Corp. v. Adriatic Insurance Co.*, 345 F.3d 190 (3d Cir. 2003) .............................................6

## STATUTES, RULES, AND REGULATIONS

28 U.S.C.

§ 1330.......................................................................................................................2, 7

§ 1603.............................................................................................................2, 7, 8, 14

§ 1605...................................................................................................................2, 7

Fed. R. Civ. P. 12 ........................................................................................................3

Fed. R. Civ. P. 26 ........................................................................................................1

The Hague Convention on the Taking of Evidence Abroad in Civil and Commercial Matters, art. 12, opened for signature Mar. 18, 1970, 23 U.S.T. 2555, T.I.A.S. No. 7444, 847 U.N.T.S. 231.........................................33

iv

**OTHER AUTHORITIES**

Hague Conference on Private International Law, Status Table, 20: Convention of
18 March 1970 on the Taking of Evidence Abroad in Civil or Commercial
Matters, Declaration of the PRC to the Hague Convention,
https://www.hcch.net/en/instruments/conventions/status-
table/notifications/?csid=493&disp=resdn .......................................................................33

## INTRODUCTION

Pursuant to Fed. R. Civ. P. 26, Petitioner UNI-TOP Asia Investment Limited ("UNI-TOP") respectfully submits this Memorandum of Points and Authorities in Support of its Motion for Leave to Conduct Jurisdictional Discovery ("Memorandum in Support of Motion for Jurisdictional Discovery").  UNI-TOP has made sufficient factual allegations in its Petition to Confirm an International Arbitral Award to show that the Court has jurisdiction over the Respondent and the dispute.  *See* Dkt. 6 ¶¶ 5-7.  Respondent's Motion to Dismiss contests the jurisdictional facts alleged by UNI-TOP, introduces witness declarations asserting alleged—but untested—facts on the issue of jurisdiction, and presents a number of conclusory allegations that challenge the factual basis of the Court's jurisdiction.  In light of the factual issues that Respondent has put into dispute, UNI-TOP requests that, consistent with the law in this Circuit, it be permitted to conduct jurisdictional discovery before the Court decides Respondent's Motion to Dismiss, and that it be permitted to do so according to the Federal Rules of Civil Procedure. UNI-TOP also requests that this Court set a schedule for jurisdictional discovery, and further stay these proceedings, including any further briefing on Respondent's Motion to Dismiss, until the conclusion of the requested jurisdictional discovery.[1]

## BACKGROUND

On June 29, 2020, UNI-TOP filed its Petition to Confirm an International Arbitral Award ("Petition").  The Petition seeks to enforce an arbitral award against the Sinopec International

---

[1] Pursuant to the Court's Minute Order of April 2, 2021, these proceedings, including any further briefing on the Respondent's Motion to Dismiss, have been stayed pending the Court's resolution of the instant motion for jurisdictional discovery.

Petroleum Exploration and Production Corporation ("SIPC") that was issued in favor of UNI-TOP in an arbitration (the "Arbitration") administered by the China International Economic and Trade Arbitration Commission ("CIETAC").  That award, for over $21 million, was issued by the CIETAC arbitral tribunal on June 30, 2017 (the "CIETAC Award").

In the Arbitration, UNI-TOP established that SIPC had breached its obligations under the parties' Agency Agreement by failing to pay UNI-TOP a commission for assisting SIPC in acquiring shares in PetroKazakhstan Incorporated ("PK"), a Canadian corporation in the oil and gas sector.  *See* Dkt. 6 ¶¶ 9-10.  In the CIETAC Award, the arbitral tribunal decided for UNI-TOP and ordered SIPC to (i) pay UNI-TOP the agency commission under the Agency Agreement and overdue interest, (ii) compensate UNI-TOP for its legal fees, and (iii) pay UNI-TOP the arbitration fees it had paid in advance.  *See id*. ¶ 11.  As detailed in UNI-TOP's Petition and accompanying Memorandum of Law, since the CIETAC Award was issued, SIPC has consistently refused to comply with the award and still owes UNI-TOP the full amount of the award.

UNI-TOP brought its Petition in this Court under Section 207 of the Federal Arbitration Act ("FAA") and the U.N. Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958 ("New York Convention").  In its Petition, UNI-TOP alleged that SIPC is an "agency, instrumentality, or organ of the People's Republic of China," Dkt. 6 ¶ 4, within the meaning of the Foreign Sovereign Immunities Act ("FSIA"), *see* 28 U.S.C. §§ 1330(b) and 1603(a)-(b), and that this Court has jurisdiction over SIPC and this dispute because UNI-TOP seeks to "confirm an [arbitration] award" under Section 1605(a)(6) of the FSIA.  Moreover, UNI-TOP stated that SIPC waived its right to challenge personal jurisdiction because the People's Republic of China ("PRC") is a signatory to the New York Convention, and that SIPC

2

is not subject to a "minimum contacts" analysis because it is part of a "foreign state" and thus not a "person" within the meaning of the constitutional due process clause.  *See id*. ¶ 7.

Rather than file an Answer to UNI-TOP's Petition, SIPC moved to dismiss the Petition pursuant to Fed. R. Civ. P. 12(b)(2), (3), and (6) for lack of personal jurisdiction, improper venue, and failure to state a claim.  *See* Dkt. 26.  With respect to jurisdiction, SIPC asserts as fact that it is not a "foreign state" within the meaning of the FSIA, and argues that UNI-TOP has failed to make a showing of SIPC's minimum contacts with the Court's district or with the United States.  *See* Dkt. 26-1 at 8, 20.  In so doing, SIPC acknowledged that, if it were part of a foreign state or the agency or instrumentality of a foreign state, the PRC's waiver of personal jurisdiction under the New York Convention would apply.  *See id*. at 17-18.

In support of the factual assertions set forth in its Motion to Dismiss, SIPC has submitted and relied on declarations by two individuals who work for SIPC—Zhang Quan, SIPC's General Counsel, and Dai Yue, SIPC's lawyer in the CIETAC arbitration—both of whom assert facts that directly contradict the allegations and evidence submitted by UNI-TOP and that are directly relevant to the question of this Court's jurisdiction over SIPC and this matter.  *See* Dkts. 26-2, 26-3.  In addition, SIPC asserts without evidence various conclusory factual allegations about its corporate structure and operations that also are directly relevant to the jurisdictional issues before the Court.  *See, e.g.,* Dkt. 26-1 at 2-5.  SIPC has thus affirmatively asserted facts—some wholly unsupported and some supported only by witness declarations—in an effort to contest the factual bases for jurisdiction advanced by UNI-TOP.

As a result of SIPC's strategic decision to introduce new, untested facts and to contest those facts asserted by UNI-TOP, it is clear that the parties dispute numerous key facts relevant

to this Court's jurisdiction over SIPC and this matter.[2]  Among other things, the parties dispute

key facts relevant to whether SIPC is an "agency," "instrumentality," or "organ" of the PRC, and

is thus a "foreign state" subject to jurisdiction under the FSIA.  For example, there are numerous

factual disputes about SIPC's corporate structure and management, including competing

assertions of fact regarding the type and extent of control that the Chinese government and/or the

China Petrochemical Corporation ("Sinopec") exercise over SIPC, and the type and extent of

involvement of the Chinese government and Sinopec in SIPC.  To illustrate the problem, SIPC

would have this Court believe that it "operates independently [of the Chinese government], no

different from privately held companies," Dkt. 26-1 at 4, yet its own website boasts that its

employees serve "[u]nder the excellent leadership of SINOPEC Group" and that the "SINOPEC

Group . . . formulated the blueprint for SIPC" to assist the "SINOPEC Group"—as part of the

Chinese state—in "carry[ing] out its middle and longterm deployment" of the Chinese

government's "14th Five-Year Plan."[3]  Jurisdictional discovery is necessary in order to resolve

these disputes and properly present to the Court the jurisdictional facts necessary to decide the

Motion to Dismiss.

---

[2] SIPC also moved to dismiss the Petition based on improper venue.  Because venue may turn on whether SIPC is a "foreign state" within the meaning of the FSIA, the parties' factual disputes are also relevant to whether this Court is the proper venue.

[3] Declaration of John V.H. Pierce, ¶ 2 & Ex. A thereto ("Pierce Decl."), attached hereto as Ex. 1.

**ARGUMENT**

## I.   UNI-TOP IS ENTITLED TO JURISDICTIONAL DISCOVERY

UNI-TOP is entitled to jurisdictional discovery from SIPC because SIPC has contested

the jurisdictional facts asserted and supported by UNI-TOP.  Moreover, SIPC has asserted

contrary jurisdictional facts and sought to support its assertions with purported evidence in the

form of documents, charts, and declarations by witnesses.  UNI-TOP has a good-faith belief that

jurisdictional discovery limited to the jurisdictional issues contested by SIPC will enable UNI-

TOP to supplement its allegations and confirm this Court's jurisdiction.  UNI-TOP is therefore

entitled under the law of this Circuit to take reasonable jurisdictional discovery under the Federal

Rules of Civil Procedure before responding to SIPC's Motion to Dismiss.

### A.   *Jurisdictional Discovery Is Available If Plaintiff Has A "Good-Faith Belief" That It Will Establish Jurisdiction*

In this Circuit, a plaintiff seeking jurisdictional discovery need only have "a good faith

belief that such discovery will enable it to show that the court has personal jurisdiction over the

defendant[s]."  *AF Holdings, LLC v. Does 1-1058*, 752 F.3d 990, 995 (D.C. Cir. 2014) (quoting

*Caribbean Broadcasting System, Ltd. v. Cable & Wireless PLC*, 148 F.3d 1080, 1090 (D.C. Cir.

1998)); *see also Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 n.13 (1978) ("[W]here

issues arise as to jurisdiction or venue, discovery is available to ascertain the facts bearing on

such issues.").  "[I]f a party demonstrates that it can supplement its jurisdictional allegations

through discovery, then jurisdictional discovery is justified."  *GTE New Media Servs. Inc. v.

BellSouth Corp.*, 199 F.3d 1343, 1351 (D.C. Cir. 2000) (citing *Crane v. Carr*, 814 F.2d 758, 760

(D.C. Cir. 1987)).

The standard for allowing jurisdictional discovery is "quite liberal" and requires only that the party requesting discovery "(1) demonstrate a good faith belief that such discovery will enable it to show that the court has personal jurisdiction over the person of the defendant, and (2) make a detailed showing of what discovery it wishes to conduct or what results it thinks such discovery would produce." *GSS Group Ltd. v. Nat'l Port Auth.*, 2011 WL 13121428, at *6 (D.D.C. Aug. 10, 2011) (internal quotations omitted) (citing *NBC-USA Housing, Inc. v. Donovan*, 2011 WL 1204759, at *14 (D.D.C. Mar. 31, 2011)). *See also El-Fadl v. Central Bank of Jordan*, 75 F.3d 668, 676 (D.C. Cir. 1996), *abrogated on other grounds by Samantar v. Yousuf*, 130 S. Ct. 2278 (2010) ("A plaintiff faced with a motion to dismiss for lack of personal jurisdiction is entitled to reasonable discovery, lest the defendant defeat the jurisdiction of a federal court by withholding information on its contacts with the forum.").

Where, as here, the defendant's motion presents:

[a] dispute over the factual basis of the court's [] jurisdiction under the FSIA, that is, [it] either contest[s] a jurisdictional fact alleged by the plaintiff, or raise[s] a mixed question of law and fact, . . . the court must go beyond the pleadings and resolve any disputed issues of fact the resolution of which is necessary to a ruling upon the motion to dismiss.

*Phoenix Consulting, Inc. v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000) (internal quotations and citations omitted). When "devising the procedures it will follow to ferret out the facts pertinent to jurisdiction," the court "must give the plaintiff ample opportunity to secure and present evidence relevant to the existence of jurisdiction." *Id.* (internal quotations and citations omitted).

Applying these standards, courts in this and other circuits have permitted jurisdictional discovery to establish jurisdiction over foreign states and their agencies or instrumentalities. *See, e.g., USX Corp. v. Adriatic Ins. Co.*, 345 F.3d 190, 198, 214 (3d Cir. 2003) (establishing personal

6

jurisdiction over Irish insurer after allowing jurisdictional discovery and finding it was an agency or instrumentality based on information obtained through discovery); *Intelsat Global Sales & Mktg., Ltd. v. Cmty. of Yugoslav Posts Tels. & Tels.*, 534 F. Supp. 2d 32, 35-36 (D.D.C. 2008) (allowing jurisdictional discovery to "aid in assessing whether [the defendant] held [agency or instrumentality] status at the time the complaint was filed"). This includes cases where the plaintiff has "put forth adequate information to support a good-faith belief regarding [the defendant's] organ status," *Helmerich & Payne Int'l Drilling Co. v. Bolivarian Republic of Venezuela*, 185 F. Supp. 3d 233, 247-48 (D.D.C. 2016), or "identified a genuine issue of jurisdictional fact," *Daventree Ltd. v. Republic of Azerbaijan*, 349 F. Supp. 2d 736, 761 (S.D.N.Y. 2004). Courts have also permitted jurisdictional discovery to determine whether the foreign defendant has sufficient minimum contacts with the United States. *See, e.g., In re Terrorist Attacks on Sept. 11, 2001*, 349 F. Supp. 2d 765, 820 (S.D.N.Y. 2005) (allowing jurisdictional discovery to determine whether the totality of the foreign defendant's contacts with the U.S. would satisfy due process requirements); *Daventree Ltd.*, 349 F. Supp. 2d at 765 (permitting jurisdictional discovery to determine whether the foreign defendant had continuous and systematic contacts with the U.S.).

### B.      *UNI-TOP Has A Good-Faith Belief That Jurisdictional Discovery Will Enable It to Establish Jurisdiction*

SIPC brings its motion to dismiss for lack of jurisdiction, asserting that it is not an agency or instrumentality of the PRC and that it does not hold sufficient minimum contacts with the District of Columbia or the United States for the exercise of personal jurisdiction to comport with due process. SIPC thus challenges this Court's jurisdiction pursuant to Sections 1330, 1605(a)(1), and 1605(a)(6) of the FSIA, which provide jurisdiction over actions against "foreign

states," defined by the FSIA and the courts to include a state's agencies, instrumentalities, and organs.  *See* 28 U.S.C. § 1603(a).  In so doing, SIPC contests a multitude of jurisdictional facts that UNI-TOP asserts and supports with evidence and sources described in the Petition and supporting documents.  Although SIPC has sought to contest the jurisdictional facts with declarations and other purported evidence, it takes the untenable position that, having affirmatively presented factual assertions by declaration and otherwise, it should nevertheless be able to avoid jurisdictional discovery under U.S. law and the Federal Rules of Civil Procedure.

SIPC's position is also untenable because UNI-TOP holds a "good faith belief," made stronger by SIPC's refusal to provide any discovery under the Federal Rules, that jurisdictional discovery will further strengthen UNI-TOP's case and enable it to establish jurisdiction under the FSIA.  The FSIA defines an agency or instrumentality as "any entity [1] which is an organ of a foreign state or political subdivision thereof, or [2] a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof."  28 U.S.C. § 1603(b)(2).  If SIPC is sufficiently controlled by the PRC, the Court may exercise jurisdiction over this matter and SIPC pursuant to the FSIA and need not establish minimum contacts for purposes of due process.  If, on the other hand, SIPC is not an agency or instrumentality under the FSIA, SIPC has suggested it would be entitled to due process protections.  UNI-TOP disagrees with that suggestion, but in any case, it is entitled to discovery to test SIPC's contention that it does not have minimum contacts with the United States, sufficient for the Court to exercise personal jurisdiction.  The following sections explain each inquiry and the relevant factual disputes posed by SIPC's allegations that require resolution through jurisdictional discovery.

1.      *UNI-TOP Has A Good-Faith Belief That SIPC May Be Majority-Owned by the PRC Or A Political Subdivision of the PRC*

This Court may exercise jurisdiction over SIPC as an agency or instrumentality if it is majority-owned by the foreign state or its political subdivision.  *See* 28 U.S.C. § 1603(b)(2). Although the term "political subdivision" is not defined in the FSIA, the D.C. Circuit has adopted a "categorical approach" to determining the legal status of foreign government-related entities for purposes of jurisdiction under the FSIA.  *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 393 (D.D.C. 2015).  Namely, "if the core functions of the entity are governmental, it is considered the foreign state itself; if commercial, the entity is an agency or instrumentality of the foreign state."  *Id.* (citing *Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 234 (D.C. Cir. 2003)).

UNI-TOP has a good-faith belief that SIPC is majority-owned by entities that hold core governmental functions or are otherwise political subdivisions of the PRC.  SIPC alleges that it has been owned by three shareholders since 2016: China Petrochemical Corporation ("Sinopec") (30 percent of SIPC's shareholder rights and interests), China Chengtong Kechuang Investment Co. ("CCKI") (40 percent), and China Reform Yuanbo Investment Co. ("CRYI") (30 percent). It acknowledges that Sinopec and the parent companies of its remaining shareholders are wholly owned by the Chinese State Council and/or the State-owned Assets Supervision and Administration Commission ("SASAC"), a special commission directly under the State Council; yet it asserts without support that these entities nevertheless operate "autonomously."  Dkt. 26-1 at 4.  This assertion contradicts available facts that strongly suggest that SIPC's shareholders exercise governmental functions, such that they should be deemed either part of the PRC itself or political subdivisions of the PRC.

9

a.     Sinopec Appears to Be Part of the PRC or A Political Subdivision of the PRC

Public sources indicate that Sinopec was established in 1983 by the PRC State Council to serve governmental interests.[4]  Sinopec has operated in a governmental capacity, holding ministry rank, operating directly under the State Council, and performing the "administrative functions of [its] predecessor line ministries."[5]  Sinopec was also charged with formulating policies and regulating petroleum activities.  As one of the major energy-related agencies or instrumentalities of the Chinese state, Sinopec held an "important social responsibility . . . to guarantee a stable oil supply" for the state, without regard to profits and losses.[6]

To this day, Sinopec's core functions remain governmental.  Sinopec is working to formulate and implement national energy security policies and strategies, including the "Four Revolutions and One Cooperation" energy security strategy recently espoused by President Jinping Xi.[7]  At a 2020 conference held by the PRC National Energy Ministry at Sinopec's headquarters, Sinopec's Chairman stated that, "over the past two years, [Sinopec] has implemented the new energy security strategy . . . proposed by [President Xi]," and that Sinopec would continue to implement "the seven-year action plan and the construction goals of natural

---

[4] Pierce Decl. ¶ 3 & Ex. B thereto, at 94 ("In 1983 the State Council established the China Petrochemical Corporation, more commonly known as Sinopec Group, in order to consolidate the processing and distribution of petroleum products.  The refining and petrochemical assets from the [Ministry of Petroleum Industry] and the chemical enterprises from the Ministry of Chemical Industry and synthetic fibre [sic] manufacturing from the Ministry of Textile Industry were brought together to create Sinopec.").

[5] Id. at 94-95 ("Sinopec should not be considered [a] standard [state-owned enterprise], since [it was] placed under the direct supervision of the State Council and tasked to perform the administrative functions of [its] predecessor line ministries.  In addition, [it] also inherited bureaucratic rank, and [was] not simply [a] market participant[], but also functioned as [a] market regulator[].").

[6] Pierce Decl. ¶ 4 & Ex. C thereto, at 154 ("The most important social responsibility that the NOCs must fulfil is to guarantee a stable oil supply.  In doing so company profits may be sacrificed.").

[7] Pierce Decl. ¶ 17 & Ex. P thereto.

gas production, supply, storage and marketing."[8]  Indeed, Sinopec's international expansion—including through SIPC—serves to further national interests, including securing a stable energy supply.[9]

There is additional evidence that Sinopec is so extensively managed and controlled by the government that it should be considered part of the PRC itself.  Sinopec's Articles of Association indicate that it has internal government organizations—called "Party organizations"—that "play the role of the leadership core and political core" in the entity.[10]  All major corporate and operational decisions are controlled by the government through the Party organization, including appointments to Sinopec's leadership and management[11]:  In 2011, the Communist Party of China ("CCP") "reshuffled" executives among the PRC's energy-related agencies or instrumentalities, including Sinopec,[12] and in January 2020, the Communist Party's Central Organization Department, which is responsible for the appointment of political leaders at the provincial/ministry-level or above, appointed the Chairman of Sinopec's Board of Directors.[13] Under Chinese law, Sinopec is classified as a "central" state-owned enterprise deemed

---

[8] *Id.*
[9] Pierce Decl. ¶ 4 & Ex. C thereto, at 149, 166 (describing the international expansion of China's national oil companies like Sinopec and the role of these companies in "guarantee[ing] China a stable supply of energy").
[10] Pierce Decl. ¶ 7 & Ex. F thereto.  Article 9 of Sinopec's Articles of Association states, "In accordance with the Company Law and the Constitution of the Communist Party of China (the 'Party'), the Company hereby set up Party organizations and related working organs, and maintain an adequate level of staffing to handle Party affairs as well as sufficient funding necessary for the activities of the Party organizations. The Party organizations play the role of the leadership core and political core in the Company."
[11] *Id.*  Article 110 of Sinopec's Articles of Association states, "When making decisions on significant matters such as direction of reform and development, key objectives, and priority operational arrangements of the Company, the board of directors should seek advice from the Party organization. When the board of directors appoints the management personnel of the Company, the Party organization shall consider and provide comments on the candidates for management positions nominated by the board of directors or the president, or recommend candidates to the board of directors and/or the president."
[12] Pierce Decl. ¶ 8 & Ex. G thereto, at 3.
[13] Pierce Decl. ¶ 18 & Ex. Q thereto.

11

strategically important to China's national security and economic development and subject to special regulation and control by the Chinese government.[14]

b.    CCKI and CRYI Appear to Be Part of the PRC or Political Subdivisions of the PRC

Although information regarding SIPC's other shareholders is not publicly available, UNI-TOP has reason to believe that CCKI and/or CRYI are similarly controlled by the Chinese government to such an extent that they exercise governmental rather than solely commercial functions. CCKI is a wholly-owned subsidiary and the alter ego of China Chengtong Holdings Group Co. Ltd., a state-owned and state-controlled entity that is wholly owned and directly managed by SASAC.[15] Indeed, in July 2019, SASAC appointed the Director of the Board and Deputy Secretary of the Party Committee of China Chengtong Holdings Group,[16] who UNI-TOP has reason to believe serves as the General Manager of CCKI. CRYI is also a wholly-owned subsidiary and the alter ego of China Reform Holdings Co. Ltd., another state-owned and state-controlled holding company that is wholly owned and directly managed by SASAC.[17]

Like Sinopec, both China Chengtong Holdings Group Co. Ltd. and China Reform Holdings Co. Ltd. are classified under PRC law as "central" state-owned entities deemed strategically important to China's national security and economic development and subject to special regulation and control by the Chinese government.[18] If these "central" state-owned

---

[14] Declaration of Xuehua Wang, ¶¶ 5-8 & Ex. A-D, G thereto ("Wang Decl."), attached hereto as Ex. 2. "Central" entities are subject to special regulations whose investment decisions are subject to the approval of the SASAC and must follow "the national development strategy."

[15] Pierce Decl. ¶ 9 & Ex. H thereto.

[16] Pierce Decl. ¶ 19 & Ex. R thereto ("Comrade LI Hongfeng was appointed Director and Deputy Secretary of the Party Committee of China Chengtong Holdings Group Co., Ltd. . . .").

[17] Pierce Decl. ¶ 10 & Ex. I thereto.

[18] Wang Decl. ¶¶ 5-8 & Ex. A-D, G thereto. "Central" entities are subject to special regulations whose investment decisions are subject to the approval of the SASAC and must follow "the national development strategy." There are

entities are found to be part of the PRC or its political subdivisions, and CCKI and CRYI are the

alter egos or agents of those entities, then CCKI and CRYI would also be considered part of the

PRC or its political subdivisions, thus qualifying SIPC under the majority ownership prong of

the FSIA.

Further support for UNI-TOP's line of inquiry can be found in public commentary on the

Chinese economic system.  Such commentary describes the Chinese state's model of wholly

state-owned entities holding shares in second-tier corporate entities as an "economic order that

often looks capitalist but is controlled by—and designed to serve—the Communist Party" that

lies at the heart of the Chinese government.[19]  This would appear to describe the structures being

used with Sinopec, CCKI, CRYI, and SIPC to disguise the extent to which these entities are

controlled by the Chinese government and integrated in the governmental apparatus of the

Chinese state.  It is highly likely that CCKI and CRYI exercise governmental functions similar to

those exercised by Sinopec, China Chengtong Holdings Group Co. Ltd. and China Reform

Holdings Co. Ltd, making SIPC majority-owned by political subdivisions of the PRC.[20]

Based upon public commentary, knowledge of the Chinese state, and information it has

been able to gather from public sources, UNI-TOP has a "good-faith belief" that discovery will

enable it to establish jurisdiction under the FSIA.  *Caribbean Broad. Sys.*, 148 F.3d at 1090.  It

also has a reasonable and "nonconclusory basis for asserting jurisdiction" under the majority

_____

specific measures issued by SASAC governing the administration of subsidiaries solely-funded and controlled by
"central" entities.
[19] Pierce Decl. ¶ 11 & Ex. J thereto.
[20] It is also possible that CCKI and/or CRYI are alter egos of their respective holding companies, which themselves
are part of the PRC or are otherwise political subdivisions of the PRC.  This means that the holding companies'
"foreign state" status under the FSIA would transfer to CCKI and/or CRYI, making SIPC majority-owned by
political subdivisions of the PRC.

ownership prong of Section 1603(b)(2).  *Intelsat Global Sales & Mktg.*, 534 F. Supp. 2d at 34.

UNI-TOP is therefore entitled, before filing its opposition to SIPC's Motion to Dismiss, to take

jurisdictional discovery to test SIPC's factual assertions and obtain additional facts regarding

SIPC and the governmental entities that own and control it.

> 2.      *UNI-TOP Has A Good-Faith Belief That SIPC May Be an "Organ" of the*
> *PRC or Its Political Subdivisions*

Under the FSIA, the Court may also exercise jurisdiction over SIPC as an agency or

instrumentality if it is an "organ" of the foreign state or its political subdivision.  28 U.S.C. §

1603(b)(2).  The D.C. Circuit has not adopted a definitive test to determine whether an entity is

an organ of the foreign state, but at least one court in this district has cited the multifactor test

used by the Second and Ninth Circuits to determine whether an entity is an organ of a foreign

state.  *See Intelsat Global Sales & Mktg.*, 534 F. Supp. 2d at 35 (citing *Peninsula Asset Mgmt. v.*

*Hankook Tire Co.*, 476 F.3d 140, 143 (2d Cir. 2007); *EIE Guam Corp. v. Long Term Credit Bank*

*of Japan, Ltd.*, 322 F.3d 635, 640 (9th Cir. 2003)).  Under this test, the court should consider:

1) Whether the foreign state created the entity for a national purpose;
2) Whether the foreign state actively supervises the entity;
3) Whether the foreign state requires the hiring of public employees and pays their salaries;
4) Whether the entity holds exclusive rights to some right in the foreign country; and
5) How the entity is treated under foreign state law.

*See Intelsat Global Sales & Mktg.*, 534 F. Supp. 2d at 35.  SIPC relies on these same factors in

its Motion to Dismiss, but rejects or ignores UNI-TOP's asserted facts and then makes self-

serving and conclusory factual assertions of its own in an effort to defeat this Court's

jurisdiction.  But, as discussed below, UNI-TOP is aware of and has alleged facts that contradict

SIPC's allegations as to each of these factors.  UNI-TOP is entitled to jurisdictional discovery

14

going to such disputed facts, particularly given that many of the disputed facts are "peculiarly within the knowledge of [SIPC]."  *Crist v. Republic of Turkey*, 995 F. Supp. 5, 12 (D.D.C. 1998).

a.      Created for a National Purpose

SIPC asserts that it does not conduct governmental activities and instead engages "exclusively" in commercial functions, Dkt. 26-1 at 11, but there is evidence indicating that SIPC was established by governmental decree precisely in order to serve a national purpose. UNI-TOP believes that there are documents in SIPC's possession, custody, or control showing that government approval was given for the establishment of SIPC by way of a governmental decree issued by the PRC's Ministry of Commerce.  UNI-TOP does not have access to such documents because they are not publicly available, but publicly available documents do show that SIPC was established in 2001 to be Sinopec's "***sole gateway***" for overseas upstream oil and gas activity.[21]  If, in fact, SIPC is a part of Sinopec or treated as such, that would be sufficient to establish jurisdiction under the FSIA.

Moreover, publicly available documents indicate that SIPC plays a key role in Sinopec's implementation of national energy security policies, including President Xi's recently announced "one cooperation" strategy.[22]  In March 2020, Sinopec's Chairman reportedly visited SIPC's headquarters to ensure its cooperation in implementing Sinopec's "one cooperation" strategy,[23]

---

[21] Pierce Decl. ¶ 6 & Ex. E thereto.  According to page 78 of Ex. E, "In an internal document, Sinopec Group defined SIPC as follows: 1. The strategic management unit of Sinopec Group's overseas upstream investment and operations, 2. The profit center responsible for managing both Sinopec Group's overseas investment and its overseas operations, 3. The sole specialized company within the Sinopec Group that engages in overseas upstream oil and gas E&P [exploration and production] and centralizes the management of overseas investment and overseas projects, and 4. SIPC centralizes the management of all matters concerning Sinopec Group's overseas upstream E&P."
[22] Pierce Decl. ¶ 20 & Ex. S thereto.
[23] *Id*. ("Chairman Zhang Yuzhuo asked us to **bear the main responsibility of Sinopec to implement the new strategy of energy security, especially "One Cooperation"** when he went to SIPC to investigate." (emphasis added)).

15

and in January 2021, Sinopec sent a letter to SIPC emphasizing SIPC's role as the "practitioner" in implementing the "one cooperation" strategy abroad.[24]  As stated previously, SIPC's own website acknowledges that SIPC serves under the "leadership" of the "SINOPEC Group," which also "formulated the blueprint for SIPC" in service of the Chinese state's "middle and longterm deployment of the 14th Five-Year Plan."[25]

In addition, Sinopec itself has admitted in prior proceedings that SIPC conducts activities for a national purpose.  In a letter addressed to the Beijing Fourth Intermediate Court during the proceedings to set aside the CIETAC Award, Sinopec stated that SIPC's acquisition of PK shares—which was the subject matter of the arbitration—involved "hundreds of millions of ***state-owned assets,***" and stated that the court needed to "safeguard the security of state-owned assets," because the enforcement of the CIETAC Award would result in "a serious loss of state-owned assets and serious damage to the system."[26]  These admissions provide further evidence that SIPC was created for, and still serves, a national purpose that is important to the Chinese state, and that Sinopec is ultimately in control of SIPC's operations and functions.

Given the foregoing facts gathered from public sources, UNI-TOP requires jurisdictional discovery in order to supplement and further develop its jurisdictional allegations, including for example the circumstances surrounding SIPC's creation, the nature and extent of the Chinese state's involvement in SIPC's creation, and the extent to which SIPC is responsible for governmental and non-commercial functions.  These are facts that are within SIPC's knowledge

---

[24] Pierce Decl. ¶ 21 & Ex. T thereto ("As the main force in the upstream of overseas, the Sinopec International Petroleum Exploration and Production Corporation bears the important responsibility of consolidating 'one foundation,' and is also the practitioner of 'one cooperation' in the new strategy of energy security.").
[25] Pierce Decl. ¶ 2 & Ex. A thereto.
[26] Wang Decl. ¶ 9 & Ex. E thereto.

and can be obtained only through discovery.  UNI-TOP believes in good faith that such

discovery would enable it to establish SIPC's status as an organ of the PRC.

                b.       Active Supervision by the State

      SIPC asserts that it operates independently of any involvement, supervision, or control by

the Chinese state.  *See* Dkt. 26-1 at 4.  Yet, its own website says the opposite, acknowledging

that it answers to the state's "leadership," adheres to the state's "blueprint for SIPC," and

dutifully follows the state's "14th Five-Year Plan." [27]  According to SIPC's Articles of

Association, which are contained in Exhibit 1 of its Motion to Dismiss, *see* Dkt. 26-2, SIPC

maintains an organizational structure that apparently allows for control by the Communist Party

and the Chinese government.  According to its Articles of Association, SIPC is governed by a

"Party Committee"[28] that holds "a ***core political role in the Company***, sees to it that it stays on

the right path, bears in mind the big picture, and ensures the implementation of the relevant

work."[29]

      SIPC's Articles of Association further provide that the Party Committee will "safeguard

and oversee the ***implementation of the principles and policies of the Party and the state within

the Company***, and [] implement the major strategic decisions of the Party Central Committee

---

[27] Pierce Decl. ¶ 2 & Ex. A thereto.

[28] According to a 2012 Investigative Report into Chinese telecommunications companies by the Permanent Select Committee on Intelligence of the U.S. House of Representatives, "it is through these [Party] Committees that the Party exerts influence, pressure, and monitoring of corporate activities.  In essence, these Committees provide a shadow source of power and influence directing, even in subtle ways, the direction and movement of economic resources in China."  Pierce Decl. ¶ 12 & Ex. K thereto.

[29] Dkt. 26-2, Articles of Association of SINOPEC Int'l Petroleum Exploration and Production Corporation ("SIPC's Articles of Association"), Article 7 ("In accordance with the Constitution of the Communist Party of China, the Company sets up Party organizations and related working organs, and maintains an adequate level of staffing to handle Party affair, guarantees working funds of the Party organizations and provides necessary conditions for the activities of the Party Organizations.  The Party Committee has a ***core political role in the Company, sees to it that it stays on the right path, bears in mind the big picture,*** and ensures the implementation of the relevant work." (emphasis added)).

and the State Council . . . ."[30]  SIPC's Board of Directors must "seek advice from the Party

Committee . . . in advance when deciding major issues of the Company" and "when selecting

members in the special committees."[31]  Thus, contrary to SIPC's self-serving assertions designed

to avoid jurisdiction in this Court, SIPC's own Articles of Association confirm that it does not

operate independently of the Chinese state.  Rather, as the Articles of Association appear to

show, the Chinese state exercises substantial control and supervision over SIPC.

In addition to SIPC's Articles of Association, UNI-TOP has knowledge and evidence of

the Chinese state's active involvement in, and supervision of, SIPC.  In recent years, the central

government's Communist Party Organization Department has appointed Sinopec's Party

Committee, members of which hold key managerial roles within SIPC.[32]  In addition, in July

2019, the Chinese State Council appointed the Chairman of the Board of Directors of CCKI's

holding company, who later that month was appointed Chairman of SIPC's Board of Directors.[33]

According to commentary, senior management of subsidiaries are often "circumscribed by the

holding company," which can allow the "central party-state" to "impose centralised [sic], top-

down authority."[34]  This means that it is possible for other government-appointed leaders within

SIPC's shareholders like Sinopec to also be channels of state supervision within SIPC.  UNI-

TOP also has reason to believe that the Chinese government actively supervises SIPC's overseas

---

[30] *Id*., Article 15.
[31] *Id*., Articles 28-29.
[32] Pierce Decl. ¶ 22 & Ex. U thereto.
[33] Pierce Decl. ¶ 19 & Ex. R thereto ("Pursuant to the decision of SASAC's the Party Committee, comrade ZHU Bixin was appointed as the Secretary of the Party Committee and Chairman of China Chengtong Holdings Group Co., Ltd. . . ."); Pierce Decl. ¶ 23 & Ex. V thereto ("The board of directors elected ZHU Bixin as the company's new chairman . . . .").
[34] Pierce Decl. ¶ 13 & Ex. L thereto, at 71.

18

oil and gas investments, which are subject to approval from the National Development and Reform Commission (NDRC)—an agency of the Chinese State Council.

Moreover, UNI-TOP has seen specific evidence of direction by the PRC of SIPC's conduct.  During the CIETAC arbitration proceedings, SIPC produced meeting minutes showing that the NDRC "coordinate[d]" SIPC's acquisition of PK shares.[35]  Jurisdictional discovery would permit UNI-TOP to confirm the nature and extent of the Chinese state's active supervision of SIPC.

c.      Hiring and Payment of Public Employees

SIPC asserts that it is not financed by the Chinese government, and that its employees are not paid by the State Council.  *See* Dkt. 26-1 at 5.  But, UNI-TOP has reason to believe that there may be public (or publicly appointed) employees in key positions within SIPC.  For example, SIPC's Articles of Association suggest that the Party Committee may play a critical role in the hiring of certain key employees.[36]  Moreover, as discussed, members of Sinopec's Party Committee, which is selected by the PRC's central government, likely hold managerial roles in SIPC.[37]  UNI-TOP also has reason to believe that SIPC's leaders have political rank, enjoy benefits provided by the state, and are subject to the supervision of the Party Commission for Discipline Inspection.[38]  In addition, it is possible that SIPC, which is indirectly wholly owned by the Chinese government, receives (or has received) funding, investment, or other support

---

[35] Wang Decl. ¶ 10 & Ex. F thereto ("On March 21 2006, Comrade ZHANG Yuqing of the Energy Bureau of the National Development and Reform Commission (NDRC) called for a special meeting to coordinate the transfer of shares in PK Company between China National Petroleum Corporation (CNPC) and Sinopec Group (Sinopec).").
[36] Dkt. 26-2, SIPC's Articles of Association, Articles 29 ("The Board of Directors shall seek advice from the Party Committee when selecting members in the special committees.").
[37] Pierce Decl. ¶ 22 & Ex. U thereto.
[38] Wang Decl. ¶ 12 & Ex. H thereto.

from the foreign state through its shareholders or others.  Jurisdictional discovery into SIPC's

sources of funding and hiring and employment practices is necessary to determine whether SIPC

hires public employees or pays its employees with government funding.

        d.      Holding of Exclusive Rights

It is likely that SIPC holds exclusive rights in the PRC.  As discussed above, SIPC and

Sinopec have asserted in prior proceedings that SIPC holds state-owned assets.  Indeed, Sinopec

relied on SIPC's status as a holder of state-owned assets as a basis to demand preferential

treatment from a Chinese court—the Beijing Fourth Intermediate Court—after the issuance of

the CIETAC Award.[39]  As noted, in those proceedings, Sinopec asserted on behalf of SIPC that

the court should pay special attention to the need to "safeguard the security of state-owned

assets" and prevent a "serious loss of state-owned assets."[40]  Moreover, given SIPC's role as

instrument of the state in advancing the state's oil and energy interests, it is likely that SIPC

holds exclusive rights in the PRC, including under PRC law.  Jurisdictional discovery is

necessary to determine these jurisdictionally relevant facts.

        e.      Treatment of SIPC under Chinese Law

UNI-TOP believes it is likely that SIPC receives special treatment under Chinese law.

As discussed above,  Sinopec has asserted in prior proceedings that SIPC holds state-owned

assets and that the issues in the CIETAC arbitration involved the "security of state-owned

assets"—and demanded preferential treatment from the Beijing Fourth Intermediate Court on

that basis.[41]  In addition, there is sufficient evidence, already discussed, indicating that SIPC does

---

[39] Wang Decl. ¶ 9 & Ex. E thereto.
[40] *Id*.
[41] *Id*.

20

not operate independently of the Chinese government's direction or supervision.[42]  Therefore, jurisdictional discovery is needed to shed light on how SIPC is treated under Chinese law *in practice*.

In sum, UNI-TOP holds a good-faith, and well-grounded, belief that SIPC is an "organ" of the Chinese state for purposes of the FSIA.  Courts have permitted jurisdictional discovery in circumstances very similar to these where the key jurisdictional question involved a defendant's status as an organ.  *See, e.g., Helmerich & Payne Int'l Drilling Co.*, 185 F. Supp. 3d at 247-48. Particularly where so much of the information is "peculiarly within the knowledge of the party against whom discovery is sought," *Crist*, 995 F. Supp. at 12, the Court must permit UNI-TOP to conduct jurisdictional discovery in order to "secure and present evidence relevant to the existence of jurisdiction," *Phoenix Consulting*, 216 F.3d at 40.

3.    *UNI-TOP Has A Good-Faith Belief That SIPC May Be an Alter Ego of One of Its Shareholders, Which Is a "Foreign State" Under the FSIA*

Additionally, the Court may exercise jurisdiction over SIPC on the ground that it is an alter ego of one of its shareholders, which itself is part of the foreign state, its political subdivision, or its agency or instrumentality.[43]  The test for jurisdiction "under an alter ego theory" is whether "the parent company so dominate[s] the subsidiary corporation as to negate its separate personality." *Mazza v. Verizon Washington DC, Inc.*, 852 F. Supp. 2d 28, 41 (D.D.C.

---

[42] *See* discussion *supra* Part I.B.2.b.

[43] Sinopec is a "foreign state" according to the definition in the FSIA.  *See* 28 U.S.C. § 1603(b).  Even if there were insufficient evidence establishing that Sinopec is part of the PRC or its political subdivision through jurisdictional discovery, Sinopec is at least an agency or instrumentality because it is wholly owned by the Chinese State Council. *See* Dkt. 26-1 at 3.  Similarly, although there is limited public information available on SIPC's other two shareholders, as explained above, UNI-TOP believes in good faith that CCKI and/or CRYI may also qualify as political subdivisions, or at the very least agencies or instrumentalities under their own organ analyses or as alter egos of their respective holding companies, which are themselves political subdivisions, agencies, or instrumentalities wholly owned by the PRC.

2012) (internal quotations omitted).  In this Circuit, establishing an alter ego relationship

between corporate entities requires showing that (1) there is "such unity of interest and

ownership that the separate personalities of the [two entities] no longer exist," and that (2) failure

to disregard the corporate forms will "present an element of injustice or fundamental unfairness."

*Labadie Coal Co. v. Black*, 672 F.2d 92, 96-99 (D.C. Cir. 1982).  As to the first element, courts

look to a number of factors that indicate whether corporate formalities to maintain separate

identities have been followed.  These factors include:

1) The nature of the corporate ownership and control;
2) Failure to maintain corporate minutes or adequate records;
3) Failure to maintain the corporate formalities;
4) A commingling of funds and other assets;
5) Diversion of corporate funds or assets to other uses; and
6) Use of the same office or business location

*Id*. at 97-99.  As noted above, SIPC states that it "operates independently, no different from

privately held companies" and that its Articles of Association "establish[] SIPC as an

'independent legal identity.'"  Dkt. 26-1 at 4.  However, as this memorandum has already made

clear, what is written on paper does not accurately reflect what is done in practice.

As discussed, Sinopec and SIPC share overlapping—if not identical—interests.  SIPC

was established as Sinopec's "sole gateway" for overseas oil and gas activity,[44] and appears

active and essential in implementing Sinopec's state-directed energy security strategies.[45]  Even

though Sinopec purports to own 30 percent of SIPC's shareholder rights, that assertion has not

yet been tested through discovery.  Moreover, regardless of the percentage of SIPC shares it

holds, the Chinese state and/or Sinopec may, given SIPC's purpose, exercise control over SIPC,

---

[44] Pierce Decl. ¶ 6 & Ex. E thereto.
[45] *See* discussion *supra* Part I.B.2.a.

without regard to the number or percentage of shares held.  Indeed, UNI-TOP has reason to believe that, prior to 2016, when CCKI and CRYI became joint shareholders, Sinopec's internal Party organization selected SIPC's managerial roles.[46]  Public sources indicate that members of SIPC's senior management concurrently held senior management roles in Sinopec.[47]  Today, Sinopec likely continues to exercise extensive control and disproportionate ownership in SIPC through legacy personnel or management structures that have remained in place since 2016.  As recently as August 2020, members of Sinopec's Party organization reportedly visited SIPC to announce the appointment and resignation of SIPC's senior managers.[48]

SIPC has also received significant financial support from Sinopec.  According to SIPC's own Articles of Association, Dkt. 26-2, Sinopec has "contributed RMB 110.405904 billion in cash," which is 90.42 percent of SIPC's total registered capital.  In addition, UNI-TOP has reason to believe that SIPC may conduct business operations on Sinopec's property.  This not only indicates Sinopec's high level of investment in and control over SIPC, but also suggests a sharing of funds and assets between the two entities.

Although UNI-TOP has more limited information on CCKI and CRYI, especially regarding their relationship and interactions with SIPC, there is some indication that these shareholders also exercise a high degree of control that goes beyond the expected level of control between a shareholder and its owned entity.  In July 2019, the Chinese State Council appointed the Chairman of the Board of Directors of CCKI's state-owned holding company, China

---

[46] Pierce Decl. ¶ 24 & Ex. X thereto.

[47] *See, e.g.,* Pierce Decl. ¶ 25 & Ex. Y thereto.

[48] Pierce Decl. ¶ 26 & Ex. Z thereto ("LI Yong, member of the party group and deputy general manager of the Sinopec Group went to the SIPC, on behalf of the party group of the Corporation, to announce the decision on the adjustments of the leading group of the SIPC.").

Chengtong Holdings Group Co. Ltd., who was shortly thereafter appointed Chairman of SIPC's Board of Directors.[49]  There may be additional crossover in leadership between SIPC and its shareholders that indicates a lack of corporate separateness.  Clearly, it would be unjust to allow SIPC to escape this Court's jurisdiction under the FSIA because, on paper, it purports to be separate from its shareholders while, in practice, it operates and is governed in unison with one of its shareholders.  UNI-TOP seeks, through the proposed jurisdictional discovery, additional information on SIPC's management and operations, and its relationship to its shareholders, that may establish an alter ego relationship between SIPC and its shareholders.

4.      *SIPC Is Likely to Be an Agent of the PRC, Such That It Is Not Entitled to Due Process Protections*

In the D.C. Circuit, whether an agency, instrumentality, or organ is entitled to constitutional due process turns on whether the foreign state exercises "sufficient control [over the agency or instrumentality or organ] . . . to create a relationship of principal to agent."  *TMR Energy Ltd. v. State Prop. Fund of Ukraine*, 411 F.3d 296, 301 (D.C. Cir. 2005) (quoting *Foremost–McKesson v. Islamic Republic of Iran*, 905 F.2d 438, 446-47 (D.C. Cir. 1990)).  If the foreign state exerts sufficient control over the entity to create an agency relationship, "then there is no reason to extend to the [entity] a constitutional right that is denied to the sovereign itself."  *Id.*

SIPC contends that it is separate from the PRC and thus enjoys due process protections, *see* Dkt. 26-1 at 19-20, but UNI-TOP has a good-faith belief based upon the information above—most notably, evidence of the central government's control over SIPC's activities,

---

[49] *See supra* note 33.

including the investment at issue in this dispute—that, with jurisdictional discovery, UNI-TOP

will be able to establish a principal-agent relationship between SIPC and the PRC, such that

SIPC will not be entitled to due process protections that would require a separate minimum

contacts analysis.

        5.      *Even If SIPC Were Entitled to Due Process, Jurisdictional Discovery May Reveal That SIPC Has Minimum Contacts with the United States*

        SIPC does not assert that it lacks any contacts with the United States, and it could not do

so.  SIPC's own website states that its "Organizational Structure" includes an entity called "SIPC

U.S.," which presumably refers to an entity here in the United States.[50]  Moreover, UNI-TOP

believes that SIPC has numerous contacts with the United States, including for example through

its holding of a 50 percent interest in leasehold acres held by Chesapeake Energy Corporation,

headquartered in Oklahoma City, Oklahoma,[51] and its indirect shareholdings in three entities

incorporated in Delaware.  It is possible that SIPC has other contacts with the United States that

would be revealed through jurisdictional discovery.

## II.    JURISDICTIONAL DISCOVERY SHOULD BE CONDUCTED ACCORDING TO U.S. LAW AND THE FEDERAL RULES OF CIVIL PROCEDURE

        SIPC contends that Chinese law prohibits the type of U.S. discovery that is necessary to

determine dispositive jurisdictional facts and decide SIPC's Motion to Dismiss for lack of

jurisdiction.  SIPC contends that jurisdictional discovery should proceed, if at all, only through

the Hague Evidence Convention and not under the Federal Rules of Civil Procedure.  SIPC is

wrong on both counts.  First, the Chinese law cited by SIPC says nothing that prohibits UNI-

---

[50] Pierce Decl. ¶ 14 & Ex. M thereto.
[51] Pierce Decl. ¶ 15 & Ex. N thereto.

TOP from requesting and taking jurisdictional discovery under the Federal Rules of Civil

Procedure in U.S. court proceedings.  Nor does it prohibit SIPC from producing discovery in the

United States under U.S. rules.  Second, SIPC cannot carry its burden of demonstrating that

discovery should proceed under the Hague Evidence Convention, in part because that process

would be slower, more burdensome, and ultimately ineffective given the likelihood that the PRC

will prevent UNI-TOP from obtaining the necessary information from an entity that the PRC

itself appears to control.

### A. Chinese Law Does Not Preclude the Court from Ordering Jurisdictional Discovery According to the Federal Rules of Civil Procedure

SIPC relies on Article 277 of the Civil Procedure Law of the Peoples' Republic of China

("PRC Article 277"), as the basis for its insistence that discovery should only proceed pursuant

to the Hague Evidence Convention.  But PRC Article 277—by its terms—does not apply in these

circumstances.[52]  Section 1 of PRC Article 277 applies to requests for "judicial assistance" from

Chinese courts, which are not at issue here.  Section 2 refers to the investigation or collection of

evidence from U.S. citizens in the PRC, which also is not at issue here.  Finally, Section 3 bars

---

[52] Article 277 of the Civil Procedure Law of the PRC reads:

> Any request for judicial assistance shall be made through channels prescribed by [relevant] international treaties concluded or acceded to by the People's Republic of China; or in the absence of such a treaty, any request for judicial assistance shall be made through diplomatic channels.

> A foreign embassy or consulate in the People's Republic of China may serve process on and investigate and collect evidence from its citizens but shall not violate the laws of the People's Republic of China and shall not take compulsory measures.

> Except for the circumstances in the preceding paragraph, no foreign authority or individual shall, without permission from the competent authorities of the People's Republic of China, within the territory of the People's Republic of China, serve process or investigate and collect evidence.

Pierce Decl. ¶ 16 & Ex. O thereto.

foreign parties from engaging in certain activities "within the territory" of China, which likewise is not an issue here.  SIPC is not a "foreign" party in China, and UNI-TOP is not acting within Chinese territory.[53]  Thus, UNI-TOP's motion for jurisdictional discovery does not even implicate PRC Article 277, much less propose any discovery that PRC Article 277 purports to prohibit.  Instead, UNI-TOP seeks to take reasonable and lawful discovery from a Chinese entity under U.S. rules in a U.S. litigation proceeding.

In any case, to the extent SIPC is concerned that it might violate PRC Article 277 to produce documents in China, answer interrogatories in China, respond to requests for admissions in China, or sit for depositions in China, those concerns can be addressed by conducting such activities outside of China.  SIPC's website indicates that its organizational structure includes SIPC entities or offices in more than twenty-five countries, including the United States.  Nothing in PRC Article 277 would prohibit SIPC from producing discovery in the United States or in any of these other locations, pursuant to the Federal Rules of Civil Procedure.

But even if SIPC's participation in discovery under the Federal Rules of Civil Procedure were somehow proscribed by PRC Article 277, the U.S. Supreme Court has held that foreign blocking statutes "do not deprive an American court of the power to order a party subject to its

---

[53] Commentary on PRC Article 277 indicates that the Chinese term used for "investigate or collect evidence" in Section 3 of PRC Article 277 refers to investigation or collection *by a Chinese court or authority*, or one that is conducted *with the support of a Chinese court or authority*.  *See id*. at 194 ("Put another way, in Chinese civil procedure, *diaocha quzheng* ('to investigate and collect evidence') ordinarily does not come into play unless an adverse party petitions the court for the right to investigate and collect certain evidence from the other party or from a third party, or the PRC court on its own determines that it is necessary to investigate and collect evidence from a party or non-party so as to be able to adjudicate the case.  Chinese civil procedure makes a distinction between *diaocha quzheng* and party-collected or self-collected evidence, in Chinese, *zixing shoujide zhengju*—literally, 'evidence which is self-collected'.").  Thus, PRC Article 277 "should not be read to prohibit a Chinese party to 'self-collect' and respond to routine discovery requests in U.S. litigation—e.g. requests for production, responses to interrogatories, requests for admission and so on."  *Id.*

jurisdiction to produce evidence even though the act of production may violate that statute." *Societe Nationale Industrielle Aerospatiale v. United States Dist. Court for S. Dist. of Iowa*, 482 U.S. 522, 544 n.29 (1987).  Instead, "[t]he blocking statute [] is relevant to the court's particularized comity analysis *only to the extent that its terms and its enforcement identify the nature of the sovereign interests in nondisclosure of specific kinds of material*."  *See id.* (emphasis added); *see also id.* ("[W]hen a state has jurisdiction to prescribe and its courts have jurisdiction to adjudicate, adjudication should (subject to generally applicable rules of evidence) take place on the basis of the best information available.  Blocking statutes that frustrate this goal need not be given the same deference by courts of the United States as substantive rules of law at variance with the law of the United States." (internal quotations omitted)).

This Court has jurisdiction over SIPC to the extent necessary to determine whether it is subject to the Court's jurisdiction, *see In re Vitamins Antitrust Litigation*, 120 F. Supp. 2d 45, 49 (D.D.C. 2000), and as such, the Court has the discretion to order discovery in accordance with U.S. law and the Federal Rules of Civil Procedure, without regard to a foreign statute that—by its terms—does not prevent SIPC from producing discovery in U.S. proceedings.[54]  SIPC should not be heard to assert any "sovereign interests" in the nondisclosure of its information or the avoidance of depositions, especially now that SIPC has taken the position that it is not part of the Chinese state.  In any case, it is not clear what sovereign interests PRC Article 277 purports to protect (beyond controlling activities "within the territory"), as it does not specify any categories

---

[54] Indeed, SIPC produced information in support of its Motion to Dismiss for use in this proceeding.  It should not now be able to use PRC Article 277 to escape producing information that may not be advantageous to its position.

or types of information and instead sweeps broadly to include information of any kind.  Thus, PRC Article 277 should not be accorded any controlling weight in the Court's analysis.

###### B.       *The Court Should Not Require the Use of the Hague Evidence Convention*

The Supreme Court has held that resort to the Hague Evidence Convention is discretionary and does not preclude U.S. courts from ordering discovery from a foreign party according to the Federal Rules of Civil Procedure.  *See Societe Nationale Industrielle Aerospatiale*, 482 U.S. at 539-40 ("We conclude accordingly that the Hague [Evidence] Convention did not deprive the District Court of the jurisdiction it otherwise possessed to order a foreign national party before it to produce evidence physically located within a signatory nation.").  Rather, the Hague Evidence Convention is "one method of seeking evidence that a court may elect to employ," *id*. at 541.  Courts typically weigh at least three factors when deciding whether to use the Convention's procedures: (1) the particular facts of the case, (2) the sovereign interests, and (3) the likelihood that resort to Convention procedures will prove effective, *id*. at 544.

This balancing test has been applied to jurisdictional discovery, with the burden of proof on the party seeking to require discovery under the Hague Evidence Convention.  *See, e.g., In re Vitamins*, 120 F. Supp. 2d at 49 ("[T]he Court sees no legal barrier to exercising the discretion given to trial courts by *Aerospatiale* in cases of jurisdictional discovery."); *id*. at 52 ("Therefore, the Court will adopt the Special Master's recommendation that the burden of proof be placed on the defendants to show why, under *Aerospatiale*'s three-prong test, the Hague Convention procedures should be used in this case.").  In considering the three factors, the *In re Vitamins* court found that the balancing test weighed against resorting to the Hague Evidence Convention to conduct jurisdictional discovery and compelled jurisdictional discovery according to the

Federal Rules.  120 F. Supp. 2d at 58.  The court's analysis of the three factors in that case is instructive.

*First*, the court considered the particular facts of that case and determined that the discovery requests were reasonable, as they were "narrowly tailored," "as unintrusive as possible," and "highly relevant and crucial to the resolution of the jurisdictional questions."  *In re Vitamins*, 120 F. Supp. 2d at 52-53.  The court determined, therefore, that the burdens imposed by the particular requests did not weigh in favor of using the Hague Evidence Convention.  *Id*. at 53.

*Second*, the court analyzed the sovereign interests of both the foreign nation and the United States, and found that, because the plaintiffs there had alleged a *prima facie* basis for jurisdiction and the requests were "not the type of blind fishing expeditions of concern to these signatory nations," the foreign nation's sovereign interests would not be "unduly hampered by proceeding with jurisdictional discovery according to the Federal Rules."  *In re Vitamins*, 120 F. Supp. 2d at 54.

*Third*, the court weighed the likely effectiveness of discovery under the Hague Evidence Convention and concluded that it would be "extremely unlikely to provide efficient and effective discovery."  *In re Vitamins*, 120 F. Supp. 2d  at 54.  It reasoned that the "need for prompt resolution of these jurisdictional questions and the time and cost to both sides in dragging out this process any longer than is necessary" made jurisdictional discovery under the Federal Rules "appropriate."  *Id*.  The court seems to have accorded greater weight to the third factor in the context of jurisdictional discovery because of the need to promptly resolve threshold jurisdictional questions in order to rule on a dispositive motion and move forward with the litigation.  *See id*.

### C.      SIPC Cannot Meet Its Burden of Demonstrating That Discovery Should Proceed Under the Hague Evidence Convention

Applying the three-factor test in *In re Vitamins*, it is clear that SIPC cannot meet its burden of demonstrating that discovery should proceed under the Hague Evidence Convention rather than under the Federal Rules of Civil Procedure.

*First*, as outlined in this memorandum of law, UNI-TOP seeks only that information that is relevant to jurisdiction, as necessary to resolve contested jurisdictional facts and respond to SIPC's jurisdictional arguments. All of UNI-TOP's discovery requests will be narrowly tailored to address issues necessary to establishing jurisdiction.

*Second*, with respect to "sovereign interests," the United States' sovereign interest in controlling U.S. court proceedings and establishing and enforcing U.S. discovery rules is substantial. *See In re Air Cargo Shipping Servs. Antitrust Litig.*, 278 F.R.D. 51, 54 (E.D.N.Y. 2010) ("[T]he United States has a substantial interest in fully and fairly adjudicating matters before its courts. That interest is only realized if the parties have access to relevant discovery." (internal quotations and citations omitted)); *Strauss v. Credit Lyonnais, S.A.*, 249 F.R.D. 429, 443 (E.D.N.Y. 2008) ("It is axiomatic that the United States has a substantial interest in fully and fairly adjudicating matters before its courts." (internal quotations omitted)). While the PRC has a sovereign interest in applying PRC Article 277 to control Chinese judicial assistance and limit the "investigati[ve]" activities of foreign parties "within [Chinese] territory," neither of those interests is implicated here. As discussed, UNI-TOP has not requested Chinese judicial assistance and is not acting within Chinese territory. Moreover, SIPC is free under the law to provide discovery in U.S. court proceedings, including by going to the United States or elsewhere to produce it. And while the PRC has an interest in how judicial proceedings are

31

conducted in China, "[it] surely do[es] not have such an interest in proceedings conducted in the United States."  *Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, 105 F.R.D. 435, 449 (S.D.N.Y. 1984).

Although the *In re Vitamins* court recognized the foreign nation's interest in "protecting [its] citizens from what [it] may perceive as unduly burdensome discovery," *In re Vitamins*, 120 F. Supp. 2d at 53, the Federal Rules of Civil Procedure already incorporate rules to properly balance the interests of the parties.  Moreover, the United States has strong sovereign interests in establishing and enforcing the rules applicable in U.S. courts, as well as providing a fair and balanced judicial forum for the enforcement of foreign arbitral awards, as required by the Federal Arbitration Act and the New York Convention.  And, just as the discovery requests in *In re Vitamins* were not "blind fishing expeditions," *id.* at 54, all of UNI-TOP's requests would be narrowly tailored so as to minimize any unnecessary burdens on the PRC's asserted sovereign interests.

*Third*, as the *In re Vitamins* court and others have recognized, Convention procedures are likely to be time-consuming, burdensome, and ineffective, particularly in this instance where SIPC has already indicated that depositions will not be allowed and it is in the PRC's own interests not to allow SIPC to provide the requested information.  *See* 120 F. Supp. 2d at 54; *see also, e.g., Societe Nationale Industrielle Aerospatiale*, 482 U.S. at 542 ("In many situations the Letter of Request procedure authorized by the Convention would be unduly time consuming and expensive, as well as less certain to produce needed evidence than direct use of the Federal Rules."); *Schindler Elevator Corp. v. Otis Elevator Co.*, 657 F. Supp. 2d 525, 530-31 (D.N.J. 2009) ("It has been the experience of this and many other courts that utilization of Hague procedures are slow and cumbersome and usually take far longer than discovery procedures

under the Federal Rules . . . .  Moreover, since the deposition is focused on the crucial threshold

issue of jurisdiction, the jurisdictional deposition should be completed as soon as possible.");

*Krishna Consciousness*, 105 F.R.D. at 450 ("[A]s a number of courts have observed, the Hague

Convention machinery is quite slow and costly even when the foreign government agrees to

cooperate.").

　　In addition to the inefficient nature of Convention procedures, there are "numerous

exceptions" under the Hague Evidence Convention to providing judicial assistance that can

"potentially bar this device from being executed at all," including where the requested discovery

is "deemed prejudicial to state sovereignty."  *Pain v. United Techs. Corp.*, 637 F.2d 775, 788-89

(D.C. Cir. 1980); *see also* The Hague Convention on the Taking of Evidence Abroad in Civil and

Commercial Matters, art. 12, opened for signature Mar. 18, 1970, 23 U.S.T. 2555, 2562, T.I.A.S.

No. 7444, 847 U.N.T.S. 231, 243.  Because SIPC is likely an agency or instrumentality of the

PRC, the PRC will have an interest in shielding critical information from production in order to

avoid enforcement of an arbitral award in U.S. courts.

　　Furthermore, the PRC has publicly declared that it will impose its own discovery

standards, for example, by executing Letters of Request under the Hague Evidence Convention

only for certain documents that are "of direct and close connection with the subject matter of the

litigation."  *See* Hague Conference on Private International Law, Status Table, 20: Convention of

18 March 1970 on the Taking of Evidence Abroad in Civil or Commercial Matters, Declaration

of the PRC to the Hague Convention, https://www.hcch.net/en/instruments/conventions/status-

table/notifications/?csid=493&disp=resdn.  Under these circumstances, there is a substantial risk

that the PRC's Central Authority would refuse to execute, or severely limit the scope of, any

request under the Convention made by UNI-TOP.  It could refuse discovery, for example, on the

33

ground that issues relevant to jurisdiction in the United States do not have a "direct and close connection" to the subject matter of the proceedings, *i.e.*, the enforcement of the CIETAC Award.  For these reasons, the Hague discovery process would not likely yield the information necessary to decide the jurisdictional issues in dispute and would therefore be ineffective. Jurisdictional discovery should proceed instead under the Federal Rules of Civil Procedure, which will ensure that the disputed jurisdictional issues are resolved effectively and in accordance with U.S. law.

## CONCLUSION

As described above, UNI-TOP has a reasonable and non-conclusory basis for asserting the Court's personal and subject matter jurisdiction, and a good-faith belief that jurisdictional discovery will supplement the facts needed to establish jurisdiction.  Even without the benefit of discovery, there are already substantial indications that SIPC is an agency, instrumentality, or organ of the PRC for purposes of the FSIA, and thus subject to this Court's jurisdiction. However, SIPC contests the jurisdictional facts alleged by UNI-TOP, such that the Court must "go beyond the pleadings and resolve any disputed issues of fact the resolution of which is necessary to a ruling upon the motion to dismiss."  *Phoenix Consulting*, 216 F.3d at 40.

Given the D.C. Circuit's "liberal" standard for allowing jurisdictional discovery, this Court should order jurisdictional discovery for the purpose of resolving factual disputes and identifying additional facts that are relevant to jurisdiction under the FSIA.  In addition, jurisdictional discovery should be conducted under the Federal Rules of Civil Procedure, because SIPC cannot meet its burden to show that resort to the Hague Evidence Convention is required. Accordingly, UNI-TOP respectfully requests that the Court set a schedule for jurisdictional

discovery under the Federal Rules and further stay the briefing of Respondent's Motion to Dismiss until the conclusion of such jurisdictional discovery.

Dated: April 30, 2021

Respectfully Submitted,

**WILMER CUTLER PICKERING HALE and DORR LLP**

/s/ David W. Bowker

David W. Bowker
David.Bowker@wilmerhale.com
1875 Pennsylvania Avenue, NW
Washington, DC 20006
USA
Tel: +1 202 663 6000
Fax: +1 202 663 6363

John V.H. Pierce (*pro hac vice*)
John.Pierce@wilmerhale.com
7 World Trade Center
250 Greenwich Street
New York, NY 10007
United States of America
Tel: +1 212 230 8829
Fax: +1 212 230 8888

Gary Born (*pro hac vice*)
Gary.Born@wilmerhale.com
Jonathan Lim (*pro hac vice*)
Jonathan.Lim@wilmerhale.com
49 Park Lane
London W1K 1PS
United Kingdom
Tel: +44 (0)20 7872 1000
Fax: +44 (0)20 7839 3537